No. 14-5237

# United States Court of Appeals for the Sixth Circuit

VARSITY BRANDS, INC., VARSITY SPIRIT CORPORATION, AND VARSITY SPIRIT FASHIONS & SUPPLIES, INC.,

*Plaintiffs-Appellants,*

v.

STAR ATHLETICA, L.L.C.,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Western District of Tennessee, Western Division (No. 2:10-cv-02508-RHC-cgc)

## APPENDIX TO APPELLANTS' BRIEF

Grady M. Garrison
Bradley E. Trammell
Adam S. Baldridge
Nicholas L. Vescovo
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103

*Counsel for Plaintiffs-Appellants Varsity Brands, Inc., Varsity Spirit Corporation, and Varsity Spirit Fashions & Supplies, Inc.*

June 23, 2014

# TABLE OF CONTENTS

**List of Varsity's Physical Exhibits Filed With the Court** ........................... App. 1

**Excerpt from H.R. Rep. No. 1476, 94th Cong., 2d Sess. (1976)** ............ App. 2-10

**Excerpt from Second Supplementary Register's Report on the General Revision of the U.S. Copyright Law (1975)** .......................................... App. 11-30

**LIST OF VARSITY'S PHYSICAL EXHIBITS FILED WITH THE COURT**

As set forth in Varsity's Notice of Filing Physical Exhibits, RE#171, PageID 2298-99, Notice of Filing Physical Exhibits, the following physical exhibits filed by Varsity are located in the file room in the Western District of Tennessee's Memphis courthouse on top of the exhibit cabinet:

1.	**Exhibit A** to the Declaration of Gary Spencer (Sublimated cheerleading uniforms bearing designs 0815, 078, 074, 299A and 299B);

2.	**Exhibit B** to the Declaration of Gary Spencer (Fabric displaying sublimated designs before being cut out and sewn);

3.	**Exhibit C** to the Declaration of Gary Spencer (Blank silhouette garments); and

4.	**Exhibit D** to the Declaration of Gary Spencer (Warmups and Jackets).

H.R. REP. 94-1476, H.R. Rep. No. 1476, 94TH Cong., 2ND
Sess. 1976, 1976 U.S.C.C.A.N. 5659, 1976 WL 14045 (Leg.Hist.)
**\*\*5659** P.L. 94-553, COPYRIGHTS ACT
Senate Report (Judiciary Committee) No. 94-473,
Nov. 20, 1975 (To accompany S. 22)
House Report (Judiciary Committee) No. 94-1476,
Sept. 3, 1976 (To accompany S. 22)
House Conference Report No. 94-1733,
Sept. 29, 1976 (To accompany S. 22)
Cong. Record Vol. 122 (1976)
DATES OF CONSIDERATION AND PASSAGE
Senate February 19, September 30, 1976
House September 22, 30, 1976
The House Report and the House Conference Report are set out.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 94-1476

Sept. 3, 1976

**\*1** The Committee on the Judiciary, to whom was referred the bill (S. 22) for the general revision of the copyright law, title 17 of the United States Code, and for other purposes, having considered the **\*\*5660** same, report favorably thereon with an amendment in the nature of a substitute and recommend that the bill as amended do pass.

\* \* \* \*

**\*47** PURPOSE

The purpose of the proposed legislation, as amended, is to provide for a general revision of the United States Copyright Law, title 17 of the United States Code.

STATEMENT

The first copyright law of the United States was enacted by the First Congress in 1790, in exercise of the constitutional power 'To promote the Progress of Science and useful Arts, by securing the limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries ' (U.S. Constitution, Art. I, sec. 8. Comprehensive revisions were enacted, at intervals of about 40 years, in 1831, 1870, and 1909. The present copyright law, title 17 of the United States Code, is basically the same as the act of 1909.

Since that time significant changes in technology have affected the operation of the copyright law. Motion pictures and sound recordings had just made their appearance in 1909, and radio and television were still in the early stages of their development. During the past half century a wide range of new techniques for capturing and communicating printed matter, visual images, and recorded sounds have come into use, and the increasing use of information storage and retrieval devices, communications satellites, and laser technology promises even greater changes in the near future. The technical advances have generated new industries and new methods for the reproduction and dissemination of copyrighted works, and the business relations between authors and users have evolved new patterns.

APP. 2

Between 1924 and 1940 a number of copyright law revision measures were introduced. All these failed of enactment, partly because of controversy among private interests over differences between the Berne Convention and the U.S. law. After World War II, the United States participated in the development of the new Universal Copyright Convention, becoming a party in 1955.

In that year, the movement for general revision of the U.S. copyright law was revived and the legislative appropriations act for the next 3 years provided funds for a comprehensive program of research and studies by the Copyright Office as the groundwork for such revision. There followed a period of study which produced 35 published monographs on most of the major substantive issues in copyright revision, and culminated in 1961 in the 'Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law.'

Between 1961 and 1964 there were numerous meetings and discussions under the auspices of the Copyright Office, participated in by representatives of a wide range of interests affected by the copyright law. Gradually a draft bill for general revision took shape, and toward the end of the 88th Congress, on July 20, 1964, it was introduced in both Houses. The 1964 revision bill was introduced in the House of Representatives, as H.R. 11947, and in the Senate by request, as S. 3008.

No further legislative action was taken on the revision bill during the 88th Congress, but before the opening of the 89th Congress the **\*48 \*\*5661** Copyright Office completely revised the bill in the light of the many comments that had been received. On February 4, 1965, the revised bill was introduced in both Houses: in the House as H.R. 4347, and in the Senate as S. 1006. The Copyright Office prepared a report to accompany the revised bill, and it was published in May, 1965 as 'The Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill.' Extensive hearings on the bill were held in both Houses during 1965, and the Senate hearings continued in 1966. H.R. 4347 was reported by the House Judiciary Committee on October 12, 1966 (H.R. Rep. No. 2237, 89th Cong., 2d Sess.), but the 89th Congress adjourned before further action could be taken.

At the beginning of the 90th Congress the bill, in the form in which it had been reported by the House Judiciary Committee, was again introduced in both Houses: in the House of Representatives on January 17, 1967 as H.R. 2512, and in the Senate on January 23, 1967, as S. 597. H.R. 2512 was reported by the House Judiciary Committee, without further amendment but with dissenting views, on March 8, 1967 (H.R. Rept. No. 83, 90th Cong., 1st Sess.). The bill was passed by the House of Representatives, with several important amendments, on April 11, 1967, by a vote of 379 to 29. The Senate Judiciary Subcommittee conducted further hearings on S. 597 in March and April of 1967. However, it was not possible to complete action on copyright revision in the 90th Congress because of the emergence of certain major problems, notably that of cable television.

On January 22 (legislative day January 10), 1969, S. 543 was introduced in the 91st Congress. Title I of this bill, other than for technical amendments, was identical to S. 597 of the 90th Congress. Title II of the bill incorporated the provisions of S. 2216 providing for the establishment of a National Commission on New Technological Uses of Copyrighted Works. This title was a response to concerns as to the impact of the legislation on the use of copyrighted materials in computers and other forms of information storage and retrieval systems. The Senate had passed, on October 12, 1967, a bill establishing such a Commission for the study of this subject, but there had been no action by the House on this separate legislation.

On December 10, 1969, the Senate Judiciary Subcommittee favorably reported S. 543, with an amendment in the nature of a substitute. No further action was taken in the 91st Congress primarily because of the cable television issue.

On February 18, 1971, S. 644 was introduced in the 92nd Congress. Other than for minor amendments, the text of that bill was identical to the revision bill reported by the Subcommittee in the 91st Congress. No action was taken on general revision legislation during the 92nd Congress, pending the formulation and adoption by the Federal Communications Commission of new cable television rules.

While action on the general revision bill was necessarily delayed, the unauthorized duplication of sound recordings became widespread. It was accordingly determined that the creation of a limited copyright in sound recordings should not await action

on the general revision bill. S. 646 of the 92nd Congress was introduced to amend title 17 of the U.S. Code to provide for the creation of a limited copyright in sound recordings. This bill passed the Senate on April 29, **\*49  \*\*5662** 1971, and, following hearings in June, 1971, a companion bill (H.R. 6927) passed the House with amendments on October 4, 1971 and was enacted as Public Law 92-140.

On March 26, 1973 S. 1361, for the general revision of the copyright law, was introduced in the 93rd Congress. Other than for technical amendments, this bill was identical to S. 644 of the 92d Congress. Additional copyright revision hearings were held in the Senate on July 31 and August 1, 1973.

The Senate Judiciary Subcommittee on April 19, 1974 reported S. 1361 with an amendment in the nature of a substitute. After adopting several amendments to the subcommittee bill, the Senate Judiciary Committee reported the legislation on July 8, 1974. On July 9 the measure was removed from the Senate calendar and referred to the Committee on Commerce. The Commerce Committee reported S. 1361 with additional amendments on July 29. After adopting several amendments the Senate on September 9 passed S. 1361 by a vote of 70 to 1.

Since it was doubtful that adequate time remained in the 93d Congress for consideration in the House of Representatives of S. 1361, on September 9, Senator McClellan introduced and obtained immediate consideration of S. 3976. That bill, passed on September 9, extended the renewal term of expiring copyrights, established on a permanent basis a limited copyright in sound recordings, and created in the Library of Congress a National Commission on New Technological Uses of Copyrighted Works. The House of Representatives passed the measure with amendments on December 19, 1974, and the Senate concurred in the House amendments on the same date. The President approved the bill on December 31, 1974, and it became Public Law 93-573.

At the beginning of the 94th Congress the revision bill, substantially identical to S. 1361 as passed by the Senate in 1974, was introduced in both Houses: Senator McClellan introduced S. 22 on January 15, 1975, and Chairman Robert W. Kastenmeier of the House Judiciary Subcommittee on Courts, Civil Liberties, and the Administration of Justice, introduced H.R. 2223 on January 28, 1975. S. 22 was reported, with additional views by the Senate Judiciary Committee on November 20 (legislative day, November 18), 1975, and passed the Senate unanimously, on February 19, 1976, by a vote of 97-0.

During 1975 the House Judiciary Subcommittee conducted extensive hearings on H.R. 2223, at which nearly 100 witnesses were heard. The Register of Copyrights also prepared a 'Second Supplementary Report on General Revision of the U.S. Copyright Law,' which discussed policy and technical issues of the revision legislation. Following some 22 days of public mark-up sessions in 1976 the House Subcommittee favorably reported S. 22 by a unanimous vote, on August 3, 1976 with an amendment in the nature of a substitute. The Committee on the Judiciary now reports that bill, as amended, without change.

Title II of S. 22, as passed by the Senate, represents a piece of legislation separate from the bill for general legislation. This measure was originally introduced by Chairman Edwin Willis of the House Judiciary Subcommittee in 1957, and received active consideration **\*50  \*\*5663** in both Houses during the early 1960's. It passed the Senate as separate legislation on three occasions, in 1962, 1963, and 1966. It was reintroduced in the 90th and 91st Congresses, and on December 10, 1969, the Senate Subcommittee conjoined it with the general copyright revision bill, reported it as Title III of S. 543. As a separate title of S. 1361 of the 93d Congress, and now of S. 22, the design legislation has passed the Senate on two additional occasions.

In reporting S. 22, the House Judiciary Committee has deleted Title II. Until 1954, designs for useful articles were not generally subject to copyright protection. The primary protection available was the design patent, which requires that the design be not only 'original', the standard applied in copyright law, but also 'novel', meaning that it has never before existed anywhere.

However, in 1954 the Supreme Court decided the case of Mazer v. Stein, 347 U.S. 201, in which it held that words of art which are incorporated into the design of useful articles, but which are capable of standing by themselves as art works separate from the useful article, are copyrightable. The example used in the Mazer case was an ornamental lamp base.

Title II of S. 22 as passed by the Senate would create a new limited form of copyright protection for 'original' designs which are clearly a part of a useful article, regardless of whether such designs could stand by themselves, separate from the article itself. Thus designs of useful articles which do not meet the design patent standard of 'novelty' would for the first time be protected.

S. 22 is a copyright revision bill. The Committee chose to delete Title II in part because the new form of design protection provided by Title II could not truly be considered copyright protection and therefore appropriately within the scope of copyright revision.

In addition, Title II left unanswered at least two fundamental issues which will require further study by the Congress. These are: first, what agency should administer this new design protection system and, second, should typeface designs be given the protections of the title?

Finally, the Committee will have to examine further the assertion of the Department of Justice, which testified in opposition to the Title, that Title II would create a new monopoly which has not been justified by a showing that its benefits will outweigh the disadvantage of removing such designs from free public use.

