**No. 14-5237**
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

VARSITY BRANDS, INC.; VARSITY SPIRIT CORPORATION;
VARSITY SPIRIT FASHIONS & SUPPLIES, INC.

Plaintiffs – Appellants

v.

STAR ATHLETICA, LLC

Defendant – Appellee

_____

**BRIEF OF APPELLEE STAR ATHLETICA, LLC**
_____

Appeal from a final judgment of the United States District Court for the Western District of Tennessee, Hon. Robert H. Cleland, United States District Judge, presiding by appointment.

Respectfully submitted,

Michael F. Rafferty, Tenn. Disc. No. 10092
Harris Shelton Hanover Walsh, P.L.L.C.
Memphis, Tennessee

Steven M. Crosby, N.Y. State Bar No. 4261269
The Feldman Law Group
New York, New York

Theodore C. Anderson, Texas Bar No. 1215700
Kilgore & Kilgore
Dallas, Texas
Attorneys for Star Athletica, LLC

No. 14-5237
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

VARSITY BRANDS, INC.; VARSITY SPIRIT CORPORIATION;
VARSITY SPIRIT FASHIONS & SUPPLIES, INC.

Plaintiffs – Appellants

v.

STAR ATHLETICA, LLC

Defendant – Appellee
_____

DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTEREST
_____

Pursuant to 6th Cir. Rule 26.1, Star Athletica, LLC makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly-owned corporation?

No.

2. Is there a publicly-owned corporation, not a party to the appeal, that has a financial interest in the outcome?

No.

> *s/Michael F. Rafferty*
> Michael F. Rafferty, Tenn. Disc. No. 10092
> HARRIS SHELTON HANOVER WALSH, P.L.L.C.
> One Commerce Square, Suite 2700
> Memphis, TN 38103-2555
> Attorney for Star Athletica, LLC

i

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ...............................................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................................1

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION...................................................................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................3

STATEMENT OF THE CASE...............................................................................4

    Facts Relevant to Issues Submitted for Review .................................................5

    Construction of Cheerleading Uniforms From Varsity's Designs ..................9

    Procedural History .........................................................................................14

ARGUMENT .......................................................................................................20

    Summary of Argument ...................................................................................20

    Standards of Review .......................................................................................22

    A copyright of a two-dimensional design of a useful article may not
    be used as a substitute for a patent of the useful article depicted in the
    design. .............................................................................................................23

    The Copyright Act requires designs of pictorial or graphic works to be
    separately identifiable and capable of existing independently of
    utilitarian aspects of the useful article, which is known as
    "separability.". ...............................................................................................28

    ARGUMENT: Issue No. 1: Varsity's allegations that Star's
    manufacturing of three-dimensional cheerleading uniforms infringed
    Varsity's copyrights in its two-dimensional cheerleading uniform
    designs are an attempt to extend copyright protection beyond the
    limits of the Copyright Act of 1976. .............................................................33

Uniforms are functional and not entitled to copyright protection. ...................................................................37

The district court correctly ruled that Star rebutted the presumptive validity of Varsity's copyright registrations and that Varsity's two-dimensional designs cannot prohibit Star from manufacturing cheerleading uniforms, but the court did not find that Varsity's copyrights were invalid. ..................................43

Separability analysis – identifying the physical and conceptual features of a useful article that can exist independently of the article's usefulness – is a refinement of the distinction between the protection provided by a copyright and a patent. ..........................49

The district court found Varsity's designs were not conceptually separable under recognized separability standards. .......53

The elements of Varsity's designs depicting cheerleading uniforms are not physically separable from actual uniforms. .............67

ARGUMENT: Issue No. 2: The district court properly exercised its discretion in ruling that expert testimony could be admissible as to Varsity's claims of copyright infringement. .................................68

ARGUMENT: Issue No. 3: The district court properly exercised its discretion to dismiss without prejudice Varsity's state-law claims after dismissing all of Varsity's federal-law claims prior to trial. ........................70

CONCLUSION .....................................................................71

CERTIFICATE OF COMPLIANCE ....................................................72

CERTIFICATE OF SERVICE .........................................................72

APPELLEE'S DESIGNATION OF
RELEVANT DISTRICT COURT DOCUMENTS ...............................................73

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE**

*Andretti, M.A. v. Borla Performance Industries, Inc.,*
426 F.3d 824 (6th Cir. 2005) ....................................................................22

*ATC Distribution Group, Inc. v. Whatever It Takes Transmissions
& Parts, Inc.*, 402 F.3d 700 (6th Cir. 2005) ...........................................47

*Baer v. R & F Coal Co.,* 782 F.2d 600 (6th Cir.1986) ............................70

*Baker v. Seldon,* 101 U.S. 99 (1879) ......................................................23

*Beaudin v. Ben and Jerry's Homemade, Inc.,* 896 F.Supp.
356 (D. Vt. 1995) .................................................................................. 23-4

*Brandir Int'l, Inc. v. Cascade Lumber Co.,* 834 F.2d 1142 (2d Cir. 1987).......29, 60

*Bridgeport Music, Inc. v. UMG Recordings*, Inc., 585 F.3d 267
(6th Cir. 2009) .........................................................................................46

*Carol Barnhart Inc., v. Econ. Cover Corp.,*773 F.2d 411
(2d Cir. 1985). ................................................................29, 36, 45, 59

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)............................................................................... 47-8

*Chosun Int'l, Inc. v. Chrisha Creations, Ltd.,* 413 F.3d 324 (2d Cir. 2005). ..........29

*Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905 (2d Cir. 1980)....................45

*Eliya, Inc. v. Kohl's Dept. Stores*, 2006 WL 2645196,
82 U.S.P.Q.2d 1088 (S.D.N.Y. Sept. 13, 2006). ..............................................*passim*

*Eve of Milady v. Impression Bridal, Inc.*, 957 F.Supp. 484 (S.D.N.Y. 1997).........48

*Fonar Corp. v. Domenick,* 105 F.3d 99 (2d Cir. 1997) ..........................................44

*Galiano v. Harrah's Operating Co., Inc.,* 2004 WL 1057552 (E.D. La., May 10, 2004), *aff'd*, 416 F.3d 411 (5th Cir. 2005).........................................................*passim*

*Gay Toys, Inc. v. Buddy L Corp.*, 703 F.2d 970 (6th Cir. 1983) ............................29

*Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774 (7th Cir. 1994) .................71

*Hi-Tech Video Productions, Inc. v. Capital Cities/ABC, Inc.,* 58 F.3d 1093 (6th Cir. 1995) ...........................................................................45

*Homfeld II, LLC v. Comair Holdings, Inc.*, 53 Fed. App'x 731 (6th Cir. 2003)...............................................................................................71

*Inhale, Inc. v. Starbuzz Tobacco, Inc.,* 739 F.3d 446 (9th Cir. 2014), *amended,* 755 F.3d 1038 (June 3, 2014)....................................................29

*Jack Adelman, Inc. v. Sonners & Gordon, Inc.,* 112 F.Supp. 187 (S.D.N.Y. 1934)......................................................23, 25, 30, 35

*Jovani Fashion, Ltd. v. Cinderella Divine, Inc.*, 808 F. Supp. 2d 542 (S.D.N.Y. 2011), *aff'd sub nom. Jovani Fashion, Ltd. v. Fiesta Fashions*, 500 Fed. App'x 42 (2d Cir. 2012), *cert. denied*, 133 S.Ct. 1596 (March 18, 2013), *reh'g denied*, 133 S.Ct. 2821 (June 10, 2013)...........................................................................................*passim*

*Kieselstein–Cord v. Accessories by Pearl, Inc.,* 632 F.2d 989 (2d Cir. 1980)...................................................................................28, 53

*Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996 (2d Cir. 1995) ............................25

*Kohus v. Mariol*, 328 F.3d 848 (6th Cir. 2003). ...............................*passim*

*Magic Mktg. v. Mailing Servs. of Pittsburgh, Inc.,* 634 F.Supp. 769 (W.D.Pa.1986)............................................................22

*Malone v. Windsor Casino, Ltd.*, 14 Fed. App'x 634 (6th Cir. 2001).....................71

*Mazer v. Stein,* 347 U.S. 201 (1954)................................................................25, 33

*Murray Hill Publ'ns, Inc. v. ABC Communications, Inc.*,
264 F.3d 622 (6th Cir. 2001) ................................................................22

*Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.*, 696 F.2d 918
(11th Cir.), *cert. denied*, 464 U.S. 818, 104 S.Ct. 78,
78 L.Ed.2d 89 (1983) .................................................................*passim*

*OddzOn Products, Inc. v. Oman*, 924 F.2d 346 (D.C.Cir. 1991) ...........................48

*Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*,
372 F.3d 913 (7th Cir. 2004) ................................................... 29-32, 53

*Robert R. Jones Assoc., Inc. v. Nino Homes,* 858 F.2d 274 (6th Cir. 1988) ...........23

*Russell v. Trimfit, Inc.*, 428 F.Supp. 91 (E.D.Pa. 1977). .........................................24

*Sem-Torq, Inc. v. K Mart Corp.*, 936 F.2d 851 (6th Cir. 1991)........................22, 70

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). ................................................ 47-48

*Stromback v. New Line Cinema*, 384 F.3d 283
(6th Cir. 2004)..............................................................................22, 31, 47

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
196 Fed.Appx. 166 (4th Cir. 2006).......................................................44

*Universal Furniture Int'l, Inc. v. Collezione Europe USA, Inc.*,
618 F.3d 417 (4th Cir. 2010). ......................................................*passim*

*Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452 (2d Cir. 1989). .......24, 49

*Williams v. City of River Rouge*, 909 F.2d 151 (6th Cir. 1990). ...........................23

*Winfield Collection, Ltd. v. Gemmy Indus. Corp.*,
147 Fed. App'x 547 (6th Cir. 2005). .............................................23, 30

STATUTES AND REGULATIONS

15 U.S.C. § 1125(a) ......................................................................................2

17 U.S.C. § 101 ...................................................................................*passim*

17 U.S.C. § 102(b) ......................................................................................33

17 U.S.C. § 106 ............................................................................................2

17 U.S.C. § 113(b) ................................................................................35, 50

17 U.S.C. § 410(c) .................................................................................. 44-45

28 U.S.C. § 1291 ..........................................................................................2

28 U.S.C. § 1331 ..........................................................................................2

28 U.S.C. § 1332 .................................................................................. 2, 70-71

28 U.S.C. § 1338(a) and (b) ..........................................................................2

28 U.S.C. § 1367 ..........................................................................................3

28 U.S.C. § 1367(c)(3) .........................................................................20, 70

Registrability of Costume Designs, 56 Fed. Reg. 56,530 (Nov. 5, 1991) ...............5

Compendium of Copyright Office Practices II, §5.01
*Definition of useful article* (1984).......................................................36, 50

TREATISES/LAW REVIEWS/MISC.

Robert C. Denicola, *Applied Art and Industrial Design: A Suggested*
*Approach to Copyright in Useful Articles,* 67 Minn. L. Rev. 707 (1983)...........4, 33

Paul Goldstein, Goldstein on Copyright § 2.5.3 (3rd ed. 2014) ..............................65

M. Nimmer and D. Nimmer, 1 *Nimmer on Copyrights* (2004).......................*passim*

Register's Report on the General Revisions of the U.S. Copyright Law (1961)…34

Supplementary Register's Report (1965), reprinted in Appendix. 15, pg. 77, *Nimmer on Copyright* (1992)……………………………………………… 34-35

William F. Patry, 1 Copyright Law & Practice 285 (1994) ....................................66

*Webster's Ninth New Collegiate Dictionary* (1983)...................................................28

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Useful articles, such as garments, are not eligible for copyright protection. The pivotal issue in this appeal concerns the concept of separability under the Copyright Act – the ability to separate non-utilitarian features from the design of useful articles, which in this case are cheerleading uniforms. The district court concluded that it is not possible to either physically or conceptually sever Varsity's designs from the utilitarian function of the resulting cheerleading uniforms. Because there is a visual component to the analysis, oral argument may substantially assist the Court in assessing whether the district court was correct.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Varsity Brands, Inc., Varsity Spirit Corporation, and Varsity Spirit Fashions & Supplies, Inc. ("Varsity") alleged five claims of infringement under the Copyright Act, 17 U.S.C. § 106, one claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a), and five state-law claims, asserting subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1338(a) and (b). (RE #1, Complaint).

Varsity appeals pursuant to 28 U.S.C. § 1291 from the final judgment entered on March 1, 2014 (RE #200, Judgment), based upon summary judgment as to Varsity's infringement claims and dismissal of its state-law claims. (R.E. #199, Op'n and Ord. Grtg in Part and Deny'g in Part Dft's Mtn for Sum'y Judgt, etc. – the "SJ Ord."). Varsity also appeals from an interlocutory order denying Varsity's motion to preclude Star's expert witnesses. (R.E. #148, Opinion and Order Overruling Pltfs' Obj's, etc. – the "Experts Ord.").