The issues raised by Title II have not been resolved by its deletion from the Copyright Revision Bill. Therefore, the Committee believes that it will be necessary to reconsider the question of design protection in new legislation during the first session 95th Congress. At that time more complete hearings on the subject may be held and, without the encumbrance of a general copyright revision bill, the issues raised in Title II of S. 22 may be resolved.

## SECTIONAL ANALYSIS AND DISCUSSION

An analysis and discussion of the provisions of S. 22, as amended, follows:

## SECTION 101. DEFINITIONS

The significant definitions in this section will be mentioned or summarized in connection with the provisions to which they are most relevant.

## *51 **5664 SECTION 102. GENERAL SUBJECT MATTER OF COPYRIGHT

### 'Original works of authorship'

The two fundamental criteria of copyright protection-- originality and fixation in tangible form-- are restated in the first sentence of this cornerstone provision. The phrase 'original works of authorship,' which is purposely left undefined, is intended to incorporate without change the standard of originality established by the courts under the present copyright statute. This standard does not include requirements of novelty, ingenuity, or esthetic merit, and there is no intention to enlarge the standard of copyright protection to require them.

In using the phrase 'original works of authorship,' rather than 'all the writings of an author' now in section 4 of the statute, the committee's purpose is to avoid exhausting the constitutional power of Congress to legislate in this field, and to eliminate the uncertainties arising from the latter phrase. Since the present statutory language is substantially the same as the empowering language of the Constitution, a recurring question has been whether the statutory and the constitutional provisions are coextensive. If so, the courts would be faced with the alternative of holding copyrightable something that Congress clearly did not intend to protect, or of holding constitutionally incapable of copyright something that Congress might one day want to protect. To avoid these equally undesirable results, the courts have indicated that 'all the writings of an author' under the present

statute is narrower in scope than the 'writings' of 'authors' referred to in the Constitution. The bill avoids this dilemma by using a different phrase-- 'original works of authorship'-- in characterizing the general subject matter of statutory copyright protection.

The history of copyright law has been one of gradual expansion in the types of works accorded protection, and the subject matter affected by this expansion has fallen into two general categories. In the first, scientific discoveries and technological developments have made possible new forms of creative expression that never existed before. In some of these cases the new expressive forms-- electronic music, filmstrips, and computer programs, for example-- could be regarded as an extension of copyrightable subject matter Congress had already intended to protect, and were thus considered copyrightable from the outset without the need of new legislation. In other cases, such as photographs, sound recordings, and motion pictures, statutory enactment was deemed necessary to give them full recognition as copyrightable works.

Authors are continually finding new ways of expressing themselves, but it is impossible to foresee the forms that these new expressive methods will take. The bill does not intend either to freeze the scope of copyrightable subject matter at the present stage of communications technology or to allow unlimited expansion into areas completely outside the present congressional intent. Section 102 implies neither that that subject matter is unlimited nor that new forms of expression within that general area of subject matter would necessarily be unprotected.

The historic expansion of copyright has also applied to forms of expression which, although in existence for generations or centuries, have only gradually come to be recognized as creative and worthy of protection. The first copyright statute in this country, enacted in 1790, **\*52 \*\*5665** designated only 'maps, charts, and books'; major forms of expression such as music, drama, and works of art achieved specific statutory recognition only in later enactments.Although the coverage of the present statute is very broad, and would be broadened further by the explicit recognition of all forms of choreography, there are unquestionably other areas of existing subject matter that this bill does not propose to protect but that future Congresses may want to.

Fixation in tangible form

As a basic condition of copyright protection, the bill perpetuates the existing requirement that work be fixed in a 'tangible medium of expression, ' and adds that this medium may be one 'now known or later developed,' and that the fixation is sufficient if the work 'can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. ' This broad language is intended to avoid the artificial and largely unjustifiable distinctions, derived from cases such as White-Smith Publishing Co. v. Apollo Co., 209 U.S. 1 (1908),[1] under which statutory copyrightability in certain cases has been made to depend upon the form or medium in which the work is fixed. Under the bill it makes no difference what the form, manner, or medium of fixation may be-- whether it is in words, numbers, notes, sounds, pictures, or any other graphic or symbolic indicia, whether embodied in a physical object in written, printed, photographic, sculptural, punched, magnetic, or any other stable form, and whether it is capable of perception directly or by means of any machine or device 'now known or later developed.'

Under the bill, the concept of fixation is important since it not only determines whether the provisions of the statute apply to a work, but it also represents the dividing line between common law and statutory protection. As will be noted in more detail in connection with section 301, an unfixed work of authorship, such as an improvisation or an unrecorded choreographic work, performance, or broadcast, would continue to be subject to protection under State common law or statute, but would not be eligible for Federal statutory protection under section 102.

The bill seeks to resolve, through the definition of 'fixation' in section 101, the status of live broadcasts-- sports, news coverage, live performances of music, etc.-- that are reaching the public in unfixed form but that are simultaneously being recorded. When a football game is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent out to the public and in what order, there is little doubt that what the cameramen and the director are doing constitutes 'authorship.' The further question to be considered is whether there has been a fixation. If the images and sounds to be broadcast are first recorded (on a video tape, fil?, etc.) and then transmitted,

the recorded work would be considered a 'motion picture' subject to statutory protection against unauthorized reproduction or retransmission of the broadcast. If the program content is transmitted live to the public while being recorded at the same time, the case would be treated the same; the copyright owner would not be forced to rely on common law rather than statutory rights in proceeding against an infringing user of the live broadcast.

**5666 Thus, assuming it is copyrightable-- as a 'motion picture' or 'sound recording,' for example-- the content of a live transmission. *53 should be regarded as fixed and should be accorded statutory protection if it is being recorded simultaneously with its transmission. On the other hand, the definition of 'fixation' would exclude from the concept purely evanescent or transient reproductions such as those projected briefly on a screen, shown electronically on a television or other cathode ray tube, or captured momentarily in the 'memory' of a computer.

Under the first sentence of the definition of 'fixed' in section 101, a work would be considered 'fixed in a tangible medium of expression' if there has been an authorized embodiment in a copy or phonorecord and if that embodiment 'is sufficiently permanent or stable' to permit the work 'to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.' The second sentence makes clear that, in the case of 'a work consisting of sounds, images, or both, that are being transmitted,' the work is regarded as 'fixed' if a fixation is being made at the same time as the transmission.

Under this definition 'copies' and 'phonorecords' together will comprise all of the material objects in which copyrightable works are capable of being fixed. The definitions of these terms in section 101, together with their usage in section 102 and throughout the bill, reflect a fundamental distinction between the 'original work' which is the product of 'authorship' and the multitude of material objects in which it can be embodied. Thus, in a sense of the bill, a 'book' is not a work of authorship, but is a particular kind of 'copy.' Instead, the author may write a 'literary work,' which in turn can be embodied in a wide range of 'copies' and 'phonorecords,' including books, periodicals, computer punch cards, microfilm, tape recordings, and so forth. It is possible to have an 'original work of authorship' without having a 'copy ' or 'phonorecord' embodying it, and it is also possible to have a 'copy' or 'phonorecord' embodying something that does not qualify as an 'original work of authorship.' Two essential elements-- original work and tangible object-- must merge through fixation in order to produce subject matter copyrightable under the statute.

Categories of copyrightable works

The second sentence of section 102 lists seven broad categories which the concept of 'works' of authorship' is said to 'include.' The use of the word 'include,' as defined in section 101, makes clear that the listing is 'illustrative and not limitative,' and that the seven categories do not necessarily exhaust the scope of 'original works of authorship' that the bill is intended to protect. Rather, the list sets out the general area of copyrightable subject matter, but with sufficient flexibility to free the courts from rigid or outmoded concepts of the scope of particular categories. The items are also overlapping in the sense that a work falling within one class may encompass works coming within some or all of the other categories. In the aggregate, the list covers all classes of works now specified in section 5 of title 17; in addition, it specifically enumerates 'pantomimes and choreographic works.'

Of the seven items listed, four are defined in section 101. The three undefined categories-- 'musical works,' 'dramatic works,' and 'pantomimes **5667 and choreographic works'-- have fairly settled meanings. There is no need, for example, to specify the copyrightability of electronic or concrete music in the statute since the form of a work would no longer be of any importance, nor is it necessary to specify that *54 'choreographic works' do not include social dance steps and simple routines.

The four items defined in section 101 are 'literary works,' 'pictorial, graphic, and sculptural works,' 'motion pictures and audiovisual works', and 'sound recordings.' In each of these cases, definitions are needed not only because the meaning of the term itself is unsettled but also because the distinction between 'work' and 'material object' requires clarification. The term 'literary works' does not connote any criterion of literary merit or qualitative value: it includes catalogs, directories, and similar factual, reference, or instructional works and compilations of data. It also includes computer data bases, and computer

programs to the extent that they incorporate authorship in the programmer's expression of original ideas, as distinguished from the ideas themselves.

Correspondingly, the definition of 'pictorial, graphic, and sculptural works ' carries with it no implied criterion of artistic taste, aesthetic value, or intrinsic quality. The term is intended to comprise not only 'works of art' in the traditional sense but also works of graphic art and illustration, art reproductions, plans and drawings, photographs and reproductions of them, maps, charts, globes, and other cartographic works, works of these kinds intended for use in advertising and commerce, and works of 'applied art.' There is no intention whatever to narrow the scope of the subject matter now characterized in section 5(k) as 'prints or labels used for articles of merchandise. ' However, since this terminology suggests the material object in which a work is embodied rather than the work itself, the bill does not mention this category separately.

In accordance with the Supreme Court's decision in Mazer v. Stein, 347 U.S. 201 (1954), works of 'applied art' encompass all original pictorial, graphic, and sculptural works that are intended to be or have been embodied in useful articles, regardless of factors such as mass production, commercial exploitation, and the potential availability of design patent protection. The scope of exclusive rights in these works is given special treatment in section 113, to be discussed below.

The Committee has added language to the definition of 'pictorial, graphic, and sculptural works' in an effort to make clearer the distinction between works of applied art protectable under the bill and industrial designs not subject to copyright protection. The declaration that 'pictorial, graphic, and sculptural works' include 'works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned' is classic language: it is drawn from Copyright Office regulations promulgated in the 1940's and expressly endorsed by the Supreme Court in the Mazer case.

The second part of the amendment states that 'the design of a useful article . . . shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately **5668 from, and are capable of existing independently of, the utilitarian aspects of the article. ' A 'useful article' is defined as 'an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information.' This part of the amendment is an adaptation of language added to the Copyright *55 Office Regulations in the med-1950's in an effort to implement the Supreme Court's decision in the Mazer case.

In adopting this amendatory language, the Committee is seeking to draw as clear a line as possible between copyrightable works of applied art and uncopyrighted works of industrial design. A two-dimensional painting, drawing, or graphic work is still capable of being identified as such when it is printed on or applied to utilitarian articles such as textile fabrics, wallpaper, containers, and the like. The same is true when a statue or carving is used to embellish an industrial product or, as in the Mazer case, is incorporated into a product without losing its ability to exist independently as a work of art. On the other hand, although the shape of an industrial product may be aesthetically satisfying and valuable, the Committee's intention is not to offer it copyright protection under the bill. Unless the shape of an automobile, airplane, ladies' dress, food processor, television set, or any other industrial product contains some element that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article, the design would not be copyrighted under the bill. The test of separability and independence from 'the utilitarian aspects of the article ' does not depend upon the nature of the design-- that is, even if the appearance of an article is determined by esthetic (as opposed to functional) considerations, only elements, if any, which can be identified separately from the useful article as such are copyrightable. And, even if the three-dimensional design contains some such element (for example, a carving on the back of a chair or a floral relief design on silver flatware), copyright protection would extend only to that element, and would not cover the over-all configuration of the utilitarian article as such.

A special situation is presented by architectural works. An architect's plans and drawings would, of course, be protected by copyright, but the extent to which that protection would extend to the structure depicted would depend on the circumstances. Purely non-functional or monumental structures would be subject to full copyright protection under the bill, and the same would be true of artistic sculpture or decorative ornamentation or embellishment added to a structure. On the other hand, where the only

elements of shape in an architectural design are conceptually inseparable from the utilitarian aspects of the structure, copyright protection for the design would not be available.