Varsity filed a notice of appeal on March 5, 2014. (R.E. #201, Not. of Appeal).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Did the district court correctly conclude that it is not possible to physically or conceptually sever Varsity's designs for cheerleading uniforms from the utilitarian function of the resulting cheerleading uniforms, as required under the Copyright Act, 17 U.S.C. § 101, and that Varsity's copyrights in two-dimensional uniform designs could not support infringement claims against Star for manufacturing three-dimensional cheerleading uniforms?

2.  Did the district court act within its discretion in ruling that expert testimony could be admissible in defending against Varsity's claims of copyright infringement as to its cheerleading uniform designs?

3.  Did the district court act within its discretion under 28 U.S.C. § 1367 in declining to exercise supplemental jurisdiction and dismissing without prejudice Varsity's state-law claims after all of Varsity's federal-law claims were dismissed when Varsity failed to allege facts to support an independent basis for subject matter jurisdiction by not alleging an amount in controversy or that complete diversity existed?

<u>**STATEMENT OF THE CASE**</u>

This case involves the distinction between industrial design and applied art in the context of the designs of cheerleading uniforms. For a discussion of the distinction, *see* Robert C. Denicola, *Applied Art and Industrial Design: A Suggested Approach to Copyright in Useful Articles,* 67 Minn. L. Rev. 707, 721 (1983) ("*Denicola*") ("Congress was unmistakably clear, however, that it intended to exclude industrial design from the subject matter of copyright: 'On the other hand, although the shape of an industrial product may be aesthetically satisfying and valuable, the Committee's intention is not to offer it copyright protection under [the 1976 Copyright Act]. Unless the shape of an automobile, airplane, ***ladies' dress***…contains some element that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article, the design would not be copyrighted under the bill.'") (emphasis added, footnote omitted).

Varsity and Star make and sell cheerleading uniforms. Star contends the design of cheerleading uniforms is industrial design, unprotectable by copyright. Varsity argues its cheerleading uniform designs are applied art, protectable as fabric designs applied to the surface of the uniform, and it obtained copyright registrations for five of its two-dimensional uniform designs by depositing with the Copyright Office three sketches, identified as "2-dimensional artwork," and two photographs of actual cheerleading uniforms, identified as "FABRIC DESIGN

(ARTWORK)."[1]

Garments are useful articles and not copyrightable, and uniforms are specifically listed as being subject to the Copyright Office's general policy of "nonregistrability of garment designs." *See* Registrability of Costume Designs, 56 Fed. Reg. 56, 530 (Nov. 5, 1991). Two-dimensional artwork depicting clothing is protectable by copyright, but the articles of clothing portrayed in the artwork are not protectable by copyright.

Varsity alleges Star infringed Varsity's copyrighted 2-dimensional designs by manufacturing the actual articles of clothing portrayed in the sketches and photographs, i.e., by manufacturing cheerleading uniforms.

**<u>Facts Relevant to Issues Submitted for Review</u>**

The following images are certified copies of the sketches and photographs Varsity deposited with the Copyright Office corresponding to the five design registrations. Although it is obvious in looking at these items deposited that they are sketches of uniform designs and photographs of completed cheerleading uniforms, it should be noted that Varsity obtained registrations as "2-dimensional artwork," not in the clothing depicted in the sketches or photos.

---

[1] The distinction between fabric design and dress design is discussed at page 25.

1.    **Design 078 (Reg. No. VA 1-417-427)** (RE #169, PageID 2135, Star's

SJ Memo'm, Ex. 2):



2.    **Design 815 (Reg. No. VA 1-675-905)** (Id., Ex. 1)



**3.** **Design 299A (Reg. No. VA 1-319-228)** (Id., Ex. 4)



**4.** **Design 299B (Reg. No. VA 1-319-226)** (Id., Ex. 5)



**5.** **<u>Design 074 (Reg. No. VA 1-411-535)</u>** (Id., Ex. 3)



074

[This space intentionally left blank]

## Construction of Cheerleading Uniforms From Varsity's Designs

Varsity employs designers to design cheerleading uniforms with standard design elements, and it has registered copyrights in its designs as "2-dimensional artwork" but not in the uniforms themselves. (RE# 173, PgID 2384, 2393-94, Varsity's SUMF ¶34).

Varsity says it published these five designs as 2-dimensional "artwork" in its catalogs, (Id., PgID 2386-87, Varsity's SUMF, ¶¶8-10), but these catalogs do not display the three copyrighted sketches or the two photographs of uniform shelltops. Instead, the catalogs contain different photographs of human models wearing actual cut-and-sew cheerleading uniforms, which is not the "2-dimensional artwork" registered with the Copyright Office. (R.E.#176, Star's Resp. to SUMF, Ex. H-J).

In its 2013 catalog, Varsity told customers how to customize cut-and-sew uniforms with industry-standard colors and stripes to "give a uniform multiple personalities," instructing them to "start with a uniform style . . .**color it up** in any combination of 24 school colors" and "**add braid** in any of 9 styles, also in your choice of colors" because it's "all about the braid." (Id., Ex. 35, 2013 Varsity catalog, pages 65 and 229) (emphasis in original). The following are images of pages 65 and 229 from the 2013 catalog which graphically display these functional color and stripe options:

9



# we are CUSTOM

one uniform + hundreds of options = a custom look for one team—YOURS!



B



C

## custom = options

**start** with a uniform style. this one even has back options!
**color it up** in any combination of 24 Varsity school colors, White, or 8 metallic colors.
**add braid** in any of 9 styles, also in your choice of colors.
**letter it** with any of hundreds of lettering choices, or add your custom logo!

A









## all about braid

second only to color, braid choice can give a uniform multiple personalities, from classic to collegiate to retro.





## 24 SCHOOL COLORS = TONS OF POSSIBILITIES

A-C. *NEW!* HALTER WH-133FA $76.95
SHELL TOP WS-133FA $76.95
ActionWeave® back design.
Halter with optional strap.
A. Lettering: (TTLLWD-3) 6", (TTPAW-3) 3"
MotionFLEX® Bodyliner, $63.95,
mock neck crop (MFBL-133CM)
Skirt, $67.95, (S-133)
B. Lettering: (TTINTL2-3) 7"
C. Lettering: (TTLL-4) 6"

## Policies

### DELIVERY
Contact your local Varsity representative or our Customer Service department or see varsity.com for current delivery schedules. Delivery schedules are approximate and may vary depending upon availability of products and time of the year your order is placed. Delivery schedule begins upon Varsity's entry and processing of your completed order in the main office. Please allow for transportation time in your area.

We assume no liability for delays in or failure to make delivery due to our inability to obtain supplies, raw materials and labor, or to conditions over which we have no control, including the delays of carriers, accidents, strikes, war, or other unavoidable cause.

### MATCHING PREVIOUS ORDERS
Need to outfit new squad members in matching uniforms?

We make every effort to match colors as closely as possible. Although the finest dyes are used in all items, materials and lots may absorb dye to slightly varying degrees and shading differences may occur. Varsity cannot be responsible for matching items purchased from our catalog to those purchased from other suppliers. See color chart for approximate Varsity colors.

All reorders for uniforms with monogram or ECMs must include a photocopy of the garment showing the style and placement of the lettering. Reorders may not match exactly unless a photocopy is included. Uniform reorders for garments with tackle twill must include the original order number. Please contact your local Varsity sales representative for all reorders.

### CANCELLATIONS
All Varsity uniforms are specially made for the individual customer. Therefore, once your order has been placed into production it is impossible to cancel it or make changes to it.

### USE AND CARE INSTRUCTIONS
Varsity garments are all easy care, easy wear. Use and care instructions are included with each garment and/or are printed clearly on all garment labels. Items not washed according to our labels are not returnable.

We recommend that no harsh detergents or bleach be used. Polyester garments should be washed separately in a full tub of warm water. Remove the garment promptly from the washer once the cycle is complete. Hang the garment to dry.

DO NOT dry clean Varsity uniforms. Any dry cleaned items are not returnable. If you wish to have your merchandise dry cleaned, you or the dry cleaner must assume responsibility for damages.

DO NOT use fabric softener on polyester garments as it may affect soil release properties.

Wash campwear in cool water and allow to dry naturally.

### RETURNS AND EXCHANGES
Varsity stands behind all of our products. If we have manufactured a garment incorrectly or our merchandise is defective, VARSITY WILL MAKE IT RIGHT. If you have questions regarding custom merchandise, please call your local representative or our customer service department toll-free at 1-800-533-8022.

**Custom Made Items:** ALL CUSTOM MADE ITEMS OR LETTERED ITEMS MAY NOT BE RETURNED OR EXCHANGED.

- Examples of items that are not returnable include but are not limited to: Made-to-order uniforms, warmups, jackets and dancewear; lettered or silk-screened items; personalized campwear, chenille; made-to-order hair accessories, socks and megaphones; poms.

- You may be ordering uniforms for growing athletes. While Varsity will remake custom items in the case of a defect in materials or workmanship, Varsity is not responsible for replacing uniforms that have been outgrown.

- Items that have been worn, soiled, laundered, or altered in any way cannot be returned.

**In Stock Items:** All in stock items may be exchanged or returned within 14 days after the receipt of your merchandise. Simply follow the directions included with your shipment.

- There is no restocking fee associated with in stock merchandise returns.

- Items that have been worn, soiled, laundered, or altered in any way cannot be returned.

- Shoe exchanges must be received in restockable condition and in their original box. If shoes are not in restockable condition (CLEAN, UNLACED, and in the ORIGINAL UNMARKED BOX), they will be returned to you.

- Due to health regulations, briefs, bodysuits, tights, and in stock dancewear are not returnable if the package has been opened.



**Uniform Color Chart** Use this color chart for approximate colors. Choose from these 32 colors or White. MotionFLEX® also available in prints available as listed where products appear in catalog. Colors for non-uniform items may vary and are listed where the products appear in catalog.

BLACK (BLK), BRIGHT GOLD (BRG), BROWN (BRN), CARDINAL (CAR), COLUMBIA BLUE (COL), DARK GREEN (DKG)

DARK MAROON (DKM), GREY (GRY), HOT PINK* (HPK), KELLY GREEN (KEL), MAROON (MAR), MIAMI DOLPHIN GREEN (MDG)

NAVY BLUE (NVY), NEW TEAL (NTL), OLD GOLD (OLD), ORANGE (ORG), PEACOCK BLUE (PBL), PURPLE (PUR)

RED (RED), ROYAL BLUE (ROY), SCARLET (SCR), TENNESSEE ORANGE (TNO), TEXAS ORANGE (TXO), VEGAS GOLD (VGD)

*Hot Pink not available in ActionWeave®

**Metallic Colors** (polyester and MotionFLEX®) for use in accent panels



GOLD (GOL), KELLY (MKG), MAROON (MMA), NAVY (MNB)

PURPLE (MPU), SCARLET RED (MRD), ROYAL (MRY), SILVER (SIL)

## Uniform Striping

**Colors available:**
All Varsity Colors: See Uniform Color Chart above.
**Additional Metallic Color:** Black (MBK)
**Fashion Colors:** Bronze (BRZ), Fuchsia (FUS), Hot Green (HGR), Turquoise (TRQ)

*$5 surcharge applies (SFCHRG).
Available with Kaleidoscope, Misty, Misty Holo Dot, or Sparkle Spandex overlay. Refer to Specialty Fabric Color Chart on p. 225 for available colors.





#19 – 1", 2"   #17 – 2" only   #24 – 1", 2"   #20 – 1", 2"   #14 – 1", 2"   #15 – 1", 2"   #12 – 1", 2"

#11 – 1", 2"   #10 – ½", 1", 2"   #200 – ½", 1", 2"   #201* – 1", 2"   #202* – 1", 2"   #210* – 1", 2"   #211* – 1", 2"   #214* – 2"

©2013 Varsity Spirit Corporation. All rights reserved. The original designs depicted in this catalog are the exclusive property of Varsity Spirit Corporation. They may not be reproduced or manufactured without written permission from Varsity Spirit Corporation. This VARSITY catalog is for the exclusive use of Varsity and its customers. No company, other than Varsity, shall use the Varsity catalog in any way in its sales presentations or otherwise and customers wishing to purchase Varsity products may do so only from Varsity. Any violation of the foregoing may constitute a violation of Federal or State law.

229

The five designs Varsity alleges were infringed by Star began as sketches by Varsity employees, which were translated into garments and construction specifications (RE#169-1, Ex.13-15) and added to Varsity's line of cut-and-sew uniforms in its catalogs. (RE#176, Ex. H-J).

Kim Williams was the designer of Designs 815 and 074; along with Amy Bailey, Ms. Williams also sketched Design 078. (RE#170, PgID 2232-3, 2236, JSUF ¶¶ 15, 23, 45,). In creating Design 078, Ms. Bailey says she "referenced" the features from the top-selling uniform styles in Varsity's 2006 catalog – "[a]ngles of braiding with lettering, the separation of color . . . the arrangement of different design aspects" – as part of her "vision" for the design. (RE#176, Ex. K, Bailey Dep. 160:19-163:18).