The Committee has considered, but chosen to defer, the possibility of protecting the design of typefaces. A 'typeface' can be defined as a set of letters, numbers, or other symbolic characters, whose forms are related by repeating design elements consistently applied in a notational system and are intended to be embodied in articles whose intrinsic utilitarian function is for use in composing text or other cognizable combinations of characters. The Committee does not regard the design of typeface, as thus defined, to be a copyrightable **5669 'pictorial, graphic, or sculptural work' within the meaning of this bill and the application of the dividing line in section 101.

Enactment of Public Law 92-140 in 1971 marked the first recognition in American copyright law of sound recordings as copyrightable works. As defined in section 101, copyrightable 'sound recordings' are original works of authorship comprising an aggregate of *56 musical, spoken, or other sounds that have been fixed in tangible form. The copyrightable work comprises the aggregation of sounds and not the tangible medium of fixation. Thus, 'sound recordings' as copyrightable subject matter are distinguished from 'phonorecords,' the latter being physical objects in which sounds are fixed. They are also distinguished from any copyrighted literary, dramatic, or musical works that may be reproduced on a 'phonorecord.'

As a class of subject matter, sound recordings are clearly within the scope of the 'writings of an author' capable of protection under the Constitution, and the extension of limited statutory protection to them was too long delayed. Aside from cases in which sounds are fixed by some purely mechanical means without originality of any kind, the copyright protection that would prevent the reproduction and distribution of unauthorized phonorecords of sound recordings is clearly justified.

The copyrightable elements in a sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording. There may, however, be cases where the record producer's contribution is so minimal that the performance is the only copyrightable element in the work, and there may be cases (for example, recordings of birdcalls, sounds of racing cars, et cetera) where only the record producer's contribution is copyrightable.

Sound tracks of motion pictures, long a nebulous area in American copyright law, are specifically included in the definition of 'motion pictures, ' and excluded in the definition of 'sound recordings.' To be a 'motion picture,' as defined, requires three elements: (1) a series of images, (2) the capability of showing the images in certain successive order, and (3) an impression of motion when the images are thus shown. Coupled with the basic requirements of original authorship and fixation in tangible form, this definition encompasses a wide range of cinematographic works embodied in films, tapes, video disks, and other media. However, it would not include: (1) unauthorized fixations of live performances or telecasts, (2) live telecasts that are not fixed simultaneously with their transmission, or (3) filmstrips and slide sets which, although consisting of a series of images intended to be shown in succession, are not capable of conveying an impression of motion.

On the other hand, the bill equates audiovisual materials such as filmstrips, slide sets, and sets of transparencies with 'motion pictures' rather than with 'pictorial, graphic, and sculptural works.' Their sequential showing is closer to a 'performance' than to a 'display,' and the definition of 'audiovisual works,' which applies also to 'motion pictures,' embraces works consisting of a series of related images that are by their nature, intended for showing by means of projectors or other devices.

**5670 Nature of copyright

Copyright does not preclude others from using the ideas or information revealed by the author's work. It pertains to the literary, musical, graphic, or artistic form in which the author expressed intellectual concepts. Section 102(b) makes clear that copyright protection does not extend to any idea, procedure, process, system, method of operation, *57 concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

Some concern has been expressed lest copyright in computer programs should extend protection to the methodology or processes adopted by the programmer, rather than merely to the 'writing' expressing his ideas. Section 102(b) is intended, among other things, to make clear that the expression adopted by the programmer is the copyrightable element in a computer program, and that the actual processes or methods embodied in the program are not within the scope of the copyright law.

Section 102(b) in no way enlarges or contracts the scope of copyright protection under the present law. Its purpose is to restate, in the context of the new single Federal system of copyright, that the basic dichotomy between expression and idea remains unchanged.

## SECTION 103. COMPILATIONS AND DERIVATIVE WORKS

Section 103 complements section 102: A compilation or derivative work is copyrightable if it represents an 'original work of authorship' and falls within one or more of the categories listed in section 102. Read together, the two sections make plain that the criteria of copyrightable subject matter stated in section 102 apply with full force to works that are entirely original and to those containing preexisting material. Section 103(b) is also intended to define, more sharply and clearly than does section 7 of the present law, the important interrelationship and correlation between protection of preexisting and of 'new' material in a particular work. The most important point here is one that is commonly misunderstood today: copyright in a 'new version' covers only the material added by the later author, and has no effect one way or the other on the copyright or public domain status of the preexisting material.

Between them the terms 'compilations' and 'derivative works' which are defined in section 101, comprehend every copyrightable work that employs preexisting material or data of any kind. There is necessarily some overlapping between the two, but they basically represent different concepts. A 'compilation' results from a process of selecting, bringing together, organizing, and arranging previously existing material of all kinds, regardless of whether the individual items in the material have been or ever could have been subject to copyright. A 'derivative work,' on the other hand, requires a process of recasting, transforming, or adapting 'one or more preexisting works '; the 'preexisting work' must come within the general subject matter of copyright set forth in section 102, regardless of whether it is or was ever copyrighted.

The second part of the sentence that makes up section 103(a) deals with the status of a compilation or derivative work unlawfully employing **\*\*5671** preexisting copyrighted material. In providing that protection does not extend to 'any part of the work in which such material has been used unlawfully,' the bill prevents an infringer from benefiting, through copyright protection, from committing an unlawful act, but preserves protection for those parts of the work that do not employ the preexisting work. Thus, an unauthorized translation of a novel could not be copyrighted at all, but the owner of copyright in an anthology of poetry could sue someone who infringed the whole **\*58** anthology, even though the infringer proves that publication of one of the poems was unauthorized. Under this provision, copyright could be obtained as long as the use of the preexisting work was not 'unlawful,' even though the consent of the copyright owner had not been obtained. For instance, the unauthorized reproduction of a work might be 'lawful' under the doctrine of fair use or an applicable foreign law, and if so the work incorporating it could be copyrighted.

## SECTION 104. NATIONAL ORIGIN

Section 104 of the bill, which sets forth the basic criteria under which works of foreign origin can be protected under the U.S. copyright law, divides all works coming within the scope of sections 102 and 103 into two categories: unpublished and published. Subsection (a) imposes no qualifications of nationality and domicile with respect to unpublished works. Subsection (b) would make published works subject to protection under any one of four conditions:

**APP. 10**

administrative rules giving copyright protection in cases where either the courts or the Congress have withheld it. At the very least, we believe that the Commission should carefully reconsider its 1972 exclusivity rules as soon as the revision bill has been enacted.

**[149]**- DRAFT -

SECOND SUPPLEMENTARY REPORT OF THE
REGISTER OF COPYRIGHTS ON THE
GENERAL REVISION OF THE
U.S. COPYRIGHT LAW:
1975 REVISION BILL
OCTOBER 1975

PART 2:

Chapter VI    - PERFORMANCES AND  RECORDINGS MADE FOR
          NON-PROFIT BROADCASTING

Chapter VII   - WORKS OF ART AND  DESIGNS

Chapter X     - COIN-OPERATED  PHONORECORD PLAYERS
         (JUKEBOXES)

§ [150]CHAPTER VI PERFORMANCES AND RECORDINGS MADE FOR NON-PROFIT BROADCASTING

Sections Considered:

§ 106    - Exclusive rights in  copyrighted works

§ 107    - Limitations on  exclusive rights: Fair use

§ 110    - Limitations on  exclusive rights: Exemption of certain
      performances and displays

§ 112    - Limitations on  exclusive rights: Ephemeral recordings

Issues:

1. With respect to those uses of copyrighted works in nonprofit instructional programs that are exempted from copyright liability for performances under section 110(2), to what extent should the making and retention of recordings of the programs be permitted under section 112(b)?

2. With respect to the use of copyrighted works in the programming of public broadcasting:

a) Should all performances be subject to voluntary licensing, or should there be compulsory licensing under certain circumstances?

b) If any sort of compulsory licensing is to be considered:

1) What should be the scope of "public broadcasting" activities subject to compulsory licensing?

[151] 2) Should compulsory licensing extend to nondramatic musical works? nondramatic literary works? pictorial, graphic, and sculptural works?

3) To what extent should it extend to the making and distribution of recordings of programs?

4) What should be the conditions for obtaining and using a compulsory license?

5) How should the compulsory licensing fees be fixed?

6) What should be the procedural framework for collecting, accounting for, and distributing the compulsory licensing fees?

3. To what extent should exemptions be provided with respect to nonprofit broadcasting of literary works aimed at blind or otherwise handicapped persons?

4. Should the provisions of section 112(c), dealing with the making and distribution of recorded programs embodying "a performance of a nondramatic musical work of a religious nature, or of a sound recording of such a musical work," be retained in the bill?

**[152]**A. DISCUSSION OF ISSUES

1. "EPHEMERAL RECORDINGS" OF ITV PROGRAMS

Since its revision in 1948, the Berne Copyright Convention has contained an article permitting broadcasting organizations to make "ephemeral recordings" for their own authorized broadcasts under various conditions and limitations. "Ephemeral recording" provisions have been adopted in a number of foreign laws, and have been the subject of much discussion in international copyright literature. As stated in the 1965 Supplementary Report of the Register: "There has been a fairly general recognition of the practical need to grant a restricted privilege to broadcasters allowing them to make recordings of copyrighted works for use solely in their licensed performances of the works. The question has been, and still is, what limitations should be imposed on this privilege."

Noting that no "ephemeral recording" provision had been included in the earlier drafts of the revision bill, the 1965 Supplementary Report stated that, in the view of the Copyright Office, "the statute should contain a properly limited, realistic provision allowing both commercial and educational broadcasters to make ephemeral recordings as a part of their authorized broadcasting activities." The 1965 bill contained a section which, under very specific conditions, would have permitted a broadcaster to make a single record for use in its authorized broadcasts within a six-month period.

**[153]**This provision proved to be controversial on several counts. As a result of this controversy, at the 1965 hearings and thereafter, section 112 in the 1966 and 1967 bills was recast, breaking the "ephemeral recording" provision into three subsections dealing generally with: (a) ephemeral recording privileges of organizations that have acquired a license to transmit the work; (b) ephemeral recording privileges of nonprofit organizations that are free to transmit the work under the instructional broadcasting exemption of section 110(2); and (c) the copyright status of works that come into being as the result of an ephemeral recording. Motion pictures and other audiovisual works were removed from the exemption, and the 1967 report stated:

In general, the committee's amendments represent a liberalization of the ephemeral recording privilege. It should be emphasized, however, that the section is still firmly based upon the traditional concept of ephemeral recordings as mere technical adjuncts of broadcasting that have no appreciable effect on the copyright owner's rights or market for copies or phonorecords. As explained further in the following analysis of the section, the committee has not adopted changes that could convert the ephemeral recording privilege into a damaging inroad upon the exclusive rights or [sic] reproduction and distribution. On the other hand, the committee is aware of the practical problems facing educational broadcasters and other transmitters if they are required to seek separate clearances of performing and recording rights, and trusts that copyright owners will work out licensing arrangements covering these cases, under which performance and recording rights could be cleared at the same time.

**[154]**As reported, section 112(b) of the 1967 bill would have allowed instructional broadcasters who were legally entitled to perform or display a copyrighted work to make not more than two reproductions of the program embodying the work, as long as they were used solely for legally-authorized transmissions or archival purposes and except for one archival copy, were destroyed within one year. The representatives of educational broadcasters objected to these limitations on number and use of copies, and these restrictions were eliminated during the floor debate when the House passed the bill on April 11, 1967.

During the Senate hearings on the bill late in 1967, the representatives of authors and publishers argued strongly in favor of restoring these restrictions. The result was a compromise of sorts; when the Senate Judiciary Subcommittee reported the bill to the full committee on December 10, 1969, the restrictions had been restored but were relaxed to

allow making and distribution of up to 12 reproductions for use during a 5-year period. This amount and period was retained in the 1971 bill and in the 1973 bill as introduced and as reported by the Senate Judiciary Subcommittee to the full Committee on April 9, 1974. However, when the full Judiciary Committee reported the bill on July 3, 1974, these figures were increased to 30 copies on phonorecords and 7 years. The report accompanying the bill states:

[155]Scope of the privilege.--Under subsection (b) an instructional broadcaster may make "no more than thirty copies or phonorecords of a particular transmission program embodying the performance or display." No further copies or phonorecords can be reproduced from those made under section 112(b), either by the nonprofit organization that made them or by anyone else. Unlike ephemeral recordings made under subsection (a), however, exchanges of recordings among instructional broadcasters are permitted. An organization that has made copies or phonorecords under subsection (b) may use one of them for purposes of its own transmissions that are exempted by section 110(2), and it may also transfer the other 29 copies to other instructional broadcasters for use in the same way.