The design Varsity ultimately registered as photographs of two separate shell-tops, 299A and 299B, was from a sketch jointly made by former Varsity designer Joe Long and the late Kraig Tallman. (Id., Ex. CC, Long Decl. ¶¶6-12).

According to Mr. Long, the first step in designing a uniform is to define its shape and appearance: "[S]tart off with that shape [of a uniform] and cut that shape into pieces[,] with ideas of how those would be reassembled[,] and add qualities to the garments" to tell the production department the cut, style, and fit of uniform designs so that fabric and braid cutting-patterns could be made and the uniform "assembled." (Id., Ex. E, Long Dep. 29:8-30:13). "The ultimate goal was to build a

cheerleader uniform that reflected the pieces that [they] were putting together to build that garment." (Id., at 34:1-9).

According to Varsity's lead designer, Ms. Williams, stripes, V's, diagonals, lines, and curves "are basic elements" of cheerleading uniforms, and seams between panels "exist to allow a customer to choose colors for both the portion above the seam and the portion below the seam." (RE#169-1, Ex. 43, Williams Dep. 166:20-22; RE#176, Ex. U, Williams Dep. 62:2-8). Gary Spencer, a Varsity vice president, testified that the purpose of "braid is to add color and decoration" and "if it is placed across a seam, it will also cover [a] seam." (Id., Ex. 44, Spencer Decl. 95:22-24.)

The functionality of Varsity's designs is illustrated in Varsity's 2009 catalog: "***Each design*** must pass rigorous standards for ***style***, ***construction***, ***fit***, and ***performance*** before it can be called a Varsity Original." (RE #176, Ex. C, pg. 2, 2009 Catalog) (emphasis added).

Cut-and-sew garments are assembled by cutting and stitching together fabric pieces and braid. (RE#176-3, Leake Decl. ¶¶3-8). Ninety to ninety-eight percent of the cheerleader shell-top uniforms sold by Varsity are cut-and-sew uniform designs, including the five Varsity designs at issue here. (RE#169-1, Ex. 43, Williams Dep. 187:4-188:15).

Late in this lawsuit, Varsity began referencing materials imprinted with images of these five uniforms by sublimation (heat-bonding colored dyes into fibers in a sheet of fabric), but Varsity has never sold any of these five designs as sublimated uniforms. (RE#182, PgID 3740, Resp. to Star's Objection to Sublimated Materials, p. 9).

Varsity inserted these materials into this lawsuit long after fact discovery by attaching them to its expert rebuttal reports and its summary judgment filings, later telling the district court these materials "were not in existence prior to the close of fact discovery," apparently because they were manufactured for this lawsuit. (Id., pp. 2-3, 9-10, 14).

**<u>Procedural History</u>**

Varsity alleges five claims of copyright infringement, one claim of trademark infringement, and five state-law claims, including unfair competition. (RE #1, PgID 1, Compl.).

Star's motion to dismiss was denied (R.E. #56, Ord. Deny'g Mtn to Dis.), but the court reserved the issues of separability, functionality and *dress-or-fabric* design. (R.E. #60, PgID 605, Ord. Deny'g Mtn to Clarify).[2]

Star filed an answer and counterclaim. (R.E. #58, Ans. and Cnterclm).

---

[2] This case was originally assigned to Judge Bernice B. Donald but Judge Robert H. Cleland from the Eastern District of Michigan was eventually appointed to be the presiding judge. (R.E. #125, Clk's Note, March 20, 2011).

Varsity moved to dismiss Star's counterclaim (R.E. #61, PgID 608, Mtn to Dismiss Cntercl.), which the district court granted in part and denied in part. (R.E. #80, PgID 812, Ord. Grtg in part Mtn to Dismiss).

The parties filed motions to compel discovery (R.E. #84, PgID 853; First Mtn to Compel; R.E. ##s 110 and 114, PgID 1370, 1411, Mtns to Compel), and Varsity filed a sealed motion to preclude Star's experts. (R.E. #97, Sealed Mtn to Precl. Exp.Test'y). These motions were referred to the magistrate judge (R.E. ##'s 93, 109, 112, PgID 1170, 1368, 1409; Ords. Rf'g Mtns. to Mag. Judge), who denied Varsity's motion to preclude expert testimony. (R.E. #137, PgID 1829, Ord. Deny'g Sealed Mtn).

Varsity's appeal of the denial of its motion to preclude expert testimony was overruled by the district court which found that Varsity's designs were in the category of materials – *garment design* – on which expert testimony was appropriate. (RE #148, PgID 1943-4; Experts Ord at 9-10). Judge Cleland found that Star's expert reports demonstrated the norms of the cheerleading apparel industry were sufficiently specialized that "'a lay person is unlikely to understand what constitutes creativity in this area, which elements are standard for the industry, and which elements are dictated by efficiency or by external standards,'" quoting *Kohus v. Mariol,* 328 F.3d 848, 858 (6th Cir. 2003). Judge Cleland concluded that "the admission of [Star]'s proffered expert opinions on the issue of

*either* copyrightability or substantial similarity is within the precepts of applicable law, and the magistrate judge did not err in so deciding." (RE #148, PgID 1943-4; Experts Ord at 9-10) (emphasis by the court).

Judge Cleland noted that the parties "hotly contested" whether Varsity's copyrighted designs were for "fabric designs" (imprinted on fabric) or "dress designs" (designs for the shape, style, fit, cut, and dimensions of a "useful article"), the latter being copyrightable only to the extent that any pictorial, graphic, and sculptural features were capable of existing independently of the utilitarian aspects of the article. The court's analysis of the propriety of expert testimony went to the heart of this case:

> [Varsity] aver[s] that [Star] infringed on their copyright over drawings and photographs of cheerleading uniforms not by reproducing those two-dimensional images, but rather by creating three-dimensional uniforms that resemble those in the images. . . . In *Eliya, Inc. v. Kohl's Department Stores,* No. 06 Civ 195(GEL), 2006 WL 2645196 (S.D.N.Y. 2006), the Southern District of New York explained the importance of this distinction. . . :
>
>> ... [A]n etching of a shoe, which has no utilitarian function and is simply an artistic rendering of a physical object, can be copyrighted, while an actual shoe cannot be. As a necessary consequence, ownership of a copyright in a pictorial representation of a useful article does not vest the owner of the picture with a derivative copyright in the useful article itself. If such roundabout copyrighting were permitted, copyright law's exclusion of useful articles would be eviscerated, because any useful article could be copyrighted by merely obtaining a copyright for a two-dimensional representation of the article.

* * *

2006 WL 2645196, at *9.

Despite [Varsity's] attempt to shoehorn their claim into one involving "the reproduction of visual art" on cheerleading uniforms, *id.,* it is in fact analogous to the situation confronted in *Eliya.* As in that case, [Varsity] here do[es] not allege that [Star] "reproduced the [two-dimensional pictures of cheerleading uniforms] on the surface of an infringing line of [uniforms]." *Id.* [Varsity] instead aver[s] that [Star] incorporated into its uniforms certain design elements depicted in the copyrighted renderings. The allegedly protected elements of [Varsity's] designs — for example stripes along the hem of a uniform's skirt or a block of white fabric across a uniform's chest, (*see* Pl.'s Reply Supp. Objections Ex. C, Dkt. # 144–3, at 2)—draw their distinctiveness from their use as part of a three-dimensional garment.

. . . **[Varsity] cannot escape the fact that their allegations of infringement are grounded in [Star]'s manufacture of cheerleading uniforms, which are useful articles.** The disposition of these claims will necessarily require a determination of those elements of [Varsity's] designs that do not qualify for copyright protection. [Star's] proffered expert opinions bear on this inquiry, and the magistrate judge did not err by refusing to exclude them as irrelevant.

(R.E. #148, Page ID 1946-8, Expert Ord. at 12-14) (emphasis added).

Star filed a sealed motion for summary judgment (R.E. #168, PgID 2120, Mtn for Sum'y Judgmt) supported by various exhibits, including certain cheerleading uniforms (R.E. #169, PgID 2126, Memo'm and Exhibits) and a joint statement of undisputed facts. (R.E. #170, PgID 2228, JSUF).

Varsity filed a sealed motion for partial summary judgment as to its copyright infringement claims. (R.E. ##'s 171-175, PgID 2298-3217, Not. of filing

17

of Physical Exhs. and Sealed Mtn for Sum'y Judgmt, et al.).

Star responded to Varsity's motion and its statement of undisputed facts. (R.E. ##'s 176–176-6, PgID 3218-3361 Sealed Resp. to MSJ & Resp. to SUMF). The exhibits to Star's response to Varsity's statement of undisputed facts and Star's exhibits to its own statement of facts were filed under seal as two separate disks. (*See* RE #213, PgID 4452-70, Notice of Filing of Star's SJ Exhibits).[3]

The district court granted Star's motion for summary judgment as to Varsity's claims of copyright infringement, "[b]ecause the court concludes as a matter of law that it is not possible to either physically or conceptually sever Varsity's designs from the utilitarian function of the resulting cheerleading uniforms. . . " (RE #199, PgID 4310, SJ Ord. at 16). The court applied the Copyright Act's definition of the design of a useful article and followed, in part, the Fifth Circuit's opinion in *Galiano v. Harrah's Operating Co., Inc.*, 416 F.3d 411 (5th Cir. 2005), explaining as follows:

> First, it is necessary to identify just what Varsity has copyrighted, and how Star is claimed to have violated these copyrights. Varsity copyrighted 2–dimensional artwork in five cheerleading uniform designs. (Pg. ID # 2230–36). . . As Varsity puts it, "Star has infringed all five of the Designs at Issue, by copying, reproducing, displaying and/or distributing its infringing images in its catalog and on its internet website, and by incorporating the designs onto the surface of its garments." (Pg. ID # 2301.)

_____

[3] Since these exhibits were filed under seal and on a disk outside the ECF system, they are not numbered with "PageID." The Appendix to the Appellee's Brief includes items from these disks which are cited herein.

The court begins its analysis with the words of the statute: "the design of a useful article, as defined in this section, shall be considered a [PGS] work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that *can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.* " 17 U.S.C. § 101 (emphasis added).. . . **[*Id.* at 4306-7; SJ Order at 12-3]**

Put another way, a cheerleading uniform loses its utilitarian function as a cheerleading uniform when it lacks all design and is merely a blank canvas. An examination of the blank cheerleading silhouettes that Varsity submitted illustrates this point. (*See* Pg. ID # 2825–26.) ***Without the kind of ornamentation familiar to sports (or cheerleading) fans, the silhouette no longer evokes the utilitarian concept of a cheerleading uniform, a garment that is worn by a certain group of people in a specific context.*** (*See, for example,* Pg. ID # 2814–18.) . . . **[*T*]*he utilitarian function of a cheerleading uniform is not merely to clothe the body; it is to clothe the body in a way that evokes the concept of cheerleading. Artistic judgment and design are undeniably important in this context, but they are not separable from the utilitarian function of the resulting garment*. [(*Id.* at 4309; SJ Ord. at 15; emphasis added)]**

. . . **[*A*] *blank silhouette of a purported "cheerleading uniform" without team colors, stripes, chevrons, and similar designs typically associated with sports in general, and cheerleading in particular, is not recognizable as a cheerleading uniform. It evokes an entirely different concept in the viewer's mind. This is because, as a matter of law, the design of cheerleading uniforms has merged with the utilitarian function they serve.*** And under the Fifth Circuit's marketability test in *Galiano,* it is unlikely that the designs in this case would be marketable outside of their utilitarian function as cheerleading uniforms. *Galiano,* 416 F.3d at 419-21. **Id. (emphasis added).**

The court dismissed Varsity's trademark infringement claim and dismissed without prejudice Varsity's state-law claims, declining to exercise supplemental

19

jurisdiction under 28 U.S.C. § 1367(c)(3). (*Id.* at 4311).

## ARGUMENT
## Summary of Argument

This case arises from an attempt by Varsity – a manufacturer of cheerleading uniforms – to use copyrights in two-dimensional designs of cheerleading uniforms to prohibit a competitor, Star, from manufacturing three-dimensional cheerleading uniforms. Neither the Copyright Act nor Sixth Circuit precedent authorizes such an extension of copyright protection.

Varsity raises three issues on appeal, the first of which is that the district court's conclusion was wrong, because, Varsity says, the basic elements of a cheerleading uniform (stripes, chevrons, V's) are separable. But Varsity relies on inapposite cases that do not involve clothing or clothing designs, and "clothing cannot be protected by copyright merely on the ground that the appearance of the useful article is determined by aesthetic considerations." *Galiano v. Harrah's Operating Co.*, 2004 WL 1057552, at *9-10 (E.D. La. May 10, 2004), *aff'd,* 416 F.3d 411 (5th Cir. 2005).