As in the case of ephemeral recordings made under section 112(a), a copy or phonorecord made for instructional broadcasting could be reused in any number of transmissions within the time limits specified in the provision. Because of the special problems of instructional broadcasters resulting from the scheduling of courses and the need to prerecord well in advance of transmission, the period of use has been extended to five [sic] years from the date the transmission program was first transmitted to the public.

On August 20, 1974, Senator Bayh introduced a formal amendment to section 112(b) of S. 1361 (No. 1831) that would again have removed any restrictions. The amendment read as follows:

(b) Notwithstanding the provisions of section 106, it is not an infringement of copyright for a governmental body or other nonprofit organization entitled to transmit a performance or display of a work under section 110(2) or 114(a) to make copies of a particular transmission program embodying the performance and display, and to distribute such copies for transmission by or through other governmental bodies or nonprofit organizations.

[156]In the floor debate on S. 1361 on September 9, 1974, there was passing reference to the Bayh amendment which, because of the date of its introduction had not been the subject of any hearings or extended comments.

The bill was therefore passed without the amendment, but with a suggestion that it might be reintroduced and given more thorough consideration in the 94th Congress.

The House Judiciary Subcommittee hearings on July 10, 1975 were devoted in part to the Bayh amendment. The representatives of instructional broadcasters took the position, in Mr. Aleinikoff's words, that "while at first glance these latest numbers may seem far more ample than before, they unfortunately still are sufficiently restrictive to prevent practical application of the ITV exemption to the rapidly changing electronic world of American education." Charles Lieb, speaking on behalf of authors, publishers, and educational media producers, opposed the proposed amendment on four grounds: (1) that it would distort the Committee's original purpose to protect "ephemeral" recordings; (2) that it would "stunt private sector development of educational materials"; (3) that it would "foster government control of curriculum material"; and (4) that the amendment is unnecessary. He urged that the Committee return to the 12-copy/5-year formula.

[157]Senator Bayh chose not to reintroduce his amendment in the 94th Congress, and refrained from putting it forward during the mark-up process. Hence, S. 22, as reported by the full Senate Judiciary Committee on October 7, 1975, retains the 30-copy/7-year formula.

## 2. COMPULSORY LICENSING FOR PUBLIC BROADCASTING

In recent months the treatment of performance, displays, and "ephemeral" recordings of certain copyrighted works by nonprofit broadcasters has become a major issue in copyright law revision. On October 7, 1975 the Senate Judiciary Committee reported the 1975 revision bill (S. 22), with a new section (section 118) creating a compulsory license for this purpose, together with complementary revisions in several sections of Chapter 8, the provision dealing with the Copyright Royalty Tribunal.

The Supplementary Report of the Register, in explaining why broadcasts for systematic instructional purposes were exempted by section 110(2) of the 1965 bill but general nonprofit "educational" or "public" broadcasting was not, said:

**[158]**... the bill ... imposes no blanket "for profit" limitation on the right of public performance. In view of the recent upsurge in the number and importance of non-profit performances, particularly nonprofit broadcasts reaching huge audiences, we have concluded that the present blanket exemption has become too broad in its application to the new conditions of today, and that it would involve serious dangers to the author's rights if continued into the future.

Although it has been broadened to some extent since its original introduction in section 110(2) of the revision bill the exemption is still mainly limited to the use of nondramatic literary and musical works, and of pictorial, graphic and sculptural works, by nonprofit instructional broadcasters. The program involved must be "a regular part of the systematic instructional activities of a governmental body or a nonprofit educational institution," and "directly related and of material assistance to the teaching content of the transmission." The primary purpose of the transmission must be for reception in classrooms, by handicapped people or other students who cannot attend classroom instruction, or by government employees.

When the Senate Subcommittee reported the 1969 bill to the full Judiciary Committee on December 10, 1969, it rejected an amendment "to provide a compulsory license at regulated rates for the use of copyrighted material in the programs of public television which are intended for reception by a general audience." The Senate **[159]**Judiciary Committee adopted the same position when it reported S. 1361, the 1973 bill, to the full Senate on July 3, 1974. Its report (S. Rept. No. 93-983) stated:

Public broadcasting

While the bill grants an exemption to instructional transmission meeting the criteria of section 110(2), the amendment to provide a compulsory license at regulated rates for the use of copyrighted material in the programs of public television which are intended for reception by a general audience, was not accepted. The programming of public television includes an increasing emphasis on programs of an entertainment or general cultural nature. The committee is not unaware of the financial strains of many public broadcasting stations. Such stations may deserve greater financial assistance, but they should not be subsidized by this country's creative talent.

Copyright proprietors should promptly undertake efforts to improve procedures whereby public television may secure copyright clearances. The committee understands that the Register of Copyrights is prepared to furnish the assistance of the Copyright Office in studying clearance procedures and making recommendations aimed at the establishment of voluntary clearinghouse arrangements.

On August 19, 1974, Senator Mathias introduced an amendment to S. 1361 which would have added a new section 118 to the bill:

 **[160]** "§ 118. Limitations on exclusive rights: Public broadcast of nondramatic literary and musical works

"(a) Public broadcast of nondramatic literary and musical works, sound recordings, and pictorial, graphic, and sculptural works shall be subject to compulsory licensing as follows:

"(1) Any public broadcasting organization or institution wishing to obtain a compulsory license under this section shall fulfill the following requirements:

"(A) At least one month before initial broadcast and thereafter at intervals and in accordance with requirements prescribed by the Register of Copyrights, record in the Copyright Office a notice stating its identity, address, and intention to obtain a copyright license under this section.

"(B) Deposit with the Register of Copyrights, at intervals and in accordance with requirements prescribed by the Register, a statement of account and the total royalty fees for the period covered by the statement based on the royalty rates provided for in clause (2).

"(2) The royalty rates under this section shall be determined by the Copyright Royalty Tribunal as reasonable royalty fees for the inclusion of non-dramatic works in public television and radio broadcasts. Such royalty rates may be calculated on a per-use, per-program, pro rated or annual basis as the Copyright Royalty Tribunal finds most appropriate with respect to the type of the copyrighted work and the nature of broadcast use, and may be changed or supplemented from time to time as deemed appropriate by the Copyright Royalty Tribunal. In particular circumstances, royalty rates negotiated between one or more public broadcasting organizations or institutions and one or more copyright owners or agencies may be substituted for the applicable rates determined by the Copyright Royalty Tribunal.

**[161]**"(3) The royalty fees deposited with the Register of Copyrights under this section shall be distributed in accordance with the following procedures:

"(A) During the month of July of each year, every person claiming to be entitled to compulsory license fees for public broadcast during the preceding twelve-month period shall file a claim with the Register of Copyrights in accordance with the requirements prescribed by the Register. Notwithstanding any provision of the antitrust laws (as designated in section 1 of the Act of October 15, 1914, 38 Stat. 730; *15 U.S.C. 12,* and any amendments of such laws), for purposes of this clause any claimants may agree among themselves as to the proportionate division of compulsory license fees among them, may lump their claims together, and may designate a common agent to receive payments on their behalf.

"(B) On the first day of August of each year, the Register of Copyrights shall determine whether there exists a controversy regarding the statement of account or distribution of royalty fees. If the Register determines that no such controversy exists, the Register shall, after deducting reasonable administrative costs under this section, distribute such fees to the copyright owners entitled, or to their designated agents. If the Register finds the existence of a controversy, the Register shall certify to such effect and proceed to constitute a panel of the Copyright Royalty Tribunal in accordance with section 803. In such cases the reasonable administrative costs of the Register under this section shall be deducted prior to distribution of the royalty fees by the Tribunal.

"(C) During the pendency of any proceeding under this subsection the Register of Copyrights or the Copyright Royalty Tribunal shall withhold from distribution an amount sufficient to satisfy all claims with respect to which a controversy exists, but shall have discretion to proceed to distribute any amounts that are not in controversy.

**[162]**"(b) For the purposes of this section, 'public broadcast' shall mean production, duplication, interconnection, distribution, and transmission of 'educational television or radio programs' by or for 'noncommercial educational broadcast stations,' as those terms are defined in title III, part IV of the Federal Communications Act of 1934, except as may be otherwise exempted under sections 110(2), 111(a)(2) and (4), 112(b) and 114(d)."

Like the Bayh amendment, the Mathias Amendment (No. 1815) was not adopted when the full Senate passed S. 1361 on September 9, 1974, but the door was left open to further consideration.

When the Senate Judiciary Subcommittee resumed its consideration of the revision bill in the 94th Congress, efforts were made to resolve the problem of public broadcasting through negotiation, and a number of meetings aimed at blanket voluntary licensing were held. The Mathias Amendment was not adopted by the Subcommittee when it reported the bill to the full Senate Judiciary Committee on April 13, 1975, but the following statement was issued:

JOINT STATEMENT OF CHAIRMAN AND MEMBERS OF SENATE SUBCOMMITTEE ON PATENTS, TRADEMARKS, AND COPYRIGHTS

The Senate Subcommittee on Patents, Trademarks, and Copyrights during the processing of the legislation for the general revision of the copyright law gave lengthy and detailed consideration to an amendment proposed by Senator Charles McC. Mathias, Jr., to establish a statutory compulsory license for the use of certain categories of copyrighted works by public broadcasting. The initiative taken by Senator Mathias has considerably improved the possibility of a satisfactory resolution of the copyright problems of public broadcasting.

**[163]**At the request of the Chairman of the Subcommittee, representatives of public broadcasting and of the creators and owners of copyrighted material have been meeting to explore mechanisms other than a statutory compulsory license to facilitate the availability of such material to public broadcasting. Representatives of the Chairman, of each member of the Subcommittee, and of Senator Mathias attended certain of these meetings.

The Subcommittee notes that considerable progress has been made, and tentative understandings have been achieved on a number of issues. Some issues remain in dispute but the Subcommittee believes that these also can be resolved if the parties seek reasonable accomodations. [sic] Consequently, the Subcommittee urges the parties on an urgent basis to continue with the negotiations.

The Subcommittee will maintain its interest in obtaining a mutually satisfactory solution. The Subcommittee expresses the hope that a complete agreement will shortly be reached.

On July 10, 1975, the House Judiciary Subcommittee heard testimony on the Mathias Amendment from panels representing public broadcasters on the one side and authors, publishers, and performing rights societies on the other. The arguments of the public broadcasters in favor of the amendment can be summarized as follows:

1. Congress, since the House of Representatives last acted on the bill in 1967, has demonstrated an "overriding concern for the financial and administrative burdens of noncommercial broadcasting," notably through the Public Broadcasting Act. Public broadcasting is financed by public support and donations; it does not permit any commercial exploitation.

[164] 2. While Congressional commitment should support some form of special consideration for noncommercial broadcasting in the copyright area, it "does not necessarily mean that noncommercial broadcasters would not be willing to make some form of payments to copyright holders in recognition of the valuable contributions that their works make in the production of programs of high quality and excellence."

3. H.R. 2223, in its present form, would face public broadcasters "with a multitude of administratively cumbersome and very costly rights 'clearance' problems that cannot help but impair the vitality of their enterprise." Administrative overhead for individual clearances would be more than any royalties, and far beyond the budgets of any public broadcaster.

4. Public broadcasting is therefore seeking a compulsory license, but one that differs from the other compulsory licensing systems in the revision bill in three respects:

a) It covers only non-dramatic works, and does not apply to motion pictures and other audiovisual works. It does not cover unpublished works or dramatizations of non-dramatic works.

b) Unlike the other compulsory licensing schemes, where the initial rate is set in the statute, it calls upon the Copyright Royalty Tribunal to set the initial rates after "full and detailed consideration of exactly what type and amount of royalty fees are appropriate for the various kinds of copyrighted works and public broadcasting exposure."

c) It "specifically encourages substitution of mutually acceptable arrangements between copyright owners and public broadcasting for Tribunal determinations."

[165]The arguments of the representatives of the musical performing rights societies can be summarized as follows:

1. The clearinghouse arrangements under which copyrighted music is licensed for performance under the present law have worked well, and there is nothing about public broadcasting that sets it apart from all other users of music.

2. Compulsory licensing is wrong in principle. The three compulsory licenses now in the revision bill are there for historical reasons, none of which apply to public broadcasting, and are the result of carefully worked out compromises.

3. Television broadcasts require both "performing" and "synchronization" licenses. Public broadcasters recognize that they need synchronization licenses in order to duplicate their programs lawfully, since the "for profit" limitation of the present law does not apply to reproduction rights. At one time they obtained synchronization licenses, and they have been negotiating for performing licenses, that would include synchronization rights, for a decade. Although their gross revenues have grown from $ 100 million to $ 250 million, and although they are using more music than ever, they have not paid any license fees during this period.