Varsity's first issue has no merit because:

(1) The district court was correct in concluding that the design of Varsity's cheerleading uniforms has merged with its utilitarian function because the chevrons, V's, and stripes are basic elements of cheerleading uniforms, elements essential to a garment being recognizable as a cheerleading uniform, which cannot

20

exist independently of their utilitarian function;

(2) The district court's ruling that Varsity's two-dimensional cheerleading uniform designs cannot be used to prohibit Star from manufacturing three-dimensional cheerleading uniforms is consistent with Sixth Circuit precedent that a copyright may not be used to provide patent-like protection;

(3) The district court's ruling that copyright protection does not extend to clothing depicted in two-dimensional sketches and photographs of cheerleading uniforms is consistent with precedent under both the 1909 and 1976 Copyright Acts that articles of clothing depicted in dress designs are not protectable by copyright; and

(4) The district court concluded the over-all configuration of the elements of Varsity's cheerleading uniform designs is not conceptually or physically separable from the uniforms themselves under each of the multiple separability tests discussed, including the Seventh Circuit's "process-oriented" test advocated by Varsity.

Varsity's second and third issues are discretionary matters: (a) whether the court properly denied Varsity's motion to preclude expert testimony and (b) whether the court properly dismissed without prejudice Varsity's state-law claims after dismissing its federal-law infringement claims.

The admissibility of expert testimony as to copyrightability and

protectability of functional items was settled in this Circuit in *Kohus v. Mariol*. Varsity does not argue *Kohus* is distinguishable or should not be followed. Varsity simply ignores *Kohus.* Varsity's second issue has no merit.

A district court should ordinarily decline to adjudicate state-law claims when the federal-law claims are dismissed prior to trial. Varsity cites no authority for its argument that Judge Cleland's ruling was "clearly erroneous," and Varsity failed to allege any facts or any amount in controversy to support diversity jurisdiction.

Varsity's third issue lacks merit and is frivolous.

<u>**Standards of Review**</u>

A district court's decision to grant a motion for summary judgment is reviewed *de novo*. *Andretti, M.A. v. Borla Performance Industries, Inc.,* 426 F.3d 824, 830 (6th Cir. 2005); *Norris*

*Hill Publ'ns, Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 629 (6th Cir. 2001). Copyrightability may be appropriate for summary judgment, because "[v]ery often no issues of material fact are in dispute and the only task for the court is to analyze the allegedly copyrightable item in light of applicable copyright law." *Sem-Torq, Inc. v. K Mart Corp.*, 936 F.2d 851, 853 (6th Cir. 1991) (quoting *Magic Mktg. v. Mailing Servs. of Pittsburgh, Inc.,* 634 F.Supp. 769, 771 (W.D.Pa.1986)).

A district court's decision to admit expert testimony is reviewed for an abuse of discretion. *Stromback v. New Line Cinema,* 384 F.3d 283, 295 (6th Cir. 2004).

A district court's decision to exercise supplemental jurisdiction over state-law claims after all federal-law claims have been dismissed is discretionary, although ordinarily state-law claims should then be dismissed without prejudice. *Williams v. City of River Rouge*, 909 F.2d 151, 157 (6th Cir. 1990).

The following copyright principles inform the issues raised in this appeal:

**<u>A copyright of a two-dimensional design of a useful article may not be used as a substitute for a patent of the useful article depicted in the design</u>**.

A long-recognized principle of copyright law is that copyright protection does not "extend from patterns/and drawings to the objects they describe." *See Baker v. Seldon,* 101 U.S. 99 (1879), and *Robert R. Jones Assoc., Inc. v. Nino Homes*, 858 F.2d 274, 278-9 (6th Cir. 1988). Speaking for this Court in *Winfield Collection, Ltd. v. Gemmy Indus. Corp.*, 147 Fed. App'x 547 (6th Cir. 2005), Judge Batchelder pointed out that it would be particularly inappropriate to provide copyright protection to clothing designs:

> In limiting protection to the design [of a 3-dimensional witch], the district court cited several cases involving clothing, in which courts refused to accord copyright protection to the actual articles of clothing, despite recognizing protection for the clothing designs. Not only were these all district court opinions from other circuits, they were all cases in which the court's decision rested upon, to great extent, a specific problem: namely, that giving copyright protection to clothing, which has a utilitarian function, would allow for the protection of patent-like features without having to fulfill the rigorous standards for obtaining a design patent. *See Jack Adelman, Inc. v. Sonners & Gordon*, 112 F.Supp. 187, 188–89 (S.D.N.Y. 1934) [discussed herein]; *Beaudin v. Ben and Jerry's Homemade, Inc.,* 896

F.Supp. 356, 358 (D. Vt. 1995) [idea of Holstein cow hat not protectable][, *aff'd*, 95 F.3d 1 (2d Cir. 1996)]; *Russell v. Trimfit, Inc.*, 428 F.Supp. 91, 93–95 (E.D.Pa. 1977) [concept of toe-sock not protectable][, *aff'd*, 568 F.2d 770 (3d Cir. 1978)]. The decorative witches at issue in the instant case, however, are purely aesthetic, and thus have no patent-like features to argue against copyright protection.

147 Fed. App'x at 550-1.

Another settled principle is that items of clothing depicted in clothing designs are generally not copyrightable. *See Whimsicality, Inc. v. Rubie's Costume Co.,* 891 F.2d 452, 455 (2d Cir. 1989) ("We have long held that clothes, as useful articles, are not copyrightable. . . The Copyright Act of 1976 did not affect the prior law in this regard.") (internal citations omitted).

Although clothes are generally not copyrightable, a fabric design may be. The distinction between fabric designs and dress designs was explained by the Fifth Circuit as follows:

> Thus, a clothing design that is intended to be used on clothing is copyrightable only to the extent that its artistic qualities can be separated from the utilitarian nature of the garment. . .
>
> Nimmer's cogent discussion of the scope of copyright protection in design works breaks the subject into two categories: (1) fabric design and (2) dress design. Fabric designs include patterns or artistic features imprinted onto a fabric or that appear repeatedly throughout the dress fabric. Because one can generally separate the artistic elements of this design from the utility of the wearable garment, NIMMER ON COPYRIGHT states that fabric designs are generally entitled to copyright protection. **On the other hand, dress designs, which graphically set forth the shape, style, cut, and dimensions for converting fabric into a finished dress or other clothing garment, generally do not have artistic elements that can**

**be separated from the utilitarian use of the garment, and therefore typically do not qualify for copyright protection.**

*Galiano,* 416 F.3d at 419 (footnotes omitted; emphasis added).

Thus, while a fabric design depicting a squirrel or a leaf may be copyrightable, *see Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996 (2d Cir. 1995), a dress depicted in a design is not. *See Jack Adelman,* 112 F.Supp. at 188 (". . . [I]t is the drawing [of a lady's dress] which is assumed to be a work of art and not the dress. It follows that plaintiff's copyright gives it the exclusive right to make copies or reprints of the drawing only, and that it gives the copyright owner no monopoly of the article illustrated").

Clothing designs are not protectable by copyright because their aesthetic design elements are inseparable parts of useful articles, not works of art, which merge with structural elements to further the function of clothing. In 1954, the Supreme Court held in *Mazer v. Stein,* 347 U.S. 201, that a useful article (a lamp) could have non-utilitarian aspects (a statuette of Balinese dancers used as the base of the lamp) that could be copyrighted. *Mazer* introduced a significant new principle of copyright law: Sculptural elements of a useful article which are superfluous and wholly unnecessary *may* be protectable.

The Copyright Office promulgated the following regulation to clarify that *Mazer* was an exception and that the overall configuration and shape of a useful article is *not* protectable by copyright:

> If the sole intrinsic function of an article is its utility, the fact that the article is unique and attractively shaped will not qualify it as a work of art. However, if the shape of a utilitarian article incorporates features, such as artistic sculpture, carving, or pictorial representation, which can be identified separately and are capable of existing independently as a work of art, such features will be eligible for registration.

37 C.F.R. § 202.10(c) (1959), cited in *Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.,* 696 F.2d 918, 922 (11th Cir.), *cert. denied,* 464 U.S. 818 (1983).

The rule that the overall configuration, appearance and shape of useful articles are not protectable by copyright was continued under the Copyright Act of 1976: A "useful article" is defined in the 1976 Act as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a 'useful article'." 17 U.S.C. § 101.

Courts have consistently rejected designers' arguments that the sole function of clothing is to cover the body and (like Varsity here) that any aesthetic appeal is merely incidental, because ***aesthetic appeal is a core purpose of clothing.*** Thus, the decorative qualities of a design element "will generally not suffice to trump its utilitarian function of enhancing the wearer's attractiveness," because the decorative elements themselves are "***intrinsic to*** the decorative function of the clothing." *Jovani Fashion, Ltd. v. Cinderella Divine, Inc*., 808 F.Supp.2d 542, 550

(S.D.N.Y. 2011) (emphasis added);[4] *accord Galiano*, 2004 WL 1057552, at *9-10[5] ("None of these artistic design features [including "color blocking, and combinations of fabrics, style lines, trim, and silhouette"] has intrinsic value as a work of art that can exist independently of the wearing apparel on which it is used. . . [P]articular artistic design features . . . not critical to the functional aspect of a garment . . . nevertheless do advance the utilitarian purpose of the garment," and the designer "cannot copyright the idea to use a particular design feature in a particular way on a particular article of clothing . . . no matter how artistically unique or aesthetically pleasing those design features may be.").

The present case involves not merely the design elements of clothing and uniforms; it involves designs for cheerleading uniforms. Varsity alleges[6] Star infringed its two-dimensional copyrights by manufacturing three-dimensional cheerleading uniforms, not by copying its two-dimensional designs, rendering inapposite the cases involving separability of sculptural works (which, as

---

[4] *Aff'd sub nom. Jovani Fashion, Ltd. v. Fiesta Fashions*, 500 Fed. App'x 42 (2d Cir. 2012), *cert. denied*, 133 S.Ct. 1596 (March 18, 2013), *reh'g denied*, 133 S.Ct. 2821 (June 10, 2013).

[5] *Aff'd*, 416 F.3d 411 (5th Cir. 2005).

[6] The allegations of infringement for each design are identical except for the design number: "Defendants [sic], without authorization from Varsity, are selling[,] distributing, advertising and have sold goods [cheerleading uniforms] bearing a design that is copied from and substantially similar to Varsity's Design 078." (RE #1, PgID 7, Compl. ¶29, p. 7; see Id., at 8-10, ¶¶ 36, 42, 49, 56, pp. 8-10).

sculptures, are necessarily three-dimensional) cited by Varsity in support of its argument.

Uniforms are, by definition, uni-form: "dress of a distinctive design or fashion worn by members of a particular group and serving as a means of identification." *Webster's Ninth New Collegiate Dictionary* (1983). In order to be a cheerleading uniform, the design must signify the wearer is a cheerleader – a member of a particular group – and serve as a means of identification as a cheerleader, the same way other uniforms identify the wearer as a FedEx courier or a soldier.

**The Copyright Act requires pictorial, graphic and sculptural works to be separately identifiable *and* capable of existing independently of utilitarian aspects of the useful article.**

The question of separability – the extent that a useful article incorporates pictorial, graphic, or sculptural *features* that can (1) be identified separately from, and (2) are capable of existing independently of, the utilitarian aspects of the article – has been applied by courts to a variety of useful objects, including furniture, bicycle racks, light fixtures, belt buckles, mannequins, craft figures, costume heads, toys, wheel covers, and even hookahs,[7] resulting in multiple tests

---

[7] *See Kieselstein–Cord v. Accessories by Pearl, Inc.,* 632 F.2d 989 (2d Cir. 1980) (decorative sculptural features of buckle design conceptually separable from useful "belt" function did not enhance belt's ability to hold up trousers and could be viewed as sculptural work with independent aesthetic value, not integral element of belt's functionality); *Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.,* 696 F.2d 918

for different useful articles. A single one-size-fits-all separability test for all useful articles is neither possible nor desirable, however, and, although the present case does not involve any of the foregoing useful articles, these cases are illustrative contrasts between useful items with easily separable applied-art features, such as belt buckles embedded with artistic *sculptures* or furniture with superfluous *sculptural* designs and industrial designs in which form and function have merged, such as an aesthetically-pleasing but functionally-shaped bicycle rack.