4. Under current law, public broadcasting is liable for copyright infringements of both performance and synchronization rights: their performances are "for profit" under the decisions interpreting the 1909 Act; copyright owners have exercised forbearance in the expectation that agreement would be reached.

[166]5. Public broadcasting has grown and changed significantly in the past decade and will continue to do so. It now competes with commercial broadcasting as a national medium, and its programming contains much of the same types of entertainment and cultural material presented by commercial broadcasters. The revenues of public broadcasting have grown significantly, and the Mathias Amendment does not take in to account its potential for future growth.

6. None of the justifications put forward in favor of the Mathias Amendment are valid: there is no problem in clearing music for broadcasting, and license fees that have been offered were all reasonable. There is no difference between commercial and public broadcasting that justifies a compulsory license. As drafted, the Amendment is ambiguous, impractical and unworkable, and Government intervention is unnecessary and unwise.

The representatives of authors and publishers of nondramatic literary material made a number of these same arguments, and expressed their willingness to continue working toward voluntary licensing agreements. They stated that "the literary community is totally opposed to compulsory-license expropriation of literary works for reading or similar uses on public broadcasting, because it would cause serious damage and needlessly establish a dangerous precedent." They argued that one of the author's fundamental rights is to decline to permit a reading or similar use because of the serious economic or aesthetic damage it might cause, and that such a serious inroad is wholly unnecessary.

[167]Mr. Karp's statement made the following point:

... **[A]** compulsory licensing system would deprive the author of his fundamental right to protect his reputation and the integrity of his work from the injury a misuse or inappropriate use would cause. The author may believe that the producer who intends to expropriate his work under a compulsory licensing system is an incompetent who will mangle it; or that a particular use will distort it; or even, as is sometimes the case, that a particular work will suffer in oral delivery. A compulsory licensing system would deny him the right to protect his reputation or work against such injuries by declining to authorize the particular use.

The authors and publishers, like the performing rights societies concluded that voluntary licensing arrangements will be less costly and burdensome to public broadcasters than a compulsory licensing system.

Both sides at the House hearings referred to the ongoing negotiations and to some of the problems that had been encountered, including questions of compulsory arbitration and anti-trust exemptions. In anticipation of the impending mark-up of the revision bill by the full Senate Judiciary Committee, the representatives of the public broadcasting industry again pressed for adoption of the Mathias Amendment, which was adopted, with some changes, by the full Senate Judiciary Committee as section 118 of S. 22, as reported on October 7, 1975. The text of the new section is as follows:

[168]§ 118. Limitations on exclusive rights: Public
broadcasting of nondramatic literary and
musical works, pictorial, graphic, and
sculptural works

(a) Notwithstanding the provisions of section 106, it is not an infringement of copyright for a public broadcasting entity to broadcast any nondramatic literary or musical work, pictorial, graphic, or sculptural work under the provisions of this section.

(b) Public broadcasting of nondramatic literary and musical works, pictorial, graphic, and sculptural works by a public broadcasting entity shall be subject to compulsory licensing upon compliance with the requirements of this section. The public broadcasting entity shall--

(1) record in the Copyright Office, at intervals and in accordance with requirements prescribed by the Register of Copyrights, a notice stating its identity, address and intention to obtain a license under this section; and

(2) deposit with the Register of Copyrights, at intervals and in accordance with requirements prescribed by the Register, a statement of account and the total royalty fees for the period covered by the statement based on the royalty rates provided for in subsection (c).

(c) Reasonable royalty fees for public television and radio broadcasts by public broadcasting entities shall be established by the Copyright Royalty Tribunal. Such royalty fees may be calculated on a per-use, per-program, prorated or annual basis as the Copyright Royalty Tribunal finds appropriate with respect to the type of the copyrighted work and the nature of broadcast use, and may be changed or supplemented from time to time by the Copyright Royalty Tribunal. A particular or general license agreement between one or more public broadcasting entities and one or more copyright owners prior or subsequent to determination of applicable rates determined by the Copyright Royalty Tribunal may be substituted for a compulsory license provided in this section.

[169](d) The royalty fees deposited with the Register of Copyrights under this section shall be distributed in accordance with the following procedures:

(1) During the month of July of each year, every person claiming to be entitled to compulsory license fees for public broadcasting during the preceding twelve-month period shall file a claim with the Register of Copyrights in accordance with the requirements that the Register shall prescribe by regulation. Notwithstanding any provision of the antitrust laws (as defined in section 1 of the Act of October 15, 1914, 38 Stat. 730; *15 U.S.C. 12,* and any amendments of such laws), for purposes of this paragraph any claimants may agree among themselves as to the proportionate division of compulsory license fees among them, may lump their claims together, and may designate a common agent to receive payments on their behalf.

(2) On the first day of August of each year, the Register of Copyrights shall determine whether there exists a controversy regarding the statement of account or distribution of royalty fees. If the Register determines that no such controversy exists, the Register shall, after deducting reasonable administrative costs under this section, distribute such fees to the copyright owners entitled, or to their designated agents. If the Register finds the existence of a controversy, the Register shall certify to such effect and proceed to constitute a panel of the Copyright Royalty Tribunal in accordance with section 803. In such cases, the reasonable administrative costs of the Register under this section shall be deducted prior to distribution of the royalty fees by the Tribunal.

(3) During the pendency of any proceeding under this subsection, the Register of Copyrights or the Copyright Royalty Tribunal shall withhold from distribution, an amount sufficient to satisfy all claims with respect to which a controversy exists, but shall have discretion to proceed to distribute any amounts that are not in controversy.

**[170]**(e) The compulsory license provided in this section shall not apply to unpublished nondramatic literary or musical works or to dramatization rights for nondramatic literary or musical works.

(f) As used in this section, the term--

(1) "public broadcasting" means production, acquisition, duplication, interconnection, distribution, and transmission of educational television or radio programs (as defined in section 397 of the Federal Communications Act of 1934 *(47 U.S.C. 397))* by or for noncommercial educational broadcast stations (as defined in section 397 of the Federal Communications Act of 1934 *(47 U.S.C. 397)),* except as may be otherwise exempted under sections 110(2), 111(a)(2) and (4), 112(b), and 114(a); and (2) "public broadcasting entity" means any licensee or permittee of a noncommercial educational broadcast station, or any nonprofit institution or organization engaged in public broadcasting.

A comparison between the 1974 and 1975 versions of the Mathias Amendment discloses some changes in language and structure. The following substantive changes are worth noting:

(1) Sound recordings are no longer included in the classes of works subject to compulsory licensing;

(2) Instead of making the act of "public broadcast" subject to compulsory licensing, the new Mathias Amendment grants an exemption to "a public broadcasting entity," subject to compliance with the compulsory licensing requirements. The new term "public broadcasting entity" is defined as "any licensee or permittee of a noncommercial educational broadcast station, or any nonprofit institution or organization engaged in public broadcasting." The latter term ("public broadcasting") is defined very broadly indeed. Taken literally, this change could vastly expand the scope of the amendment beyond anything discussed in the House Subcommittee hearings.

## [171]3. BROADCASTING FOR THE BLIND AND HANDICAPPED

A by-product of the negotiations aimed at voluntary licensing for public broadcasting was a proposal to exempt the reading of literary works in broadcasts to the blind from copyright liability. No agreement on this issue could be reached during the negotiations, and on July 3, 1975 the Senate Judiciary Subcommittee reported S.22 to the full Committee with a new subsection adding the following performing rights exemption in section 110:

(8) performance of a literary work in the course of a broadcast service specifically designed for broadcast on noncommercial educational radio and television stations to a print or aural handicapped audience.

Following a reference to this problem during the House Judiciary Subcommittee hearing on public broadcasting on July 10, 1975, a full discussion was presented during the testimony on September 18, 1975. While reserving the position of his organization on the language in which it is expressed, the representative of the American Association of Publishers endorsed the principle of a limited exemption for broadcasting of copyrighted works to the blind and deaf. The representative of the Authors League, however, opposed the provision adopted by the Senate Subcommittee, as well as the following proposal, which had been put forward by the American Foundation for the Blind:

[172](8) performance or the reading aloud (whether in person or by phonorecords) of books and other literary works, musical scores, instructional texts, specialized materials and other printed matter in the course of a broadcast service specifically designed or presented for blind and other physically handicapped persons (who are unable to read normal printed material as a result of such limitations) on non-commercial educational radio or television, including non-commercial broadcasting on any subsidiary carrier authority or cable transmission. Provisions of this subsection shall apply to non-commercial telecasts specifically designed for the aural handicapped.

The authors' opposition was based partly on the broad and ambiguous wording of the proposals, and on the lack of demonstrated need for an exemption. It was pointed out that the Division for the Blind and Physically Handicapped of the Library of Congress obtains royalty free clearances expeditiously for a large number of braille and recorded editions of copyrighted works. The representatives of public radio supported the Senate Subcommittee amendment, and urged that a corresponding right to make "ephemeral recordings" in this situation be written into section 112.

On October 7, 1975, the full Senate Judiciary Committee reported S.22 without any change in the new section 110(8). Meanwhile, however, Durward K. McDaniel, National Representative of the American Council of the Blind, wrote to Chairman Kastenmeier of the House Judiciary Subcommittee, presenting a revised text of the Council's earlier proposal, [173]this time limiting the exemption to performance "on any subsidiary radio carrier authority or cable transmission." Mr. McDaniel's full text reads as follows:

(8) performance or the reading aloud (whether in person or by phonorecords) of books and other literary works, musical scores, instructional texts, specialized materials and other printed matter in the course of a non-commercial broadcast service specifically designed or presented for blind or other handicapped persons (who are unable to read normal printed material as a result of such limitations) on any subsidiary radio carrier authority or cable transmission. Provisions of this subsection shall apply to non-commercial telecasts specifically designed for the aural handicapped.

## 4. "EPHEMERAL RECORDINGS" OF WORKS OF A RELIGIOUS NATURE

Section 112(c) first met the light of day on February 8, 1971, when Senator McClellan introduced S.644, the 1971 version of the revision bill. With one minor change it has remained a part of the bill since then, and was the subject of hearings before the Senate Judiciary Subcommittee on August 1, 1973, and before the House Judiciary Subcommittee on September 18, 1975. The provision, which was sponsored by the association of National Religious Broadcasters (NRB), would exempt as a form of "ephemeral recording" the making by a nonprofit organization of a single reproduction of a program containing nondramatic musical works "of a religious nature" for use in a single broadcast by a licensed broadcaster. As stated in the 1974 Senate report:

[174]Religious broadcasts.--Section 112(c) provides that it is not an infringement of copyright for certain organizations to make no more than one copy for each transmitting organization of a broadcast program embodying a performance of a nondramatic musical work of a religious nature or of a sound recording. In order to receive the benefits of this exception there must be no charge for the distribution of the copies, none of the copies may be used for any performance other than a single transmission by an organization possessing a license to transmit a copyrighted work, and, other than for one copy that may be preserved for archival purposes, the remaining copies are destroyed within one year from the date the program was first transmitted to the public. When the conditions of this section are present, the ephemeral recording privileges would also apply to such transmitting organization.

The representative of SESAC, Inc., also representing other performing rights societies and musical copyright owners, regarded the issue as "whether or not a religious program producer can use a piece of religious music and distribute it to approximately 4,000 radio stations without any compensation to the creator of that religious music." He argued that a payment of mechanical reproduction fees in this situation would be nominal, but to withhold it altogether would violate established trade practices and would discriminate against the creators of music "of a religious nature," a term he considered questionably vague.

The representatives of religious broadcasters stated that religious programs are produced on tape or disc for distribution by mail of one copy only to each broadcast station **[175]**carrying the program. None of the programs are prepared for profit, and the program producer either pays the station to carry the program or furnishes it free of charge. The stations have performing licenses so that the copyright owners receive compensation. Following the performance the tape is returned or the disc destroyed. To require a second payment for the mechanical reproduction would only drive some of the copyrighted music off the air.