It is important not to confuse the analyses for different useful items when discussing clothing, because clothing has its own well-developed case law on

(11th Cir.), *cert. denied,* 464 U.S. 818 (1983) (aesthetic features of automobile wheel cover were part of the design *of* a "useful article" and not eligible to be copyrighted); *Gay Toys, Inc. v. Buddy L Corp.*, 703 F.2d 970, 974 (6th Cir. 1983) ("[T]oys do not even have *an* intrinsic function other than the portrayal of the real item," are not useful articles, and may be copyrighted); *Carol Barnhart Inc., v. Econ. Cover Corp.,* 773 F.2d 411 (2d Cir. 1985) (generic mannequin torsos not copyrightable because they did not possess artistic or aesthetic features that were physically or conceptually separable from their utilitarian dimension); *Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.,* 834 F.2d 1142 (2d Cir. 1987) (bicycle rack design not entitled to copyright protection because the artistic form merged with the design *of* a useful article); *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.,* 372 F.3d 913, 931-2 (7th Cir.2004) (face of mannequin sculpture portraying "hungry look" of high-fashion runway model met independence requirements for conceptual separability, protectable by copyright protection); *Chosun Int'l, Inc. v. Chrisha Creations, Ltd.,* 413 F.3d 324 (2d Cir. 2005) (Halloween costumes with sculpted heads presented fact issues as to separability); *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.,* 618 F.3d 417 (4th Cir.2010) (per curiam) (decorative sculptural design elements were independent of furniture designs and conceptually separable from furniture's utilitarian aspect); *Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 739 F.3d 446 (9th Cir. 2014), amended, 2014 WL 2465052 (June 3, 2014) (hookah's design not copyrightable because its sculptural features were not separable from its shape).

separability. Among other things, the analysis for non-clothing may include the separability of *sculptural* elements which is not applicable to the analysis for the aesthetic elements of clothing designs.

This is one of the flaws in Varsity's position, because Varsity relies on two cases – *Pivot Point* and *Universal Furniture* – which involve superfluous sculptural features, unlike clothing designs, that are easily separable from the utilitarian function of the useful articles.

Clothing is useful and may not be protected by copyright. The court in *Jack Adelman* – cited by this Court in *Winfield Collection* – succinctly explained in 1934 that a two-dimensional drawing did not give the copyright owner a monopoly in the article illustrated.

A "ladies' dress" is listed in the legislative history of the 1976 Act as a pattern/shape not subject to copyright protection. Since 1976, courts have continued to address the protection that is – and is not – available under copyright law for clothing designs. Casino uniforms, prom dresses, belt buckles, and shoes have all been subjects of infringement claims, and the analyses of these claims provide guidance in determining whether Varsity's claims of infringement are an impermissible extension of patent-like protection for copyrights in two-dimensional designs of cheerleading uniforms.

Judge Cleland discussed the shoe case – *Eliya* – in ruling that expert

30

testimony should not be excluded, and he discussed the casino uniform case – *Galiano* – and the prom dress case – *Jovani* – in his order granting summary judgment. These three cases best explain why Varsity's copyrights do not prohibit the manufacture of actual uniforms depicted in its two-dimensional sketches and photographs: **The functional aspects of a shoe, a dress, and a uniform cannot be separated from the design elements that make each article useful.**

In granting summary judgment, Judge Cleland surveyed the recognized separability tests and concluded Varsity's five cheerleading uniform designs were not physically or conceptually separable from their utilitarian function. Varsity argues incorrectly that Judge Cleland created his own test, mislabeling his observations and conclusion as a "test." Regardless, a different test does not render a different result: The utilitarian function of Varsity's cheerleading uniform designs cannot be separated from any non-utilitarian aspects under any proper analysis under Section 101.[8]

Varsity relies on the Seventh Circuit's "process-oriented" test in *Pivot Point*, arguing that Varsity's designers were, incongruently, not motivated to design

---

[8] A test is merely a tool to assist the court in determining separability under the Act. It is a means to an end, not an end in itself. *See Kohus,* 328 F.3d at 855 ("This test [Learned Hand's famous abstractions test] of course does not identify the dividing line in individual cases, but rather constitutes a methodological tool courts can use to identify the spectrum of options."); *Stromback*, 384 F.3d at 296 ("The test itself does not identify protectible elements of a work, but instead is a tool for accomplishing that task.").

cheerleading uniforms during the design process.[9] But Judge Cleland analyzed Varsity's design process under *Pivot Point*, finding that "the designers were at all times conceiving of and sketching various designs of cheerleading uniforms." (R.E. #199, PgID 4308, SJ Ord. at 14).

Varsity's characterization of its designers' "process" misses an important point: The stripes, V's, and chevrons that Varsity argues are separable from the uniform's shape (which is not copyrightable) are what make a cheerleading uniform a cheerleading uniform. **These elements are not superfluous or merely decorative; they are essential elements that identify a garment as a cheerleading uniform and its wearer as a cheerleader.** In short, they are functional. A sweater is still a sweater without a leaf or squirrel on the chest, a belt is still a belt without sculptural art in the buckle, and a bed is still a bed without ornate scrolls, but a cheerleading uniform is not a cheerleading uniform without the constituent elements of team colors, stripes and chevrons, and these elements, when removed, cannot exist independently as anything other than the design of a cheerleading uniform. The overall configuration of elements – panels, stripes and chevrons – that define a uniform as a cheerleading uniform and the uniformity of these elements that define the garment as a uniform dictate that these

---

[9] In a dissenting opinion in *Pivot Point*, Judge Kanne criticized the majority's test because, its "explanation of conceptual separability lacks a basis in the statute," 372 F.3d at 932-3, and "[p]roblematically, the majority's test for conceptual separability seems to bear little resemblance to the statute." *Id.* at 934.

elements are inseparable – the pictorial or graphic features cannot be identified separately from, and are not capable of existing independently of, the utilitarian aspects of the article. It is what it is, and what it is, is a cheerleading uniform.

**ARGUMENT: ISSUE NO. 1**

**Varsity's allegations that Star's manufacturing of three-dimensional cheerleading uniforms infringed Varsity's copyrights in its two-dimensional cheerleading uniform designs are an attempt to extend copyright protection beyond the limits of the Copyright Act of 1976.**

The Copyright Act of 1976 codifies principles of certain court rulings and prior Copyright Office policies, including the rule that "[u]nlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea itself." *Mazer*, 347 U.S. at 217 ; *see* 17 U.S.C. § 102(b): "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of [its] form." The Act also codifies the principle, also recognized in *Mazer*, that copyright protection does not extend to "useful articles."

In 1955, following the decision in *Mazer*, Congress began a comprehensive revision of the copyright law which had been substantially unchanged since 1909. *See Denicola*, 67 Minn.L.Rev. at 708 n.6.

The various bills introduced in Congress between 1955 and 1976 included

"design" legislation as a separate Title II, but this entire provision was deleted by the House of Representatives when the current Act was finally passed in 1976. *See* H. Rep. No. 94-1476, page 47 (Sep. 3, 1976).

The Copyright Office prepared multiple studies of copyright law prior to 1976, including the Copyright Register's 1961 Report which recommended "[t]he statute should not alter existing court decisions . . . that copyright protection would not extend to a copyrighted picture of a dress, used to manufacture the dress," explaining:

> [w]here the "work of art" actually portrays the useful article as such-- as in a drawing, scale model, advertising sketch, or photograph of the article--existing court decisions indicate that copyright in the "work of art" does not protect against manufacture of the useful article portrayed. We agree with these decisions and the distinctions made in them.

Chapter II, Register's Report (1961), reprinted in Appendix 14, pps. 26-28, *Nimmer on Copyright* (1992).

In the Supplementary 1965 Report, the Register again recommended that the statute should not alter "existing court decisions" that a copyright in a pictorial, graphic, or sculptural work portraying a useful article as such does not extend to the manufacture of the useful article itself. Supplementary Register's Report (1965), reprinted in Appendix. 15, pg. 77, *Nimmer on Copyright* (1992). Congress accepted the Register's recommendation, preserving then-existing case law, such

as *Jack Adelman. See* 17 U.S.C. § 113(b) (adopting case law in effect on December 31, 1977).

The Act requires design elements be capable of existing "independently from the utilitarian aspects of the article," which requires unprotectable design elements to be filtered out. Thus, only superfluous design elements ***wholly unnecessary to the useful article*** are relevant to the question of separability, and the filtering step is essential to prevent misuse of copyright law, especially here, where Varsity's allegations of infringement are based on the constituent elements of a cheerleading uniform – panels, stripes, and chevrons – the over-all configuration of which is not protectable under the 1976 Act. In *Norris*, the Eleventh Circuit quoted the House Report as follows:

> *. . .[T]he Committee is seeking to draw as clear a line as possible between copyrightable works of applied art and uncopyrighted works of industrial design*. . .[A]lthough the shape of an industrial product may be aesthetically satisfying and valuable, the Committee's intention is not to offer it copyright protection under the bill. Unless the shape of [a] . . . ladies' dress **. . .** contains some element that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article, the design would not be copyrighted under the bill. ***The test of separability and independence from "the utilitarian aspects of the article" does not depend upon the nature of the design – that is, even if the appearance of an article is determined by aesthetic (as opposed to functional) considerations, only elements, if any, which can be identified separately from the useful article as such are copyrightable.*** And, even if the three-dimensional design contains some such element . . . ***copyright protection*** would extend only to that element, and ***would not cover the overall configuration of the utilitarian article as such***.

696 F.2d at 924, n. 9 (emphasis added).

The aesthetic value and uniqueness of the shape of a useful article and its constituent parts, as well as the amount of work that went into its design, are not relevant in evaluating separability. *See* Compendium of Copyright Office Practices II §505.05 (1984).

The shape and appearance of Varsity's configurations of fabric panels, braid, stripes, and chevrons, in bright team colors, are expressly *not* protectable under copyright law, because these components further the function of a cheerleading uniform. This is the teaching of *Norris*: "The wire wheel covers in this case are not superfluous ornamental designs, but functional components of utilitarian articles." 696 F.2d at 924. This is in contrast to *Universal Furniture*:

> The [sculptural] designs can therefore be 'identified separately from' the utilitarian aspects of the furniture. 17 U.S.C. § 101. Indeed, the designs are 'wholly unnecessary' to the furniture's utilitarian function. *Carol Barnhart,* 773 F.2d at 419. ***A carved scroll of leaves on a nightstand post, for example, does nothing to improve the utilitarian aspect thereof***.

618 F.3d at 434 (emphasis added).

Copyright protection may extend to a design's drawings and photographs, but it can never extend to the production of cheerleading uniforms whose design elements comprise "the over-all configuration of the utilitarian article as such," because such configurations cannot satisfy the Act's requirement of existing "independently" from the utilitarian aspects of the article. *See Jovani,* where the

plaintiff argued the "selection, coordination, and arrangement" of otherwise uncopyrightable individual elements of a prom dress were "authorial choices" that were conceptually separate and therefore copyrightable. The court in *Jovani* rejected this argument, because only those constituent elements of the useful article that are physically or conceptually separable and independently identifiable from the article are copyrightable, pointing out the plaintiff's claim that the individual elements were not protectable by copyright but the article's over-all configuration was protectable "undercuts any argument that those elements are conceptually separable from the dress itself." 808 F.Supp.2d at 551.

**Uniforms are functional and not entitled to copyright protection.**

The Copyright Act defines a "useful article" as an article "having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. § 101. One utilitarian function of the team colors, stripes, V's, and lines, as shown in the copyright registrations depicting Varsity's cheerleading uniforms, is to signify cheerleading team membership.

An important function of any uniform is to identify the person wearing it as a member of an organization - the Army, FedEx, or Girl Scouts. A function of a cheerleading uniform is to identify the person wearing it as a member of a cheerleading team. (RE# 169-2, PgID 2178-9; Dec'n of A. Sarabia ¶7).

Here, the district court correctly rejected Varsity's argument that blank silhouette garments are as functional as designs with the basic elements of cheerleading uniforms, because this argument disregards the identity function of a uniform:

> Varsity argues that a blank cheerleading silhouette "covers the body to the same degree, wicks away moisture, and withstands the rigors of cheerleading movements at least as much as, if not more than, a garment that has a design on the front of it." (Pg. ID # 2342.) This statement may be true, but it ignores the fact that *the utilitarian function of a cheerleading uniform is not merely to clothe the body; it is to clothe the body in a way that evokes the concept of cheerleading.*

(R.E. #199, PgID 4309, SJ Or. p. 15) (emphasis added).

According to Varsity's chief designer, Kim Williams: "The design is the entire combination of the elements that are placed on the uniform." (RE# 175-3, PgID 2851, Williams Dep. 39:1-19). Varsity seeks copyright protection for the over-all configuration of the V's, diagonals, lines, and curves in its five designs but, according to Ms. Williams, these are *the basic elements of cheerleading uniform design*:

> Q. Isn't it true that V's and diagonals, lines and curves have -- were being used in cheerleading uniforms from the beginning?
>
> A. Sure. The basic elements are basic elements.

RE# 176, Ex. U, Williams Dep. at 62:2-8; *see* RE #169-2, PgID 2180-81, Sarabia Dec'n, ¶10: "Most cheerleading designs use diagonals, curves, lines and bright

colors to achieve the function of identifying the person wearing it as a cheerleader. The Varsity designs follow this convention."