## B. COMMENTS AND RECOMMENDATIONS

### 1. LIMITATIONS ON RECORDINGS FOR ITV (THE "BAYH AMENDMENT")

The Copyright Office adheres to the position stated in a letter from the Register of Copyrights to Senator McClellan, dated January 31, 1975, expressing opposition to the Bayh amendment. The Register stated:

I feel that some limitation is essential, and 30 copies should be ample to facilitate the activities of nonprofit organizations. The circulation of as many as 30 copies itself presents some danger to creators, since it is extremely difficult to insure that unauthorized copies are not made. Moreover, I believe a limitation on the period the copies or phonorecords may be held is eminently sound. There is nothing magic about a seven-year cut but, as a matter of principle, if a program is to be rebroadcast authors and proprietors of the copyrighted works embodied in the program should be entitled to renegotiate a new deal, including additional compensation.

### [176]2. COMPULSORY LICENSING FOR PUBLIC BROADCASTING

a. The failure of the negotiations, aimed at finding a voluntary solution to these problems, which seemed so promising at the time of the House hearings in July, 1975, is to be regretted and deplored. Compulsory licensing has been, and should be, regarded as an extreme last resort in copyright law. Despite the expressions of blame and disappointment now being exchanged, the Copyright Office remains unconvinced that voluntary arrangements are impossible other than under the compulsion of government regulation. It is true that public broadcasting is not paying anything now, that it enjoys at least some degree of exemption with respect to completely nonprofit performances, that its budgets remain low and clearances difficult, and that it is offering to pay fair royalties in the future under a compulsory license. It has also failed so far to gain the terms it was seeking in voluntary negotiations. But to conjure up the threat of massive government-run compulsory licensing machinery in an effort to improve its bargaining position is of questionable necessity.

b. A careful review of the statements made during the negotiations in various written submissions, and at the hearings, indicates that clearance of music is public broadcasting's foremost problem, and that a major impediment to a voluntary solution to that problem has been the lack of a statutory anti-trust exemption. At the same time, enactment of such an exemption has implications and unforeseeable consequences beyond the current problems of public **[177]**broadcasting. A compulsory license limited to nondramatic musical compositions, might, in view of the fairly organized structure of the industry, be made to work fairly well. Certainly, the dangers inhering [sic] in the compulsory licensing of literary works are less evident in the case of music.

c. The Copyright Office considers the dangers of an unqualified compulsory license for literary works so great and the need for it so unproven, that it could not support a copyright bill containing such a provision, including the revision bill as it was reported by the Senate Judiciary Subcommittee on October 7, 1975. The loss of control by authors over the use of their work in a major mass communications medium, and the dangers of State control and loss of freedom of expression implicit in the proposed system, would probably be too high a price to pay even if public broadcasting were being severely hampered by the legal obligation to get clearances. But, aside from the problem of reading to the blind, discussed below, it cannot be said that the practical problems of public broadcasters in getting clearances for reading literary works, have been illustrated convincingly, much less proved.

d. It has been suggested that the problem of loss of control might be solved by requiring a notice to be filed, perhaps two weeks or one month in advance, on the copyright owner (presumably at the last address shown in the records of the Copyright Office), thus providing a right of refusal as in section 110(4). We have **[178]**serious doubts about both the practicability or the necessity of such a system, though obviously it would be preferable to a raw compulsory license.

e. The problem of pictorial, graphic, and sculptural works, including photographs, strikes us as a great deal more real. Here, the public broadcasters' needs are obviously demonstrable, and the difficulties of individual clearance more evident. Should a compulsory license be established for music, its extension to graphics might be justified in theory. The problem here is that there is no organization or representative to speak for artists and photographers, whose exclusive rights should not, in fairness, be swept aside in the interests of expediency and business convenience.

f. The Copyright Office is not convinced that any compulsory license is necessary for public broadcasting. If Congress considers that some sort of compulsory licensing is needed, we believe it should be confined to music, and that the Mathias amendment should be completely rewritten to make its vague and ambiguous language conform to the language and context of the revision bill, to insure that it goes no further than intended or needed, and to provide for a workable and fair administrative framework. The rights to perform, and to make and distribute recorded programs, should be limited to bona fide noncommercial educational broadcasters, and should be carefully circumscribed in the statute itself.

[179]g. Part of the language of the Mathias amendment appears aimed at allowing schools to make videotape recordings of public broadcasts. This is a relevant question in connection with classroom uses under the fair use doctrine in section 107, and should be dealt with in that context in the legislative report.

h. One possible way of dealing with the problem of pictorial, graphic and sculptural works might be to provide a temporary moratorium. During the moratorium, public broadcasters would be free to use graphics, but only if they made reports on the works used, and the nature and frequency of their use, to the Copyright Office. The Office could be charged with the responsibility to report its findings to the Congressional Committees by a certain date, together with recommendations for legislative action. It could be hoped that, out of this process, a nation-wide clearinghouse arrangement with standard fees and blanket licensing agreements covering graphics, could be evolved.

i. The Copyright Office opposition to compulsory licensing schemes involving primary uses of literary works, even if combined with advance notice and right of refusal, is deep-seated. At the same time, we recognize the advantages in centralized blanket licensing on a voluntary basis for all concerned. We also recognize that negotiations toward this end are not going to occur automatically and need to be encouraged, if not strongly induced. We do not favor a moratorium in this area, but perhaps the same effect could be [180]achieved by limiting liability for statutory, or even actual, damages for a stated period, during which the patterns of use and the practical needs of copyright owners and users could be studied in some depth.

j. As already indicated, whatever its substantive content, the language and structure of the Mathias Amendment needs thorough revision. In addition, if changes in the duties and functions of the Copyright Royalty Tribunal are contemplated as a result of actions on the Mathias Amendment in either House, a careful review of the substantive and procedural impact of these changes on the workings of the other compulsory licensing provisions in the bill should be undertaken at the same time.

## 3. BROADCASTING FOR THE BLIND AND HANDICAPPED

The recent proposal of the American Council of the Blind appears to form the basis for a reasonable compromise, based on limiting the exemption to subcarriers or restricted cable facilities. Where a royalty-free license is desired for broadcasts and other transmissions going beyond those permitted under the exemption, a possibility for expediting clearances would be to use the procedure proposed in section 710 of the current Senate version of the bill (S.22 as reported on October 7, 1975). This provision authorizes the Register of Copyrights, in consultation with the Chief of the Library of Congress Division for the Blind and Physically Handi[181]capped, to establish standardized forms and procedures for clearing rights for braille and tape editions, voluntarily, at the time of copyright registration. In any event, the language of section 110(8) in the current Senate version needs substantial tightening and clarification.

## 4. "EPHEMERAL RECORDINGS" OF WORKS OF A RELIGIOUS NATURE

A precedent for special treatment of works of a religious nature is found in section 104 of the present copyright law, which states:

... nothing in this title shall be so construed as to prevent the performance of religious or secular works such as oratorios, cantatas, masses, or octavo choruses by public schools, church choirs, or vocal societies, rented, borrowed, or

obtained from some public library, public school, church choir, school choir, or vocal society, provided the performance is given for charitable or educational purposes and not for profit.

Even more pertinent, a specific exemption using the words "works of a religious nature" and referring to "services at a place of worship or other religious assembly" appears in section 110(3) of the current bill. The 1974 Senate Report on this provision reads, in part, as follows:

The exemption, which to some extent has its counterpart in sections 1 and 104 of the present law applies to dramatico-musical works "of a religious nature." The purpose here is to exempt certain performances of sacred music that might be regarded as "dramatic" in nature, such as oratorios, cantatas, musical settings of the mass, choral services, and the like. The exemption is not intended to cover performances of secular operas, musical plays, motion pictures, and the like, even if they have **[182]**an underlying religious or philosophical theme and take place "in the course of [religious] services."

To be exempted under section 110(3) a performance or display must be "in the course of services," thus excluding activities at a place of worship that are for social, educational, fund raising, or entertainment purposes. Some performances of these kinds could be covered by the exemption in section 110(4), discussed next. Since the performance or display must also occur "at a place of worship or other religious assembly," the exemption would not extend to religious broadcasts or other transmissions to the public at large, even where the transmissions were sent from a place of worship. On the other hand, as long as services are being conducted before a religious gathering, the exemption would apply if they were conducted in places such as auditoriums, outdoor theaters, and the like.

Special treatment for works of a religious nature and for performances in the course of religious services are common in foreign laws and have not been challenged in U.S. copyright law. The question can thus be approached purely as a matter of policy. The Copyright Office takes no position as to whether or not section 112(c) should be retained in this bill.

§ [183]CHAPTER VII WORKS OF ART AND DESIGNS

Sections Considered:

§ 101 - Definitions ("pictorial, graphic, and sculptural works"; "useful articles")

§ 102 - Subject matter of copyright: In general

§ 106 - Exclusive rights in copyrighted works

§ 113 - Scope of exclusive rights in pictorial, graphic, and sculptural works

TITLE II - Protection of Ornamental Designs of Useful Articles

Issues:

1. Should the bill for general revision of the copyright law contain provisions, such as those now in Title II, aimed at establishing a special form of protection, based on but more limited in scope than copyright, for ornamental designs of useful articles?

2. Assuming that the bill establishes a sui generis form of design protection, is the inter-relationship between copyright and design protection, under section 113 of Title I and sec. 227 of Title II, satisfactory?

[184] 3.Are the provisions of sec. 202 ("Designs not subject to protection") too restrictive?

4. Should protection for a design under Title II commence when it is "first made public," as provided by sec. 204, or on some other date?

5. What should be the term of protection under the design title?

6. Are the administrative provisions of secs. 209-218, including sec. 215 on fees, satisfactory?

7. Under what circumstances should the claimant of protection for a design under Title II be entitled to maintain an action for infringement in the absence of a certificate of registration?

8. Where should the "Design Act" be administered?

9. Are the amendments proposed by sec. 232 to title *28 U.S.C. § 1498*(a), dealing with U.S. Government infringement of a protected design, satisfactory?

10. With respect to calligraphy:

a) Should calligraphic works be subject to copyright protection?

b) To what extent should a calligrapher be entitled to reproduce copyrighted text matter in a calligraphic work?

**[185]** 11. With respect to designs for type faces:

a) Should an original type face design be eligible for copyright protection under Title I?

b) Should, alternatively or cumulatively, an original type face design be entitled to design protection under Title II?

c) Are the definitions of "useful article," in sec. 101 and sec. 201(b)(1), and the list of designs not subject to protection in sec. 202, satisfactory in relation to type face designs?

d) Should the bill specifically limit the protection for type face designs:

1) By restricting liability to the unauthorized duplication of the design in the manufacture of fonts, matrixes, plates, etc. used for printing, thus freeing printers, authors, publishers, photocopiers, etc. from any risk of liability?

2) By establishing a compulsory licensing system insuring that anyone wishing to manufacture a font, matrix, place, etc., reproducing a protected type face design, could do so on payment of a reasonable fee?

**[186]**A. LEGISLATIVE HISTORY OF
SECTION 113 AND TITLE II

Until 1954 it had been widely assumed that the only statutory protection for the designs of utilitarian articles was that available under the design patent law, which dated back to 1842. That patents have proved inadequate as a practical form of protection for designs is something on which most people will agree. The main arguments usually advanced against the patent law as a means of protecting designs are:

1) Inappropriateness. Patentable designs must be more than "original" (created independently without copying); they must also be "novel" (new in the absolute sense of never having existed before anywhere) and "non-obvious" (the product of a creative act going beyond mere talent or artistry). A patented design that meets these extraordinarily high standards gets more than rights against copying; a design patent consists of a complete monopoly over the use of the design in any manner.

2) Judicial hostility. Because the standards of protection are so high and the scope of protection is so broad, the mortality rate of those design patents that have been tested in the courts has been extremely high.

**[187]** 3) Cost. Obtaining a design patent is expensive, in some cases prohibitively so. Nearly all applicants are required to retain an attorney, and the substantial costs of filing and pursuing an application through the searching process often operate as a deterrent, especially since the chances of issuance are problematical. An applicant with several new designs has no way of knowing which will be popular, but in most cases cannot afford to apply for design patents on all of them.

4) Delay. The patent examining process consists of searching the "prior art" to determine novelty in an absolute sense. Whatever realistically may be the effectiveness of prior-art searching in the case of designs, the process is inevitably a slow one. In the design patent area, the Patent and Trademark Office now has a backlog of about 7 months,

and the average time lag between filing and issuance for a design patent is about 21 months. It must be emphasized that protection under a patent starts only upon issuance, so that a design may be vulnerable to copying during the time a patent application is pending.