These basic elements of colorful stripes and V's further the function of uniforms as identifying cheerleaders: "The second identity function is to establish the wearer as a team member . . . When one sees someone wearing one of the Varsity designs, one knows that, not only is the person wearing the uniform a cheerleader, but that they belong to a cheerleading team." (Id., at ¶10). An Army uniform displays the basic elements that identify the wearer as belonging to one Army not another, just as a cheerleader is identified as a member of her team by wearing a cheerleading uniform displaying the basic elements of team colors, stripes, and V's configured to match her team.

Citing a statement in *Universal Furniture* that the superfluous ornamentation there had nothing to do with the furniture's function and relying on testimony that its designers' objective was not to increase the functionality of any garment, Varsity argues "the non-functionality of the Varsity Designs is again confirmed that the designs can be applied to garments by cutting-and-sewing, weaving, embroidering, screen-printing, or sublimation." (Brief at 56-7). This argument, however, overlooks the intrinsic utilitarian function of these designs as uniforms and cheerleading uniforms in particular. Varsity mocks Judge Cleland's conclusion that the "cheerleading-uniform-ness" of its designs cannot be separated from their

function, but Varsity never addresses the identity function of its uniform designs, nor does it address that the over-all configuration of the essential elements of its uniforms is not protectable.

In its application to the Copyright Office for registration of Design 0815 (Registration No. VA 1-675-905), Varsity deposited a sketch that included a pompom and a cheerleader. These features of Varsity's registration, underscoring the "cheerleading-uniform-ness" of this design, are absent from the image on page 7 of Varsity's brief:

**Copyright Office's Registration:**     **Varsity's Version of Registration:**



Their removal from the sketch in Varsity's brief is curious, but one fact is undeniable: The registration Varsity submitted to the Copyright Office included these items; the image on page 7 of Varsity's brief does not.

The significance of the removal of these items is illustrated by Varsity's reliance on non-record evidence (improperly inserted in Appellants' Brief in footnote 6 on page 45) in the form of a YouTube video of Nirvana's parody of cheerleaders, "Smells Like Teen Spirit." This video shows a band performing in a gymnasium with tattooed teen-age girls dressed in black outfits, spastically dancing and waving pompoms, which collectively identify the girls as spirit-***less*** cheerleaders. This ***video*** is not an apt comparison to Varsity's claimed copyrights in ***two-dimensional*** artwork or the resulting uniforms that it sells, yet it proves the utilitarian identity-function of a colorful striped uniform worn by real cheerleaders to express genuine team spirit, which Varsity never addresses. Instead, Varsity baldly argues these black outfits are recognizable as cheerleading uniforms even though they lack the typical ornamentation of stripes, chevrons, or V's. The correct interpretation of these black outfits is that they are, by design, ***anti***-cheerleading uniforms: the one element that *does* identify these girls as cheerleaders is the pompoms, one of the items conspicuously missing from the sketch on page 7 of Varsity's brief.

Varsity misunderstands the district court's ruling. Judge Cleland did not rule all cheerleading uniform designs must include every basic element of a typical uniform; he ruled that the five designs that are the bases of Varsity's infringement

claims include basic elements that are not independent of the utilitarian function of the resulting cheerleading uniforms.

The Copyright Office policy is that uniforms may not be protected by copyright:

> The general policy of nonregistrability of garment designs will be applied not only to ordinary wearing apparel, but also to period and historical dress, and uniforms.

Registrability of Costume Designs, 56 Fed. Reg. 56,530 (Nov. 5, 1991). This policy and the well-established law that clothing designs are not generally registerable to protect uniforms were undoubtedly why Varsity did not disclose it was depositing designs *of* cheerleading uniforms for these five designs and why Varsity told the Copyright Office that it was **not** seeking to protect its other designs of clothing, calling them fabric designs instead.[10]

---

[10] Varsity says that these five designs are similar to other uniform designs that it has registered as 2-dimensional artwork. The Copyright Office rejected some of Varsity's other applications, and Varsity petitioned for reconsideration, telling the CO that its designs were 2-dimensional fabric designs "and not the design of an item of clothing." See Letter dated January 28, 2009, from Thomas Kjellberg, page 5 (R.E. #176, Eh. X to Star's SUMF). Citing *Galiano* as correct and authoritative, Varsity told the CO that it was not seeking to register clothing designs or the design of an item of clothing. Varsity now argues that Galiano is "discredited" and that Star infringed these 2-dimensional uniform designs by manufacturing actual uniforms, not by copying the 2-dimensional design. Varsity is seeking to do exactly what it told the CO it was not doing – registering a 2-dimensional copyright to use as a copyright in clothing itself.

The only other Circuit Court decision involving copyright protection for uniform designs – *Galiano* – is consistent with Copyright Office policy and confirms clothing cannot be protected by copyright merely on the grounds the appearance of the useful article is determined by aesthetic considerations. In *Galiano*, the Fifth Circuit affirmed the district court's summary judgment for Harrah's Casino because the uniforms' "artistic and utilitarian elements were conceptually indivisible and therefore not copyrightable subject matter," and the casino's uniforms based on copyrighted two-dimensional designs did "not qualify for copyright protection." 416 F.3d at 414-5. The plaintiff in *Galiano* made "no showing that its designs are marketable independently of their utilitarian function as casino uniforms." 416 F.3d at 422.[11] Judge Cleland reached the same conclusion in the present case and correctly entered summary judgment for Star.

**The district court correctly ruled that Star rebutted the presumptive validity of Varsity's registrations and that Varsity's two-dimensional designs cannot prohibit Star from manufacturing cheerleading uniforms, but the court did not find that Varsity's copyrights were invalid.**

Varsity argues, incorrectly, that the district court did not afford its copyright

---

[11] The parallels with *Galiano* are striking. Among other things, the plaintiff attempted to rely on "Harrah's People" magazine as evidence of infringement, which the district court rejected because "the uniform designs themselves are not copyright protected, [and] the magazine cannot be evidence [that] Harrah's directly infringed on a copyright of those uniforms." 2004 WL 1057552 *11, n 17. The cover of "Harrah's People" magazine – which includes a cheerleader in uniform – is in the present record at RE #176-5, PageID 3345-56, Crosby Decl.

registrations presumptive validity under the Copyright Act, 17 U.S.C. 410(c).[12]

(Brief, pp. 21–31). But, the court did ***not*** rule that Varsity's two-dimensional copyrights were invalid.

Judge Cleland, in footnote 2 (R.E. #199, PgID 4300 SJ Order), acknowledged the statutory presumption, noting that it is relatively easy to rebut and that other evidence rebutted the presumption, citing *Universal Furniture.* Although Varsity relies on *Universal Furniture* in arguing Judge Cleland wrongly decided the separability issue, Varsity ignores that court's ruling on the rebuttable nature of the presumption:

> The submission of a valid certificate of copyright registration creates a presumption of originality for five years from the date of the registration. However, as we have explained, this presumption is fairly easy to rebut because the Copyright Office tends toward cursory issuance of registrations. *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.,* 196 Fed. Appx. 166, 170 (4th Cir. 2006). "[T]he presumption of validity may be rebutted where other evidence in the record casts doubt on the question," such as "evidence that the work had been copied from the public domain or by evidence that the work was a non-copyrightable utilitarian article." *Fonar Corp. v. Domenick,* 105 F.3d 99, 104 (2d Cir. 1997) (internal citation and quotation marks omitted).

*Universal Furniture,* 618 F.3d at 430 (citation omitted).

---

[12] "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c). This rebuttable presumption is only applicable to three of Varsity's five copyrights in the present case due to the five-year limit from first publication.

The presumption of validity from a certificate of registration is not irrebuttable; registration creates a rebuttable presumption which shifts the burden of proof to the party challenging the copyright. *Hi-Tech Video Productions, Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1095 (6th Cir. 1995). The Second Circuit, relying on the House Report to the 1976 Act, has noted that the rebuttable presumption created by registration under §410(c) simply re-orders the burden of proof in an infringement case. *See, Carol Barnhart,* 773 F.2d at 414, citing *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980) ("It is clear, however, that a certificate of registration creates no irrebuttable presumption of copyright validity. Where other evidence in the record casts doubt on the question, validity will not be assumed.").

The district court held that copyright protection for Varsity's two-dimensional designs, as depicted in sketches and photographs, did not extend to prohibit Star from manufacturing three-dimensional cheerleading uniforms. Varsity's first argument – that the court failed to give due deference to its registered copyrights – is based upon Varsity's failure to understand the court's ruling, the record, and the allegations of its own complaint.

Varsity relies on this weak rebuttable presumption, despite the extensive evidence presented by Star and Varsity showing the lack of separability and independence from its uniforms, but Varsity ignores this Court's copyright

45

infringement standards, particularly *Kohus*.

Proving copyright infringement requires a showing of substantial similarity between the plaintiff's copyright and what the defendant makes, and the Sixth Circuit has cast the substantial-similarity inquiry as a two-part test: First, the court must identify which aspects of the artist's work are *protectible* by copyright and, second, the court must determine whether the allegedly infringing work is substantially similar to the protectible elements of the artist's work. *Bridgeport Music, Inc. v. UMG Recordings*, Inc., 585 F.3d 267, 274 (6th Cir. 2009).

The first step of determining protectability requires filtering-out non-copyrightable functional elements, such as scenes a fair, and, in cases involving functional items, the next step is to eliminate those elements dictated by efficiency and particular business or industry practices, *Kohus*, 328 F.3d at 856, such as the industry-wide practice of constructing cheerleading uniforms that efficiently address the rigors of cheer in team-identifying configurations of colored fabric panels, stripes, chevrons, and other basic elements.

Judge Cleland focused on the protectability portion of this Court's infringement standards, and, because the actual uniforms depicted in the copyrights lacked protectable features, no finding on the validity of Varsity's two-dimensional copyrights was necessary.

The present case is similar to *Eliya,* where the defendant conceded the

46

plaintiff had a valid 2-dimensional copyright in the design of a three-dimensional item of clothing, a shoe, but the copyright failed the protectability test because the plaintiff was trying to use it to control the manufacture of goods: "Any work that has an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information - such as a shoe - is not granted the protection of copyright." *Id.* at \*9.

The result in *Eliya* is consistent with this Court's protectability analysis for substantial similarity in a copyright infringement case. *See, e.g., Kohus*, *Stromback*, 384 F.3d at 294-5, and *ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 705 (6th Cir. 2005). When features of a copyrighted work portraying a useful article are not protectible, substantial similarity cannot be found and, as a matter of law, neither can infringement.

Many of Varsity's citations in its brief are inaccurate or confusing, particularly in its argument on presumptive validity (pp. 21-30). The inaccurate page citations to court opinions and treatises are too numerous to list, but they hamper verification of Varsity's assertions, several of which are simply wrong or inapposite. On page 26, Varsity cites two Supreme Court decisions for the proposition that the Copyright Office's interpretation of the Copyright Act is entitled to deference: *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944), and *Chevron*

47

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). These two opinions have nothing to do with the Copyright Office or copyright law; *Skidmore* involved a policy of the Wage and Hour Administrator, and *Chevron* involved EPA policy. Varsity specifically refers to page 139 of the *Skidmore* opinion, but nothing on that page applies to the present case or relates to the proposition of law argued by Varsity: "There is no statutory provision [in the FLSA] as to what, if any, deference courts should pay to the Administrator's conclusions. And, while we have given them notice, we have had no occasion to try to prescribe their influence." 323 U.S. at 139.

Varsity's brief includes at least two phantom quotes. On page 27 of its brief, Varsity attributes the following quote to *OddzOn Products, Inc. v. Oman*, 924 F.2d 346 (D.C.Cir. 1991), at page 349: "It is the job of the administrative agency, not this reviewing court, to determine in the first instance which is the better test for determining conceptual separability," but this quote cannot be found anywhere in the *OddzOn* opinion. Similarly, on page 52 of Varsity's brief, the quote attributed to the court in *Eve of Milady v. Impression Bridal, Inc.*, 957 F.Supp. 484 (S.D.N.Y. 1997), cannot be found in that opinion, either.

Judge Cleland did not find Varsity's copyrights were invalid, and Varsity's argument that he failed to apply the rebuttable presumption of copyright registration is simply wrong and not supported by applicable authority.

**<u>Separability analysis – identifying the superfluous and wholly unnecessary features of a useful article that can exist independently of the article's usefulness – is a refinement of the distinction between the protection provided by a copyright and a patent.</u>**

Useful articles are not copyrightable under the 1976 Copyright Act, and the Act defines the scope of protection for the design of a useful article using terms which distinguish the protection provided by a patent from the protection provided by a copyright, particularly with regard to "pictorial, graphic, and sculptural works," defined as:

> . . . two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form **but not their mechanical or utilitarian aspects are concerned**; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and **only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article**.

17 U.S.C. §101 (emphasis added).

Section 101's use of "separately" gave birth to separability analysis, and "garments" are identified as items that generally do not qualify for copyright protection:

> A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is

49

considered a "useful article." 17 U.S.C. § 101. **Examples of useful articles include . . . garments, and the like.**

Compendium of Copyright Office Practices II §505.01 *Definition of useful article,* (emphasis added).