[188]Beginning around 1914, the growth and economic impact of design piracy, and the nearly total failure of the patent law as a method to combat it, led to a variety of alternative efforts to protect original designs. The attempts to stop design piracy by industry self-regulation through the NRA Codes, and later through the formation of "originators' guilds" combined with a form of boycott, were quite effective for a time during the 1930's, but were eventually struck down by the courts. Judicial actions aimed at getting the courts to declare design piracy illegal on any one of a number of theories -- Federal copyright, State common law copyright, Federal and State trademarks, unfair competition (including claims of "passing off" and "misappropriation"), fraud and breach of confidence, implied contract, etc. -- were almost entirely unsuccessful.

During this period there were constant and frequently intense efforts to obtain Congressional enactment of separate design legislation. Between 1914 and 1957 nearly 50 design protection bills were introduced, and a number of hearings were held. Some of the bills were closer to copyright than patent; some leaned the other way; most of them took the form of special protection based on copyright principles but considerably more limited in scope and duration than traditional copyright. Several of the bills came close to enactment, but none made it all the way through both Houses.

[189]In 1952, a successful program for the general revision of the patent laws resulted in comprehensive new patent legislation in which the design patent provisions were deliberately left untouched. The basic reason for leaving the design provisions alone was an agreement among the sponsors of the legislation that the patent law was not the place to deal with design protection. It was understood that, as soon as the general patent bill had been enacted into law, the Coordinating Committee of the National Council of Patent Law Associations would turn to the development of separate design legislation based on a registration system similar to copyright.

This effort started several years before the current program for general revision of the copyright law got underway in 1955, and for some time the two legislative efforts proceeded independently of each other. However, in addition to spearheading the general revision effort during its first decade, the Copyright Office was actively and intimately involved with the NCPLA Coordinating Committee and the Patent Office in the development and drafting of the design bill, and with the compromises that produced what is now Title II of the 1975 copyright bill. It was originally contemplated, with considerable optimism, that the design bill would be enacted before the legislative phase of the general revision bill had even begun.

[190]A radical change in the legal status of original designs in the United States occurred on March 8, 1954. On that date the U.S. Supreme Court, by a 7 to 2 majority in *Mazer v. Stein , 347 U.S. 201,* upheld the copyrightability of "works of art" that had been incorporated as the designs of useful articles. The Court strongly endorsed a Copyright Office Regulation accepting as copyrightable "works of artistic craftsmanship, in so far as their form but not their mechanical or utilitarian aspects are concerned, such as artistic jewelry, enamels, glassware, and tapestries, as well as all works belonging to the fine arts, such as paintings, drawings and sculpture...."

The Mazer case involved identical copies of lamp bases in the form of statuettes representing human figures. The figurines had been registered for copyright as "works of art." The majority of the Court, with Justices Douglas and Black dissenting, held that works of art are copyrightable as the "writings of an author," that original works of art do not cease to be copyrightable, as works of art, when they are embodied in useful articles, and that for this purpose the following factors make no difference whatever:

1) the potential availability of design patent protection for the same subject matter; on this point Justice Reed said:

[191]We ... hold that the patentability of the statuettes, fitted as lamps or unfitted, does not bar copyright as works of art. Neither the Copyright Statute nor any other says that because a thing is patentable it may not be copyrighted. We should not so hold.

Unlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea -- not the idea itself. ... The copyright protects originality rather than novelty or invention -- conferring only "the sole right of multiplying copies." Absent copying there can be no infringement of copyright. Thus, respondents may not exclude others from using statuettes of human figures in table lamps; they may only prevent use of copies of their statuettes as such or as incorporated in some other article. ... The dichotomy of protection for the aesthetic is not beauty and utility but art for the copyright and the invention of original and ornamental design for design patents. We find

nothing in the copyright statute to support the argument that the intended use or use in industry of an article eligible for copyright bars or invalidates its registration. We do not read such a limitation into the copyright law.

2) the intention of the artist as to commercial application and mass production of the design.

3) the aesthetic value of the design, or its total lack thereof; the majority opinion on this point states:

[192]The successive acts, the legislative history of the 1909 Act and the practice of the Copyright Office unite to show that "works of art" and "reproductions of works of art" are terms that were intended by Congress to include the authority to copyright these statuettes. Individual perception of the beautiful is too varied a power to permit a narrow or rigid concept of art. ... They must be original, that is, the author's tangible expression of his ideas. ... Such expression, whether meticulously delineating the model or mental image or conveying the meaning by modernistic form or color, is copyrightable.

4) the fact that the design, in its useful embodiment, was mass-produced and merchandised commercially on a nation-wide scale.

Justice Reed concluded his opinion for the majority by saying:

The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in "Science and useful Arts." Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered.

The revolutionary impact of the Mazer decision upon design protection took some time to sink in. Its reach clearly went beyond lamp base designs, but did it go so far as to cover all original industrial designs (machinery, automobiles, refrigerators, etc.)? The Copyright Office decided that, for purposes of registration, the following lines should be drawn in its regulations, which are still in effect:

[193]§ 202.10 Works of art (Class G).

(a) General. This class includes published or unpublished works of artistic craftsmanship, insofar as their form but not their mechanical or utilitarian aspects are concerned, such as artistic jewelry, enamels, glassware, and tapestries, as well as works belonging to the fine arts, such as paintings, drawings and sculpture.

(b) In order to be acceptable as a work of art, the work must embody some creative authorship in its delineation or form. The registrability of a work of art is not affected by the intention of the author as to the use of the work, the number of copies reproduced, or the fact that it appears on a textile material or textile product. The potential availability of protection under the design patent law will not affect the registrability of a work of art, but a copyright claim in a patented design or in the drawings or photographs in a patent application will not be registered after the patent has been issued.

(c) If the sole intrinsic function of an article is its utility, the fact that the article is unique and attractively shaped will not qualify it as a work of art. However, if the shape of a utilitarian article incorporates features, such as artistic sculpture, carving, or pictorial representation, which can be identified separately and are capable of existing independently as a work of art, such features will be eligible for registration.

[194]This meant that virtually all original two-dimensional designs for useful articles (textile fabrics, wallpaper, floor tiles, painted or printed decorations, etc.), were subject to copyright registration. The same was true of those three-dimensional designs that can be conceptually separated and are capable of existing independently of the utilitarian aspects of the article embodying them (lamp bases, carvings on furniture, costume jewelry, decorator items, etc.). This interpretation has been accepted in a number of court decisions and has not been successfully challenged. During fiscal year 1975 the Patent and Trademark Office issued 3,631 design patents, and the Copyright Office made 9,617 registrations covering designs for useful articles. Although it has substantially expanded the scope of designs subject to copyright registration as "works of art," the Mazer case, as interpreted by the courts and the Copyright Office, leaves unprotected a large body of creative work: three-dimensional designs of utilitarian articles as such, as distinguished from three-dimensional ornamentation or embellishment incorporated in them.

In its origins in the early 1950's, the design bill was intended as the main alternative to design patents for all original designs of useful articles. After the impact of the Mazer decision and its interpretation had been absorbed, the

interaction between the proposed design legislation and the present or proposed copyright law **[195]**had to be carefully reexamined. Extended discussions and debates produced a compromise, now embodied in section 113 of Title I and sec. 227 of Title II.

The current design bill, as separate legislation, was first introduced by Chairman Willis of the House Judiciary Subcommittee on July 23, 1957, by request of the Chairman of the Coordinating Committee on Designs of the National Council of Patent Law Associations. The bill was introduced in both Houses in the next (86th) Congress, and Senate hearings were held on S. 2075 (the O'Mahoney-Wiley-Hart bill) on June 29, 1960. Further hearings were held in the Senate on August 16 and 17, 1961 on the 87th Congress' version of the bill. The full Senate Judiciary Committee reported it favorably on July 12, 1962, and the bill (S. 1884) passed the Senate on July 23, 1962. In the 88th Congress the Senate, without further hearings, passed the bill on December 6, 1963, and a hearing was held in the House Subcommittee on December 12, 1963. The Subcommittee reported the bill favorably to the full House Judiciary Committee on August 12, 1964, but there was no further action during the 88th Congress. In the following Congress the Senate Subcommittee held a hearing on July 28, 1965, and the bill was reported with amendments by the full Committee on July 22, 1966. It passed the Senate five days later. The bill was reintroduced in the 90th and 91st Congresses, and on December 10, 1969 the Senate Judiciary Subcommittee reported it as Title III of the general revision bill. **[196]**In this form it was introduced again in the 92nd and 93rd Congress, was reported favorably by the Senate Judiciary Committee on July 3, 1974, and passed the Senate on September 9, 1974.

To summarize, the design bill has been pending in one or both Houses ever since its initial introduction in 1957. It has been the subject of hearings three times in the Senate and once in the House. On four occasions it has passed the Senate. On two other occasions it has been reported favorably by the House and Senate Judiciary Subcommittees, and was the subject of a hearing before the House Judiciary Subcommittee in December, 1963. As a historical sidelight, it is worth noting that Representative Gerald R. Ford sponsored six successive design bills bearing his name, in every Congress from the 86th through the 91st.

Aside from the Justice Department, there has been no expressed opposition to the design bill in either House since it was joined to the copyright bill in 1969. Amid all the sound and fury over protection for type face designs at the House Subcommittee hearing on July 17, 1975, the only witness on Title II as such strongly supported its enactment as part of copyright law revision.

**[197]**B. THE TYPEFACE ISSUE

In a letter to Chairman Kastenmeier of the House Judiciary Subcommittee dated June 6, 1975, the Register of Copyrights stated that the question of protection for designs of typefaces had become a major point of concern for the Copyright Office. The letter went on as follows:

... To the best of my recollection, no issue of protection for typeface designs of typeface designs as works of art under the copyright law was raised during the early part of the revision program, including the period during which the bill was under consideration by your Subcommittee. I first became aware of typeface design as a major domestic copyright issue in the early 1970's when the widespread introduction of photomechanical processes for reproducing the printed word promised to alter the typographic industry radically.

In the Copyright Office, my predecessor, Mr. Kaminstein gave serious consideration to industry arguments that we should register claims to copyright in typeface designs as works of art. We had, and still have, a regulation **[*37 C.F.R. 202.1 (a)*]** that has been interpreted to prohibit copyright registration for typeface designs, and the Copyright Office was urged either to change the regulation or to interpret it differently. Following Mr. Kaminstein's retirement the issue was reserved, but has been raised again during the past two years, both in the Copyright Office and in the courts.

Meanwhile, the technological developments in this field were being felt throughout the world, and resulted in a movement to obtain better international protection for typeface designers. The United States participated in the development **[198]**of, but did not sign, the Vienna Typeface Convention of 1973, which would obligate members to protect original typeface designs for a minimum of 15 years under one or another form of law, specifically including copyright protection.

Shortly after I became Register of Copyrights, I was once more presented with the petition and arguments of domestic proponents of copyright protection for typeface designs, some of whom had been active in formulating the international treaty. However, I was also made aware of considerable opposition to any change in the Copyright Office Regulations to permit registration of typeface designs. To provide an opportunity for both sides to present their arguments openly, I held a public hearing on November 6, 1974, the first rulemaking hearing ever held by the Copyright

Office, and received testimony on the issues implicit in any change in the regulations affecting typeface designs ... We specifically requested comment on five points. Written comments were received through January 15, 1975.

In my closing statement at the conclusion of a highly informative all-day hearing, I had to say that I felt I was "between a rock and a hard place." A strong case was made by each side. Proponents of a change in the regulation sought to demonstrate the significance of artistry in designing typefaces -- a "beautiful group of letters," and the differences between the typefaces of different designers. Opponents of any change raised the issues as to the scope of my regulatory authority, and the practical ramifications of an administrative change in this case.

Among others, Irwin Karp, Counsel for the Authors' League, insisted that protection for typeface designs should be dealt with solely as a legislative matter. He said:

[199]'We also believe that if any change ultimately ought to be made in the status of publishing typography -- font and face -- it should certainly not be done by the inflexible method of change in your registration regulations. Neither you or the regulations have the capacity to cope with multitudinous problems that would be created, ...

You are not a legislator. You can only say yes or no. Register or not Register. And you can't mediate or modify the impact of that absolute judgment on many industries and the whole process of disseminating information and culture in this country.'

[Transcript of Typeface Hearing, November 6, 1974, pages 83-84]

As I indicated at the Office's hearing, I take this argument very seriously. I also believe that, implicit in the provisions of H.R. 2223 is the hitherto unexplored question of whether and to what extent typeface designs would be protected under the language of your revision bill, including the design legislation in title II. At the Office's hearing I asked proponents and opponents to reflect on the design bill as a possible solution to the question of protection for typefaces.