The 1976 Act provides that a copyright of an image of a useful work cannot be used to expand the reach of copyright law: "This title does not afford, to the owner of copyright in a work that portrays a useful article as such, any greater or lesser rights with respect to the making, distribution, or display of the useful article so portrayed than those afforded to such works under the law. . ." 17 U.S.C. §113(b).

Varsity's designs are two-dimensional sketches and photographs of apparel, which are not works of art but plans for useful articles – cheerleading uniforms. Varsity seeks exactly the type of protection – control of the manufacture of goods based on an image of clothing – prohibited by Section 113(b).

The two clothing design cases most similar to the present case are *Galiano* and *Jovani*. Since these cases cannot be distinguished, Varsity strains to neutralize them. Varsity says, without citing authority, that *Galiano* is "discredited" (p. 42), but this is wishful thinking. *Galiano* is limited to clothing designs ***and*** is applied to uniforms, the very subject matter of this case. *See* 416 F.3d at 421-2.Varsity says that *Jovani* has no precedential value, but Varsity fails to provide a complete

citation of the case, omitting the Supreme Court's denial of the plaintiff's petition for certiorari *and* request for rehearing.

In *Galiano*, the district court emphasized that the plaintiff's casino uniform designs were not capable of existing "independently" from their intrinsic utilitarian function: "While not denying the aesthetic value of these artistic design features, they are still just that – design features of useful wearing apparel. None of these artistic design features has intrinsic value as a work of art that can exist *independently* of the wearing apparel on which it is used." 2004 WL 1057552, at \*9 (emphasis added). The Fifth Circuit affirmed the district court's ruling in *Galiano*, adding: "Gianna [the designer] makes no showing that its designs are marketable *independently* of their utilitarian function as casino uniforms. Gianna correctly notes that there are costume museums and that they are replete with extravagant designs that might also have utilitarian qualities, but Gianna does not demonstrate that its designs describe such material." 416 F.3d at 422 (emphasis added).

In *Jovani*, the Second Circuit rejected the plaintiff's argument that its prom dress designs with purely decorative elements were separable and independent non-functional elements, stating:

> This narrow statement of a garment's function is not supported by our precedent, which recognizes that ***clothing, in addition to covering the body, serves a 'decorative function,' so that the decorative elements of clothing are generally 'intrinsic' to the overall function, rather***

51

> ***than separable from it.*** *Whimsicality, Inc. v. Rubie's Costume Co.,* 891 F.2d at 455 (observing that garments' decorative elements are 'particularly unlikely to meet [the] test' of conceptual separability.).

500 Fed. App'x at 45 (emphasis added).

None of the artistic design features of Varsity's cheerleading uniforms – like *Galiano*'s casino uniforms and *Jovani* 's prom dress – has intrinsic value as a work of art that can exist independently of the garment, and none of the constituent elements is "wholly unnecessary" or superfluous to the function of the resulting cheerleading uniforms. This is a fatal flaw in Varsity's position: The constituent elements of these designs are what make them designs *of* useful articles. As Judge Cleland found, "the design *of* cheerleading uniforms has merged with the utilitarian function they serve." (RE #199, PgID 4310; SJ Ord. at 16).

Varsity's designs are *not* sculptural works. Yet, Varsity relies only on separability cases involving non-clothing elements, such as sculptural works superfluous to furniture, while chastising Judge Cleland for considering cases involving design elements that are basic to, and comprising the over-all configuration of, specific kinds of clothing (prom dresses and casino uniforms), dismissing the court's well-reasoned decision as purportedly based on the court's *ipse dixit*.

**The district court found Varsity's designs were not conceptually separable under recognized separability standards.**

Varsity is incorrect (Brief, p. 31) that the district court invented a new conceptual separability test and failed to follow established standards. Judge Cleland quoted *Pivot Point*'s summary of six tests for determining conceptual separability (RE#199, PgID 4301, SJ Ord., p. 7),[13] finding that Varsity's designs were not separable under five of these tests, making no ruling on the first test (from *Kieselstein-Cord*) which is based on a primary-subsidiary assessment of artistic, sculptural, and utilitarian features.

With respect to the **second test** – Nimmer's test of whether the useful article would still be marketable to some significant segment of the community simply because of its aesthetic qualities[14] – Judge Cleland found that Varsity's designs failed this test because: "it is unlikely that the designs in this case would be marketable outside of their utilitarian function as cheerleading uniforms." (Id. at p.

---

[13] Varsity makes bald, inaccurate declarations – such as its claim on page 34 of its brief that *Pivot Point*'s process-oriented approach is "the most widely adopted approach" – that are not supported by any authority. *Pivot Point*'s survey of the various separability tests is often cited, but, as noted, Judge Cleland analyzed Varsity's designs under the Seventh Circuit's "approach" in that case and found that Varsity's designs could not be separated from their utilitarian function. Regardless of its purported influence, Judge Cleland applied *Pivot Point*'s test to Varsity's uniform designs and found that they could not exist independently from their utilitarian function.

[14] Melville B. Nimmer & David Nimmer, 1 *Nimmer on Copyright* §2.08[B][3], at 2–101 (2004).

16).

The evidence supports this ruling. Varsity markets the panel, stripe, and chevron features as functional components of its uniforms, allowing customers to construct uniforms in team colors using these components. In its 1998 catalog, Varsity told its customers how to create a team identity using the basic elements of a cheerleading uniform: "All uniform pieces are available with your choice of color and color placement *in panels and striping*, so you can create lots of different looks to fit lots of different squads and different occasions . . . *Striping's a must for any uniform*. You can even design your own color set-up. We don't limit you to one, two, three, or four colors. The choice is up to U!" (R.E.#169-1, Ex. 22, 1998 catalog VSC 34603) (emphasis added and omitted):

[This space intentionally left blank]



Varsity marketed the five designs at issue here the same way – as designs for functional cheerleading uniforms. The following images are pages from Varsity's catalogs which depict, respectively, Design Numbers 815, 078, 074, and 299A/B, as cheerleading uniform tops, skirts, pants, and jackets, but *not as fine art*:



Varsity leads the way, from designs with a definite fashion sense, to fabrics that go the distance and beyond. With Varsity, you're ahead of the game!

**A-C. SHELL TOP**
WS-0815RA $75.95
*NEW!* ActionWeave® racer back design and side panels.
**MEN'S SHIRT**
GS-0815S $75.95
Solid back. With or without waistband.
A, C. Lettering: (TTBRDG-3) 3".
Emblem: (ECM-136) 3".
MotionFLEX® bodyliner, $62.95, crop (MFBLR-0815CM) or waist length (MFBLR-0815WM).
Skirt, $62.95, (S-0318)
B. Lettering: (TTBRDG-3) 4"
Pants, $67.95, (GP-0612)

*Available Not Shown:*
MotionFLEX® bodyliner, $62.95, crop (MFBLR-0815CV) or waist length (MFBLR-0815VW)
Same as above, with V-neck.

**D. REGULAR FIT JACKET**
PMR-0815FB $89.95
*NEW!* Front/back design. Lined.
Lettering: (TTBRDGVS-3) 3".
Pants, $64.95, (PMP-0815)

*Available Not Shown:*
REGULAR FIT JACKET
PMR-0815S $87.95
Same as above, with solid back.

SHELL TOPS | 51

56

# style front and flipped

F. FITTED JACKET
WUF-057FB   $79.95
Front/back design, pockets.
Lettering: (TTSKBTVS-3) 4".
Pants, $46.95, (VVP-030)

G. SHELL TOP
WS-078FA   $82.95
*NEW!* ActionWeave® back
design and side panels.
Lettering: (TTSKBT-3) 4", (TTM-2) 3".
Monogram: (MNB-1) 1".
MotionFLEX® bodyliner, $59.95,
crop (MFBLR-078CV) or
waist length (MFBLR-078VW)
Skirt, $65.95, (S-0713)

*Available Not Shown:*
MEN'S SHIRT
GS-078FB   $82.95
Front/back design. With
or without waistband.



shell tops

63

57



(RE#176, Exs. H-J, 2008, 2007 and 1999 catalogs).

These five designs were marketed by Varsity only as cut-and-sew cheerleading apparel, like those depicted above, not sublimated fabric designs. (RE# 182, PgID 3740, Resp. to Star's Obj to Sublimated Mat, p. 9).

Like the plaintiffs in *Galiano, Jovani* and *Eliya*, Varsity made no showing that the five designs were marketable independently of their utilitarian function as cheerleading uniforms. Here, the evidence is that these designs have no other marketable use. *See* RE#176, Ex. BB, Goldaper Supp. Decl., ¶3 ("None of the individual pre-cut panels and strips of striping has any real independent marketable worth, if not used on a cheerleader uniform or similar item of clothing."); Id.,  Ex. A, Harder Dep. 121:5-9, 126:11-127:1 (Varsity marketed none of the five designs for sale as two-dimensional images; none displayed in art gallery or museum.); Id., Ex. F, Sarabia Supp. Decl. ¶9 ("Varsity was not paying its apparel designers to make sketches to decorate the halls.").

With respect to the **third test** – whether the article stimulates in the mind of the beholder a concept that is separate from the concept evoked by its utilitarian function[15] – Judge Cleland found that Varsity's designs failed this test because: "[R]emoving the lines, patterns, and chevrons from the actual physical garments at issue in this litigation and placing them on a different canvas does not remove their association as cheerleading uniforms. A sample fabric displaying sublimated

---

[15]  *Carol Barnhart*, 773 F.2d at 422 (Newman, J., dissenting).

designs illustrates this point. Despite showing the design physically separated from a utilitarian cheerleading uniform, the fabric evokes the image and concept of a cheerleading uniform and proves the difficulty of removing the design from the utilitarian article." (RE#199, PageID 4310, SJ Ord., p. 16 [citations omitted]).

The record supports this ruling. *See* R.E.#169-1, Ex.46, Leake Dep. 19:21-23 ("They provided me with a sketch. And I took it and got it – converted the sketch to a product."); Id., Ex.52, Long Dep. 123:9-13 ("[T]he sketch is to communicate … how I want to cut this particular garment up in pieces and lay braid in …"); RE#176, Ex. F, Sarabia Supp. Dec'n ¶¶9-12 (Varsity's three sketches of cheerleading uniforms are "the first plan for the creation of garments" and the two photographs are depictions of the end result; this declaration also discusses the "Varsity Legend" video, http://www.varsity.com/about/varsitylegends at 5:00-5:30; 6:33-6:47, which says Kraig Tallman "knew that what he was designing was showing an identity to the end-user – the cheerleaders themselves. He wanted them to look good in it, to be able to perform better."); Id., Ex. U, Williams Dep. 62:2-8 (Stripes, V's, diagonals, lines and curves "are basic elements" of cheerleading uniforms).

With respect to the **fourth test** – whether the artistic design was significantly influenced by functional considerations[16] – Judge Cleland found that Varsity's designs failed this test because: "[T]he designers were at all times conceiving of and

---

[16] *Brandir*, 834 F.2d at 1145, adopting the test proposed in Denicola.

sketching various designs of cheerleading uniforms." (RE#199, PgID 4308, SJ Ord. at 14).

The record supports this finding. According to Mr. Long, the starting point in designing a uniform is its shape, which the designer cuts into pieces "with ideas of how those would be reassembled" to tell the production department the cut, style, and fit of uniform designs so that fabric and braid cutting-patterns could be "made" and the uniform "assembled." RE#176, Ex. E, Long Dep. 29: 8-13. ; RE #169-1, Ex. 48, Harder Dep. 153:20-21, 204: 14-19 ("Striping is used as a decorative form," and "often striping is used [in sportswear design] to depict colors of teams.;" Id. at 153: 4-9 (These five Varsity designs "are used to translate the two dimensional designs into the garment" and "for no other purposes except to be there for that."); Id., Ex. 52, Long Dep. 123: 7-13 (sketch of 299A was to show how to cut garments into pieces and lay-in striped braid for a design meeting); Id., Ex. G, Spencer Dep. 95:15-96:20 (primary purpose of braid is to add color and decoration to the uniform); Id., Ex. CC, Long Dec'n ¶¶ 6-12 (details 299 design conception and collaboration); Id., Ex. E, Long Dep. 136:4-10 (color identifies the cheerleader with a group, organization, club; braid in neckline reinforces structure).

In its 2013 catalog, Varsity shows how to customize a uniform style to give it "multiple personalities," offering 24 colors and 9 striped-braid options to depict

team colors on fabric panels in the uniform designs, using one style to create three different team identities:



Varsity tells customers and sales reps to customize the design by "start[ing] with a uniform style" and "**color it up** in any combination of 24 school colors" and "**add braid** in any of 9 styles, also in your choice of colors" because it's "all about the braid:"



(RE#169-1, Ex. 35, 2013 Varsity catalog, page 65) (emphasis in original).