From the written comments, two primary issues emerged. First, the term of protection in the design bill is considered by many to be too short for typeface designs; enactment in its present form would not enable us to join the Vienna Typeface Convention. Some doubt was also expressed as to whether typeface designs are within the subject matter of the design bill, since the bill protects "ornamental designs of useful articles" and the various physical embodiments of typeface designs might not come within the bill's definition of "useful articles."

[200]Under the circumstances, I believe it would be highly appropriate for you to schedule time at your hearings to receive testimony from both sides on the question of protection for typeface designs under either title I or title II of your bill."

The hearing, which was held on July 17, 1975, produced a sharp controversy. Proponents of typeface design protection argued that new photocomposition techniques have made unauthorized copying of typefaces an urgent problem, that original designs for fonts of type are the "writings of an author" in both the constitutional and the statutory sense, that no case law in any field rules out their copyrightability, that registration for typeface designs would impose no burden on authors and reprinters, and that both Titles I and II of the revision bill should be amended to make clear that typeface designs can be considered "original" and that fonts of type are "useful articles." They also recommended that the term of protection under the design bill be extended to 15 years, to conform with international standards.

Opponents argued that neither Title I nor Title II of the bill as drafted protects typeface designs; they opposed any amendment of Title I to bring typeface designs within the scope of traditional copyright protection, and they stated that Title II would be inappropriate without "very extensive amendment including mandatory licensing at reasonable rates." They argued that the issue is not [201]one of "typeface piracy," but of creating exclusive rights for a few big manufacturers, who would use them to enforce tying arrangements between their machines and fonts. Concern was expressed by a representative of magazine publishers lest recognition of exclusive rights might lead to suits to enjoin publication of printed matter. Representatives of typographers and the American Institute of Graphic Arts expressed concern about the danger of excessive protection that would foreclose the use of certain typefaces.

In a letter dated July 28, 1975 to Chairman Kastenmeier, supplementing his testimony on July 17, Michael Parker, Director of Typographical Development for the Mergenthaler Linotype Company, stated:

"As stated at the hearings, Mergenthaler has no objection to compulsory licensing of protected typeface designs at a reasonable fee. Additionally, it does not seek unfettered protection for original typeface designs. It seeks only to protect original typeface designs:

1. from unauthorized use to make means for composing text, and

    2. from such unauthorized means being used to compose a page of text.


We make no claim to the composed page, and would have no objection to expressly stating that text composed from an unauthorized means is not an **[202]**infringement of the protected typeface design. These limitations and disclaimers provide a complete answer to the objections of the International Typographers' Association, and Mr. Wasserstrom, Counsel for Hearst Corporation."

A recent letter to the Register of Copyrights from Mergenthaler's attorney states:

"... The sole question that should be considered by the Copyright Office is whether original typeface designs are copyrightable subject matter under the present Copyright Law. If there is any doubt, this doubt must be resolved in favor of registration in accordance with established Copyright Office practice.

It is respectfully submitted that the outcome of the July 17 hearings before Representative Kastenmeier are wholly immaterial to the responsibility of the Copyright Office to determine if original typeface designs are entitled to copyright protection under the present Copyright Law. The impact of such registration should be equally immaterial to the Copyright Office and is a matter solely for the Courts to consider in appropriate cases. Of course, if the Copyright Office feels the present law grants too many rights in the case of original typeface designs, that is a matter which can be properly raised in the legislative forum of Congress, but it should not be used as an excuse to deny registration of copyrightable subject matter.

It is courteously urged that the Copyright Office reach an early determination whether it will or will not register the claim of copyright in original typeface designs under current law. The decision should not be deferred pending the "political winds" which might blow from Congress.

**[203]**The Copyright Office has had pending for more than a year an application by Eltra Corporation, parent of Mergenthaler Linotype Company, to register its claim of copyright in an original typeface design entitled ORION. Prompt action on this application is urged. In this regard, it is the desire of Mergenthaler to have a judicial determination, if necessary, on whether it is entitled to register the claim of copyright in ORION in order to clarify the status of the current law insofar as original typeface designs in view of the limitations in Section 113 of Title I, H.R. 2223."

C. COMMENTS AND RECOMMENDATIONS


1. THE DESIGN PROTECTION ACT (TITLE II)

a. As the law now stands, a large area of designs of useful articles is subject to full copyright protection, while the remainder, consisting of a large body of fine three dimensional designs, is virtually without effective protection. The design bill (Title II of the revision bill) would remedy this injustice and restore a balance to the level of deserved protection in a field involving a high degree of creativity.

b. The Copyright Office adheres to its position strongly favoring the enactment of Title II of the bill. We agree with the comments of the National Aeronautics and Space Agency (NASA) that a decision should be made as to whether this Title of the bill is to be part of title 17 of the U.S. Code, and that an effort should be made to clear up possible ambiguities resulting from conjoining the two titles in the Code.

**[204]**c. Section 202 of the design title has been strongly criticized for its failure to protect the shape of wearing apparel. However, this restriction represents a hard-won compromise, and may well be the reason why there has been no opposition to the bill since 1969, other than the traditional opposition of the Department of Justice.

d. In the context of protection for typeface designs under Title II, questions have been raised as to whether a font is a "useful article," and whether any typeface design can qualify for protection under subsections (b) and (c) of section 202. In our opinion there is no question that truly original designs for typefaces can qualify for protection under the

design title, and we do not feel that revisions in the definition of "useful article" or the language of Sec. 202 are necessary to achieve this purpose.

e. In its testimony before the House Judiciary Subcommittee on May 8, 1975, the Department of Commerce raised several points, all worthy of consideration:

(1) The bill should not require that the design be made public before registration;

(2) The bill should permit multiple designs to be filed on a single application;

(3) Declarations should be allowed in lieu of the requirements for statements under oath;

[205](4) The fee of $ 15 is too low, and the Administrator should have discretion to set the fee at cost. The Copyright Office has no fundamental objection to these suggestions. We observe, however, that multiple designs should be registrable on a single application only if they bear some discernable relation to each other. As for the fee, we have severe reservations about the Administrator being able to set fees on the basis of costs of operations in cases of this sort, where he could be in a position to subsidize the inefficiency of his own operations. If, as we are recommending, administration of the design operation is entrusted to the Copyright Office, the design fee should bear some relation to standard copyright fees.

f. A point raised by the Patent Office, by the representatives of typographers, and supported by Alan Latman in his testimony before the House Judiciary Subcommittee, has to do with the possibility, under Sec. 220, of maintaining an action for infringement without a certificate of registration. The Copyright Office sees no objection to tightening this provision to prevent maintenance of suit in the absence of a certificate of registration.

g. The question of where the design title should be administered is unanswered in the bill but some expectation has been expressed that the Administrator would be the Commissioner of Patents or a subordinate official of the Patent Office. There [206]were, in fact, some informal discussions of this possibility over 20 years ago. However, in the light of the Mazer decision and the extremely close relationship between copyright and design registration, the Copyright Office now feels strongly that administration of the design title should be in the Copyright Office.

h. Both the Department of Justice and NASA raise questions concerning Sec. 232, which concerns suits against the United States Government for design infringement under the new bill. We agree with the suggestions advanced by NASA for technical improvements in the section, but we do not share the Justice Department's concern about possible "difficulties for government procurement."


## 2. CALLIGRAPHY

The age-old "art of beautiful writing" has not, unless accompanied by illuminated letters, ornamental borders, pictorial embossing, and the like, been considered a subject of traditional copyright. In the light of the recent discussions of the Copyright Office Regulations in the context of the dispute over typeface designs, we are inclined to believe that this position is wrong. We believe that the report on Title I should make clear the copyrightability of original calligraphic works as "pictorial, graphic, or sculptural works."

[207]A related question concerning the liability of calligraphers for copyright infringement was the subject of correspondence between Senator McClellan and the Register of Copyrights. In a letter dated December 17, 1974, the Register wrote:

In their correspondence, calligraphers have requested an exemption to use copyrighted works without incurring copyright liability for two purposes: (1) instruction of student calligraphers, and (2) a single reproduction on a commission basis at the request of clients, i.e., for a profit-making purpose. In my review, I concluded that those two cases should be distinguished.

As you know, the judicial doctrine of fair use would be codified in a general way in section 107 of the copyright revision bill. Viewing the guidelines for fair use in the bill, I think a single reproduction of excerpts (or in the case of short works, the entire work) from a copyrighted work by a student calligrapher or the teacher in a learning situation would be a fair use of the copyrighted work. I do not recommend any change in the bill, but you may want to include a paragraph in the Committee Report on this point when the bill is next reported.

Reproduction by a calligrapher of a copyrighted work at the request of a client represents another, and possibly different, case. Since the reproduction would be made for profit, the fair use privilege is more circumscribed. Resolution

of the infringement question turns on facts such as possible competition between the copyright owner and the calligrapher or her client, and possible dilution of the market for the copyrighted work. In most cases, I think it probable that the courts would consider that the single copy reproduction of a copyrighted work by a calligrapher, for one client, for his private enjoyment, would not represent an infringement of the copyright, especially where only excerpts are reproduced. On the other hand, multiple copy reproduction for sale would probably represent an infringement ....

[208]In conclusion, I do not believe any specific exemption for calligraphers in the revision bill is justified. The fair use provisions probably free calligraphers of copyright liability in most cases of single copy reproduction. In other cases, I do not perceive any basis for a special exemption from the rights of copyright owners.

3. DESIGNS FOR TYPE FACES

a. The issue of protection for original typeface designs under the present law, Title I of the revision bill, or the design act embodied in Title II, is one of extraordinary difficulty and complexity. In view of the consistent tradition in the Copyright Office in opposition to the registration of any type face designs, the long-standing interpretation of the Office's regulations to this effect, and the many doubts raised at the Copyright Office hearing on the subject, it is our view that registration under the present law should be made only on the basis of a clear-cut judicial decision.

b. The testimony at the House hearings on July 17, 1975 suggested that, underneath the sharp arguments, there may be an underlying basis of agreement. It seems possible that, if the bill were amended to foreclose copyright for typeface designs under Title I and to make clear the availability of protection under Title II, the various positions might be accommodated if:

a) liability were clearly restricted to the unauthorized duplication of the design in the manufac[209]ture of fonts, matrixes, etc., and if printers, authors, publishers, etc., were clearly freed from any risk of liability; and

b) a compulsory licensing system were established under Title II, allowing anyone to manufacture a font, etc., reproducing a protected type face design on payment of a reasonable fee.

This proposal would obviously require careful elaboration as to content, form, and procedure. However, the Copyright Office considers this the best hope of resolving an important and difficult problem, and would do its best to contribute to a productive result.

§ [210]CHAPTER VIII EXCLUSIVE RIGHTS IN SOUND RECORDINGS

Sections Considered:

§ 106       - Exclusive rights in  copyrighted works.

§ 114       - Scope of exclusive  rights in sound recordings.

H.R. 5345     - (94th Cong., 1st  Sess., March 21, 1975) - A bill to amend
        the Copyright Act of 1909, and for  other purposes

Issues:

1. Should sections 106 and 114 be amended to grant the owner of copyright in a sound recording the exclusive right to make derivative works?

2. Should the exclusive right of reproduction of copyrighted sound recordings under section 114 be made subject to compulsory licensing?

3. Should the rights in copyrighted sound recordings be expanded by establishing a compulsory licensing system under which royalties would be paid for performances of copyrighted sound recordings?

[211]A. BACKGROUND OF SECTION 114

The Copyright Office revision study on the unauthorized duplication of sound recordings, published in 1957, summarized the legislative history on the subject up to that point as follows:

Respectfully submitted,

s/Adam S. Baldridge

Grady M. Garrison
Bradley E. Trammell
Adam S. Baldridge
Nicholas L. Vescovo
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103

*Counsel for Appellants*
*Varsity Brands, Inc.,*
*Varsity Spirit Corporation, and*
*Varsity Spirit Fashions & Supplies,*
*Inc.*

June 23, 2014

# CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June 2014, I electronically filed the

original of the foregoing with the Clerk of this Court by using the CM/ECF system,

which will send notice of such filing to the following registered CM/ECF users:

Michael Francis Rafferty
Kannon Cooper Conway
HARRIS SHELTON HANOVER WALSH
One Commerce Square
Suite 2700
Memphis, TN 38103

Steven Michael Crosby
Kalpana Nagampalli
FELDMAN LAW GROUP
220 E. 42nd Street
Suite 3304
New York, NY 10017

*Counsel for Appellee*
*Star Athletica, L.L.C.*

Theodore C. Anderson, III
Ashley E. Tremain
KILGORE & KILGORE
3109 Carlisle
Dallas, TX 75204

s/Adam S. Baldridge