Contrary to Varsity's current argument that its designs contain superfluous and wholly-unnecessary decorative elements, Varsity has for years advertised these same elements as functional, stating that its designs were "the perfect teaming of form and function:"

Like the spirit leaders and their new high-energy skills, the designs were sleek, athletic, exciting - and offered greater flexibility and strength for the more rigorous routines. It was the perfect teaming of form and function.

It was the beginning of Varsity Spirit Fashions.

(RE#169-1, Ex. 21, Webb Dep. Ex. 16, Varsity's 2010 catalog, inside cover).

[This space intentionally left blank]

Similarly, in its 1998 catalog, Varsity said "functional should look fabulous:"



(RE#149-2, PageID 1986 Varsity's 1998 catalog, inside cover).

Varsity tells its sales reps that "DESIGN AFFECTS FIT! *Any garment will fit tighter due to lots of braid, lettering, etc.*," [17] and "[t]he more complex a style (braid, panels, and lettering), the tighter the fit."[18]  In its "Youth Sizing" materials, Varsity says:

> Realize that *the design of a shell top will influence the way that it fits*. Placement and amount of striping/lettering will make a difference in how a shell will fit*. Shell tops with a lot of striping will fit tighter than shell tops with little striping*; 3-color lettering will make a shell more binding than 1-color lettering.[19]

Contrary to the spin that Varsity's lawyers and hired experts make in this litigation, these candid inter-company materials show that function influences every aspect of the design of its cheerleading uniforms.

With respect to the **fifth test** – whether the artistic features can stand alone as traditionally conceived works of art and whether the useful article in which they are embodied would be equally useful without them[20] – Judge Cleland found that Varsity's designs cannot stand alone and the uniforms would lose their function as cheerleading uniforms if the stripes and chevrons were removed: "[A] cheerleading uniform loses its utilitarian function as a cheerleading uniform when it lacks all design and is merely a blank canvas." Id. at p.15

---

[17]  RE#176, Ex. N, "Shell Tops – Adult," VSC 36172 (emphasis added).

[18]  Id., Ex. O, "Measuring for Specific Garments," VSC 036195.

[19]  Id., Ex. P, "Youth Sizing," VSC 035797 (emphasis added).

[20]  1 Goldstein on Copyright §2.5.3, at 2:67.

The record supports these findings by Judge Cleland. *See* 169-1, Ex. 17, pg. VSC35111 (Striping and braid are a "very important part" of Varsity's uniforms); Id., Ex. 44, Spencer Dep. 130:13-20 (Removal of the stripes would require deconstruction of Varsity's uniforms for these five designs); Id., Ex. 43, Williams Dep. 172:13-21 (The uniform is nothing without stripes – the combination of these basic elements makes it a uniform – the stripes are not separable without adverse effect).

The **sixth test** asks: Can a cheerleading uniform be conceived without any ornamentation or design, yet retain its utilitarian function as a cheerleading uniform?[21] Judge Cleland found that "a cheerleading uniform loses its utilitarian function as a cheerleading uniform when it lacks all design and is merely a blank canvas." (RE#199, PgID 4309, SJ Ord. at 15). The blank cheerleading uniforms (RE#175 -1, PgID 2825 – 2826) support this finding.

Although Judge Cleland considered various tests for determining separability under the Copyright Act, the goal of these tests is to make the determination required by the statute: to identify "features that can be identified *separately from*, and are capable of existing *independently of*, the utilitarian aspects of the article." 17 U.S.C. § 101 (emphasis added). The word

---

[21] *See* William F. Patry, 1 Copyright Law & Practice 285 (1994).

"independently" appears 13 times in the Summary Judgment Order in the present case; Judge Cleland understood that the court's job is to apply the statute.

The present case involves application of separability analysis to one type of industrial design – cheerleading uniforms. Judge Cleland properly relied on the only appellate decision involving uniforms, *Galiano*, which limited its test to clothing designs:

> We therefore adopt the likelihood-of-marketability standard *for garment design only,* because it appears firmly rooted as the implicit standard courts have been using for quite some time. We are not unaware of the pitfalls of such a standard, but its inherent problems are minimized when the rule's ambit reaches a single type of applied art.

416 F.3d at 421-2 (emphasis by the court, footnotes omitted).

### <u>The elements of Varsity's designs depicting cheerleading uniforms are not physically separable from actual uniforms.</u>

Varsity does not argue that its designs are physically separable, effectively waiving the issue by arguing that physical separability is "irrelevant" here. (Brief, p. 63, n. 12). But, this undermines *all* argument for conceptual separability: "functional components of useful articles, no matter how artistically designed, have generally been denied copyright protection unless they are physically separable from the useful article." *See Eliya,* at *12 (denying *conceptual* separability on this basis, citing *Norris* 696 F.2d at 924).

Physical separability requires that a design element can be removed from the original item and separately sold without adversely impacting the article's functionality. It is not enough that an element can be removed from the useful article; it must have some value in its freestanding form, above the value of its constituent material. *Jovani,* 808 F. Supp. 2d at 550.

Here, Judge Cleland found that Varsity's designs fail because:

(1) Removal of the designs would adversely affect the clothing: "A cheerleading uniform loses its utilitarian function as a cheerleading uniform when it lacks all design and is merely a blank canvas." (RE#199, PgID 4309, SJ Ord. at 15).

(2) The design elements, by themselves, have no value: "It is unlikely that the designs in this case would be marketable outside of their utilitarian function as cheerleading uniforms." (Id. at 16).

## ARGUMENT: ISSUE NO. 2

**The district court properly exercised its discretion in ruling that expert testimony could be admissible as to Varsity's claims of copyright infringement.**

The admissibility of expert testimony as to copyrightability is settled law in the Sixth Circuit: Under *Kohus v. Mariol*, the admissibility of such testimony is committed to the discretion of the district court. Citing *Kohus*, both the magistrate judge and the district court judge concluded that Star's proffered expert testimony

would assist the trier of fact as to the functionality of design elements which is a sufficiently specialized subject that expert testimony may assist a lay person to understand.

Like *Kohus*, the present case involves a claim of copyright infringement from the two-dimensional design of a useful article. Like *Kohus*, expert testimony on functionality would "likely be required" as to what aspects of the useful object are necessary to their function. 328 F.3d at 856. *Kohus* explicitly called for expert testimony on the functionality of a three-dimensional latch depicted in two-dimensional drawings registered with the Copyright Office, vacating the district court's judgment specifically *because* the court rejected proffered expert testimony.

Varsity does not argue that *Kohus* is distinguishable or that it is not controlling. Varsity simply ignores it. Having failed to properly engage the *Kohus* rationale by directly challenging the ruling in that case, Varsity has waived this issue.

Moreover, Varsity does not cite any opinion by either of Star's experts which could be interpreted as an opinion on the law. The testimony of Star's experts would assist the trier of fact with respect to design elements that are sufficiently specialized that a lay person is unlikely to understand as to clothing design in general and cheerleading uniforms in particular.

Judge Cleland acted within his discretion in denying Varsity's motion to preclude Star's experts from testifying as to constituent elements of cheerleading uniform designs and the functionality and separability of Varsity's designs.

## **ARGUMENT: ISSUE NO. 3**

### **The district court properly exercised its discretion to dismiss without prejudice Varsity's state-law claims after dismissing all of Varsity's federal-law claims prior to trial.**

Pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. *Baer v. R & F Coal Co.,* 782 F.2d 600, 603 (6th Cir.1986). The doctrine of pendent jurisdiction is codified as supplemental jurisdiction in 28 U.S.C. § 1367, subsection "c" of which provides "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

Courts should ordinarily dismiss state-law claims if a plaintiff's federal claims have been dismissed prior to trial. *Sem-Torq, Inc. v. K Mart Corp.*, 936 F.2d at 855-6. This is exactly what Judge Cleland did here.

Varsity says its claims were supported by diversity jurisdiction under 28 U.S.C. § 1332, which it also says that it "pled in the Complaint." (Brief at 66-7). But Varsity is mistaken; its complaint does not allege any amount in controversy nor does it allege that diversity of citizenship existed at the time the complaint was

filed. Varsity simply cites 28 U.S.C. § 1332, which is insufficient. *See Malone v. Windsor Casino, Ltd.*, 14 Fed. App'x 634, 635 (6th Cir. 2001) (per curiam) (referring to diversity statute alone is not enough).

Varsity makes no allegations of citizenship of Star's member(s), which would be the basis for determining the defendant's citizenship. *Homfeld II, LLC v. Comair Holdings, Inc.*, 53 Fed. App'x 731, 732 (6th Cir. 2003); *see Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994) ("In a diversity case, for example, it is not enough for the plaintiff to allege that the claim is within the diversity jurisdiction; the complaint must allege the citizenship of the parties and the amount in controversy.").

Dismissal of Varsity's state-law claims was within the court's discretion. Indeed, it is the prescribed course when all federal claims have been dismissed.

Varsity's argument on this issue is frivolous.

## <u>CONCLUSION</u>

The judgment of the district court should be affirmed.

Respectfully submitted,

*s/Michael F. Rafferty*
Michael F. Rafferty, Tenn. Disc. No. 10092
HARRIS SHELTON
HANOVER WALSH, P.L.L.C.
Memphis, Tennessee  38103-2555
Attorneys for Defendant-Appellee
Star Athletica, LLC

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIRMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, because it contains 13,997 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6), because it has been prepared in a proportionally spaced typeface using Word 2010 in Times New Roman. All of the text, including footnotes, is in 14-point font.

3. I relied on the word count of Word 2010 in preparing this Certificate.

I declare under penalty of perjury that the foregoing is true and correct.

Date: January 5, 2015.

> *s/Michael F. Rafferty*
> Michael F. Rafferty
> Attorney for Appellee

## CERTIFICATE OF SERVICE

Pursuant to Rule 25(d) of the Federal Rules of Appellate Procedure, I certify that a copy of the foregoing Brief of the Appellee Star Athletica, LLC was served on plaintiff's counsel, Grady M. Garrison, Bradley Trammell, and Adam S. Baldridge, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, 165 Madison Avenue, Suite 2000, Memphis, TN 38103, this 5th day of January, 2015.

> *s/Michael F. Rafferty*

## APPELLEE'S DESIGNATION OF
## RELEVANT DISTRICT COURT DOCUMENTS

1.    RE #1, Complaint

2.    RE #56, Order Denying Motion to Dismiss

3.    RE #58, Answer and Counterclaim

4.    RE #60, Order Denying Motion for Clarification

5.    RE #61, Motion to Dismiss Counterclaims

6.    RE #80, Order Granting in Part and Denying in Part Motion to Dismiss

7.    RE #84, First Motion to Compel Discovery Responses

8.    RE #93, Order Referring First Motion to Compel to Mag. Judge Claxton

9.    RE #97, Sealed Motion to Preclude Testimony of Putative Experts

10.    RE #109, Order Referring Motions to Preclude Experts, etc. to Mag. Judge Claxton

11.    RE #110, Motion to Compel Discovery from Plaintiffs

12.    RE #112, Order Referring First Motion to Compel Discovery from Plaintiffs to Mag. Judge Claxton

13.    RE #114, Memorandum of Facts and Law in Support of First Motion to Compel Discovery from Plaintiffs

14.    RE #125, Judge Robert H. Cleland added as presiding judge in place of Judge S. Thomas Anderson

15.    RE #137, Order Denying Sealed Motion to Preclude Expert Testimony

16.     RE #144, Plaintiffs' Reply in Support of Objections to Mag. Judge's Order Denying Motion to Preclude Expert Testimony

17.     RE #148, Opinion and Order Overruling Plaintiffs' Objections to Mag. Judge's Decision and Granting Plaintiffs' Motion for Extension of Time to Identify Experts

18.     RE #149, Sealed Motion to Strike Second Supplemental Expert Report of Antonio Sarabia II

19.     RE #168, First Sealed Motion for Summary Judgment (Defendant)

20.     RE #169, Memorandum and Affidavits in Support of First Sealed Motion for Summary Judgment

21.     RE #170, First Sealed Joint Statement of Undisputed Facts

22.     RE #171, Notice of Filing of Physical Exhibits

23.     RE #172, Sealed Motion for Summary Judgment (Plaintiffs)

24.     RE #173, Sealed Statement of Undisputed Facts

25.     RE #174, Sealed Response to Defendant's Motion for Summary Judgment

26.     RE #175, Sealed Notice of Errata for Corrected Exhibits to Plaintiffs' Statement of Facts

27.     RE #176, Sealed Response to Plaintiffs' Motion for Summary Judgment

28.     RE #182, Sealed Response in Opposition to Objection to Submission of Sublimated Materials

29.     RE #199, Opinion and Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, etc.

30.     RE #200, Judgment in favor of Defendant Star Athletica, LLC

31.    RE #201, Notice of Appeal

32.    RE #213, Notice of Filing of Star's SJ Exhibits