RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0194p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

VARSITY BRANDS, INC.; VARSITY SPIRIT CORPORATION; VARSITY SPIRIT FASHIONS & SUPPLIES, INC.,

            *Plaintiffs-Appellants*,

     *v.*

STAR ATHLETICA, LLC,

            *Defendant-Appellee*.

No. 14-5237

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:10-cv-02508—Robert H. Cleland, District Judge.

Argued:  April 24, 2015

Decided and Filed:  August 19, 2015

Before:  GUY, MOORE, and McKEAGUE, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  Grady M. Garrison, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C., Memphis, Tennessee, for Appellant.  Michael F. Rafferty, HARRIS SHELTON HANOVER WALSH, P.L.L.C., Memphis, Tennessee, for Appellee.  **ON BRIEF:** Grady M. Garrison, Bradley E. Trammell, Adam S. Baldridge, Nicholas L. Vescovo, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C., Memphis, Tennessee, for Appellant.  Michael F. Rafferty, Steven M. Crosby, Theodore C. Anderson, HARRIS SHELTON HANOVER WALSH, P.L.L.C., Memphis, Tennessee, for Appellee.

     MOORE, J., delivered the opinion of the court in which GUY, J., joined.  McKEAGUE, J. (pp. 33–36), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

KAREN NELSON MOORE, Circuit Judge.    Are cheerleading uniforms truly cheerleading uniforms without the stripes, chevrons, zigzags, and color blocks?  That is the question that strikes at the heart of this appeal.  Plaintiffs-Appellants Varsity Brands, Inc., Varsity Spirit Corporation, and Varsity Spirit Fashions & Supplies, Inc. (collectively "Varsity") have registered copyrights for multiple graphic designs that appear on the cheerleading uniforms and warm-ups they sell.  Defendant-Appellee Star Athletica, LLC, also sells cheerleading gear bearing graphic designs that, according to Varsity, are substantially similar to the designs for which Varsity has valid copyrights.  Star asserts that Varsity's copyrights are invalid because the designs at issue are unprotectable "design[s] of . . . useful article[s]."  17 U.S.C. § 101 (2012). The district court concluded that a cheerleading uniform is not a cheerleading uniform without stripes, chevrons, zigzags, and colorblocks, and therefore Varsity's copyrights are invalid. Varsity now appeals, and we take up the question that has confounded courts and scholars: When can the "pictorial, graphic, or sculptural features" that are incorporated into "the design of a useful article" "be identified separately from, and [be] capable of existing independently of the utilitarian aspects of the article[?]" *Id.*

For the reasons we now explain, we **REVERSE** the district court's judgment and enter partial summary judgment for Varsity with respect to whether Varsity's designs are copyrightable pictorial, graphic, or sculptural works, and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

Varsity designs and manufactures apparel and accessories for use in cheerleading and other athletic activities. R. 170 at 1 (Joint Statement of Undisputed Facts ("JSUF") ¶ 1) (Page ID #2228).  It employs designers who sketch design concepts consisting of "original combinations, positionings, and arrangements of elements which include V's (chevrons), lines, curves, stripes, angles, diagonals, inverted V's, coloring, and shapes . . . ."  R. 173 at 2–3, 6 (Pls.' Statement of

Undisputed Facts ("PSUF") ¶¶ 1, 4, 21 (Page ID #2385–86, 2389); R. 173-2 at 4–5 (Williams Decl. ¶ 8) (Page ID #2439–40). When creating these designs, the designers do not consider functionality of the uniform or the ease of producing a full-sized uniform that looks like the sketch. R. 173 at 2–3, 6 (PSUF ¶¶ 4–5, 21) (Page ID #2385–86, 2389); R. 173-2 at 4–5 (Williams Decl. ¶ 8) (Page ID #2439–40). After a designer completes a sketch, Varsity decides whether to implement that design concept for cheerleading or other uniforms, or whether to abandon the design concept altogether. R. 173 at 4 (PSUF ¶¶ 11–12) (Page ID #2387). Once Varsity selects a design for production, the production crew re-creates the design using one of four methods to create a cheerleading uniform: "cutting and sewing panels of fabric and braid together"; sublimation;[1] embroidery; or screen printing. *Id.* at 8–9 (PSUF ¶ 28) (Page ID #2391–92). Varsity sells its merchandise by advertising in catalogs and online by inviting customers to choose a design concept among the many designs that Varsity offers, before selecting the shape, colors, and braiding for the uniform. R. 173-3 at 3–4 (Williams Dep. at 22–23) (Page ID #2449–50).

Varsity sought and received copyright registration for "two-dimensional artwork" for many of its designs, including the following designs, which are the subject of this lawsuit:

---

[1]Sublimation is the process of printing the design directly onto fabric. The printer heats the ink and infuses it into the fabric while the ink is gaseous. Once the design is printed onto the fabric, the production team cuts the fabric in the shape of the design and sews the pieces together. R. 173-1 at 4 (Spencer Decl. ¶ 8) (Page ID #2412) ("After the paper and fabric are finished feeding through the machine, the large pieces of fabric have the designs on them which are then cut out and the outer edges are sewn together as a front and back of a garment."); *see also* R. 173 at 9 (PSUF ¶ 31) (Page ID #2392).



Design 078
Registration No. VA 1-417-427



Design 0815
Registration No. VA 1-675-905



Design 299B
Registration No. VA 1-319-226



Design 299A
Registration No. VA 1-319-228



Design 074
Registration No. VA 1-411-535

R. 1-15 at 2 (Compl. Ex. 15) (Page ID #48); R. 1-16 at 2–3 (Compl. Ex. 16) (Page ID #51–52); R. 1-17 at 2 (Compl. Ex. 17) (Page ID #54); R. 1-18 at 2 (Compl. Ex. 18) (Page ID #57); R. 51-1 at 2 (1st Am. Compl. Ex. 9) (Page ID #536).[2]

Star markets and sells uniforms and accessories for football, baseball, basketball, lacrosse, and cheerleading. R. 170 at 2 (JSUF ¶ 5) (Page ID #2229). Varsity filed this lawsuit after seeing Star's marketing materials and noticing that Star was advertising cheerleading uniforms that looked a lot like Varsity's five registered designs. *See* R. 1 at 3–4, 6–10 (Compl. ¶¶ 13–15, 27–53) (Page ID #3–4, 6–10). Varsity alleges five claims of copyright infringement

---

[2]Varsity's original complaint alleged that Star infringed Varsity Design 034. *See* R. 1 at 4 (Compl. ¶ 14(e)). Varsity sought leave to amend the complaint in order to allege that Star had infringed Design 074, not Design 034, R. 48 at 1 (Unopposed Mot. to Amend Compl. ¶ 1) (Page ID #518), which the district court granted, R. 49 at 1 (Order Granting Unopposed Mot. to Amend Compl.) (Page ID #531). Varsity attached a copy of Design 074 and the certificate of registration for Design 074 to its First Amended Complaint. R. 51-1 at 2 (Amend. Ex. 9) (Page ID #536); R. 51-2 at 2–3 (Amend. Ex. 19) (Page ID #538–39).

for "selling[,] distributing, [and] advertising . . . goods bearing . . . design[s] that [are] copied from and substantially similar to" five of Varsity's designs in violation of the Copyright Act, 17 U.S.C. § 101 *et seq. Id.* at 7–10 (Compl. ¶¶ 29, 36, 42, 49, 56) (Page ID #7–10). In addition, Varsity has asserted that Star violated Tennessee's laws against unfair competition, inducement of breach of contract, inducement of breach of fiduciary duty, and civil conspiracy.[3] *Id.* at 11–13 (Page ID #11–13). Star denied liability for all of Varsity's claims and asserted counterclaims, including a claim that Varsity made fraudulent representations to the Copyright Office. R. 58 at 1–18 (Answer) (Page ID #585–602).

At the close of the discovery period, both parties filed motions for summary judgment. Star argued that it was entitled to summary judgment on all of Varsity's claims. With respect to Varsity's copyright-infringement claims, Star argued that Varsity does not have a valid copyright in the five designs for two reasons: (1) Varsity's designs are for useful articles, which are not copyrightable; and (2) the pictorial, graphic, or sculptural elements of Varsity's designs were not physically or conceptually separable from the uniforms, making the designs ineligible for copyright protection. R. 168 at 2 (Def.'s Mot. for Summ. J.) (Page ID #2121). Varsity asserted a right to summary judgment, as well, arguing that its copyrights were valid because the designs were separable and non-functional, and that Star infringed those valid copyrights. R. 172 at 1–2 (Pls.' Mot. for Summ. J.) (Page ID #2300–01). Varsity also sought dismissal of Star's counterclaims. *Id.* In response to Varsity's motion for summary judgment, Star primarily focused on whether Varsity's designs were unprotectable useful articles, *see* R. 176-2 at 8–13 (Def.'s Combined Mem. of Law in Opp'n to Pl's Mot. for Summ. J. and Reply in Supp. of Def.'s Mot. for Summ. J.) (Page ID #3282–87), but also argued that Varsity had not met its obligation "to prove which 'key elements' of its designs are original," *id.* at 14 (Page ID #3288). Varsity responded in its sur-reply to Star's claim that Varsity's designs were unoriginal. *See* R. 177 at 10–11 (Pl.'s Sur-Reply in Supp. of Mot. for Summ. J.) (Page ID #3371–72).

The district court entered summary judgment in Star's favor on the copyright claims, concluding that Varsity's designs were not copyrightable because the graphic elements of

---

[3]Varsity also alleged violations of the Lanham Act, 15 U.S.C. § 1125(a) (2012). The district court entered summary judgment for Star with respect to the Lanham Act claim upon Star's motion, which Varsity did not oppose. R. 199 at 17 (D. Ct. Op. & Order Re Mot. for Summ. J.) (Page ID #4311); 172 at 2 (Pls.' Mot. for Summ. J.) (Page ID #2300–01). Nor does Varsity appeal the entry of judgment on that claim.

Varsity's designs are not physically or conceptually separable from the utilitarian function of a cheerleading uniform because the "colors, stripes, chevrons, and similar designs typically associated with sports in general, and cheerleading in particular" make the garment they appear on "recognizable as a cheerleading uniform." R. 199 at 15 (D. Ct. Op. & Order Re Mot. for Summ. J.) (Page ID #4309). In other words, the district court held that the aesthetic features of a cheerleading uniform merge with the functional purpose of the uniform. The district court did not address whether Varsity's designs were unoriginal, and therefore unprotectable. Without addressing the merits of the state-law claims, the district court dismissed them without prejudice on the basis that it had resolved all of Varsity's federal claims and declined to exercise supplemental jurisdiction. *Id.* at 17–18 (Page ID #4311–12) (citing 28 U.S.C. § 1367(c)(3) (2012) ("The district court[] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.")).

This appeal followed. Varsity challenges the district court's entry of summary judgment on the issue of copyright infringement and dismissal of the state-law claims. Appellant Br. at 16–18. Because Varsity seeks a remand to the district court for further proceedings, it asks that we address the district court's ruling permitting Star's experts to testify about whether Varsity's designs are copyrightable, non-useful designs. *Id.* at 18.

## II.  COPYRIGHT INFRINGEMENT

We review the district court's grant of summary judgment de novo. *Jones v. Blige*, 558 F.3d 485, 490 (6th Cir. 2009). When reviewing an entry of summary judgment, we view the record in the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party. *Id.* The moving party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Varsity has alleged that Star infringed its valid copyrights. To prevail, Varsity must show that (1) it owned a valid copyright in the designs, and (2) that Star "copied protectable elements of the work." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004). We have said that "[t]he first prong tests the originality and non-functionality of the work," *id.*, but there are actually five elements to establish the validity of a copyright:

> (1) originality in the author; (2) copyrightability of the subject matter; (3) a national point of attachment of the work, such as to permit a claim of copyright; (4) compliance with applicable statutory formalities; and (5) (if the plaintiff is not the author) a transfer of rights or other relationship between the author and the plaintiff so as to constitute the plaintiff as the valid copyright claimant.

4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.01[A] (2003) (footnotes omitted).  We have also said, "[t]he second prong tests whether any copying occurred (a factual matter) and whether the portions of the work copied were entitled to copyright protection (a legal matter)."  *Lexmark*, 387 F.3d at 534.  This means that "a court should first identify and eliminate those elements that are unoriginal [or not copyrightable] and therefore unprotected" "before comparing similarities between" the plaintiff's and defendant's works.  *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003).  If the elements of the work that the defendant copied as a factual matter were not copyrightable—that is, non-original or ineligible for copyright protection—then the plaintiff cannot establish that the defendant has infringed the copyright.  *See* 4 NIMMER ON COPYRIGHT § 13.01[A].  The only element of the validity of Varsity's copyright that is at issue in this appeal is whether Varsity's designs are protectable subject matter under the Copyright Act.  *See* Appellant Br. at 1–2, 16–18; Appellee Br. at 3, 20–22.  The parties do not address the originality of the designs, and therefore we do not address that issue now.

Varsity challenges the district court's entry of summary judgment with respect to the copyright claims on three grounds.  First, Varsity argues that the district court did not afford appropriate deference to the Copyright Office's determination of copyrightability.  Second, Varsity contends that the district court used the wrong approach to determine whether a design is a protectable pictorial, graphic, or sculptural work that is separable from the utilitarian aspects of the article.  Third, Varsity asserts that its designs are copyrightable as a matter of law because they are graphic works and not useful articles.  We address each of these arguments in turn.

## A.  Copyright Registration and the Presumption of Validity

Varsity has successfully registered all five of the designs at issue with the Copyright Office.  Congress has bestowed upon those who have obtained copyright registration "made before or within five years after first publication of the work" a presumption of validity "[i]n any

judicial proceeding[].”  17 U.S.C. § 410(c) (2012).  A certificate of registration “constitute[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate.”  *Id.*  That presumption is rebuttable; once the plaintiff introduces evidence that he registered the work “before or within five years after first publication,” *id.*, then the burden shifts to the alleged infringer to present evidence that the plaintiff’s copyrights are invalid, *Hi-Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1095 (6th Cir. 1995).  “The evidentiary weight to be accorded the certificate of a registration made” more than “five years after first publication of the work” “shall be within the discretion of the court.”  17 U.S.C. § 410(c).

Three of Varsity’s designs were registered within five years after first publication, Appellant Br. at 21, and therefore Star “shoulders the burden of rebutting the presumptive validity of [those three] copyright[s],” *Lexmark*, 387 F.3d at 534.  Varsity registered the other two designs five years and six months and six years and four months after first publication, Appellant Br. at 22, and so we have discretion to view the registrations for these two designs as evidence of validity if we wish.  The district court acknowledged the statutory presumption afforded the three designs, but treated the presumption as “‘fairly easy to rebut because the Copyright Office tends toward cursory issuance of registrations.’”  R. 199 at 6 n.2 (D. Ct. Op. & Order) (Page ID #4300) (quoting *Universal Furniture Int’l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 430 (4th Cir. 2010)).  Varsity takes umbrage with the district court’s treatment of its presumption of validity and argues that courts should give deference to the Copyright Office’s determinations about the originality and separability of Varsity’s designs under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  Appellant Br. at 25–26.  What deference must we give to the Copyright Office’s determination that Varsity’s designs are non-functional and separable from the “utilitarian aspects of the article” to which they are affixed:  *Chevron*, *Skidmore*, or none?

*Chevron* deference is appropriate not only when “Congress . . . ha[s] expressly delegated authority or responsibility to implement a particular provision or fill a particular gap.”  *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).  We must also give “judicial [*Chevron*] deference” to an agency’s “interpretive choices” when “the agency’s generally conferred authority and other statutory circumstances [make apparent] that Congress would expect the

agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which 'Congress did not actually have an intent' as to a particular result." *Id.* (quoting *Chevron*, 467 U.S. at 845). In these circumstances, "any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.* at 227. Courts should give *Chevron* deference to an agency interpretation when Congress "provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Id.* at 230.

In some circumstances, however, when Congress has not expressly or impliedly delegated to an agency the power to promulgate rules with the power of law, courts need not give *Chevron* deference to the agency's interpretation. *Id.* at 234 (holding that tariff-classification ruling letters "are beyond the *Chevron* pale"). Nevertheless, agency interpretations of a statute deserve "respect proportional to [the interpretations'] 'power to persuade,'" otherwise known as *Skidmore* deference, *see id.* at 235, when the agency has "specialized experience and broader investigations and information available" than those available to the judiciary, *id.* at 234 (internal quotation marks omitted).

We have not resolved the level of deference courts must accord certifications of copyright registration, but our sibling circuits have shown some deference to the Copyright Office's interpretations of the Copyright Act. The Second Circuit gives some deference to the Copyright Office's *Circular for Copyright Registration on Form SE* as an interpretation of whether copyright registration of serial publications serves as registration for the independently authored contributions that were published in the serial issue. *See Morris v. Bus. Concepts, Inc.*, 283 F.3d 502, 505–06 (2d Cir. 2002) (citing *Mead Corp.*, 533 U.S. 218) ("In this case, however, we find the Office's interpretation persuasive."). Sitting en banc, the Third Circuit has held that the Copyright Office's "longstanding practice of denying registration to [a category of works] merits deference, but declined to label that deference "*Skidmore* deference." *Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 286 & n.5 (3d Cir. 2004) (en banc) (Alito, J.) ("We do not decide what degree of deference is warranted under the circumstances. At a minimum the practice of the Copyright Office reflects a body of experience and informed judgment to which

courts and litigants may properly resort for guidance.") (internal quotation marks omitted)). Noting that "'[c]ourts have twisted themselves into knots trying to create a test to effectively ascertain whether the artistic aspects of a useful article can be identified separately from and exist independently of the article's utilitarian function,'" the Ninth Circuit rejected *Chevron* deference for the Copyright Office's *Compendium* and opinion letters, but held that *Skidmore* deference was appropriate. *Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 755 F.3d 1038, 1041–42 & n.2 (9th Cir. 2014) (quoting *Masquerade Novelty, Inc. v. Unique Indus.*, 912 F.2d 663, 670 (3d Cir. 1990)) (also citing *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638–39 (9th Cir. 2004)); *see also Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 747 F.3d 673, 685 n.52 (9th Cir. 2014) ("Because the [copyright registration] forms created by the Copyright Office are statutorily authorized, it is possible that they qualify for the more deferential *Chevron* deference under *Mead*," but not deciding the question because applying *Skidmore* deference was sufficient). Similarly, the Eleventh Circuit has held that courts should give "some deference" to the Copyright Office's decision to *deny* an application for copyright registration because of "the considerable expertise of the Register in defining the boundaries between copyrightable works of art and noncopyrightable industrial designs."[4] *Norris Indus., Inc. v. Int'l Tel. & Telegraph Corp.*, 696 F.2d 918, 922 (11th Cir. 1983); *see also Olem Shoe Corp. v. Wash. Shoe Corp.*, 591 F. App'x 873, 882 n.10 (11th Cir. 2015) (giving *Skidmore* deference to the Copyright Office *Compendium*'s construction of the meaning of "preexisting work" because "copyright law is 'highly detailed' and it is apparent that the Copyright Office 'can bring the benefit of specialized experience to bear on the subtle questions of this case.'" (quoting *Mead*, 533 U.S. at 235)).

We now hold that the Copyright Office's determination that a design is protectable under the Copyright Act is entitled to *Skidmore* deference. Individual decisions about the copyrightability of works are not like "rules carrying the force of law," which command *Chevron* deference. *Mead*, 533 U.S. at 226–27. Like tariff-classification rulings, which the Supreme Court held are entitled to *Skidmore*—not *Chevron*—deference, *id.* at 235, copyright registration is not "a product of such formal process," *id.* at 235, or the type of process that suggests that the Copyright Office is engaging in any sort of rulemaking when issuing certificates of registration.

---

[4]That the Eleventh Circuit did not label the degree of deference owed to the Copyright Office "*Skidmore*" or "*Chevron* deference" is unsurprising; *Norris* preceded *Chevron* by a year. *See Chevron*, 467 U.S. at 837 (decided in 1984).

And, although the Copyright Office is "charged with applying [the Copyright Act]," and therefore "necessarily make[s] all sorts of interpretive choices," *id.* at 227, these choices are akin to tariff-ruling letters because they apply to individual applications and are conclusive only as to the application under review,[5] *see id.* at 233–34.  Hence, we conclude that the Copyright Office's decision to issue a certificate of copyright registration is "beyond the *Chevron* pale."  *Id.* at 234.

How much to defer to the determination to issue a copyright registration depends on "'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking the power to control.'"  *Mead*, 533 U.S. at 228 (quoting *Skidmore*, 323 U.S. at 140).  The Copyright Office unquestionably has experience identifying useful articles and pictorial, graphic, and sculptural works.  The Copyright Office publishes an internal manual that instructs its employees who are tasked with reviewing and registering copyrights how to apply the relevant provisions of the Copyright Act uniformly.  *See* COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES ") §§ 903.1, 924–924.3(D) (3d ed. 2014) [hereinafter COMPENDIUM III].  In addition, the evidence in the record suggests that the Copyright Office consistently applied the same interpretation of separability to Varsity's numerous designs like the ones at issue in this case, which Varsity successfully registered with the Copyright Office.  *See* R. 173-6 (Carroll Decl. Ex. A) (Page ID #2541–2605).  Comparison between the designs at issue in this case and the other Varsity registered designs confirms that the Copyright Office consistently found the arrangements of stripes, chevrons, and color-blocking to be original and separable from the

---

[5]The Court noted that tariff-classification letters do not qualify for *Chevron* deference in part because "Customs has regarded a classification as conclusive only as between itself and the importer to whom it was issued . . . ."  *Mead*, 533 U.S. at 233.  Copyright registration certainly affects artists other than the copyright owner because registration prevents other artists from copying the copyright owner's work without authorization.  17 U.S.C. § 106 ("[T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following . . . ."); *id.* § 113(a) ("[T]he exclusive right to reproduce a copyrighted pictorial, graphic, or sculptural work in copies under section 106 includes the right to reproduce the work in or on any kind of article, whether useful or otherwise."); *id.* § 501(a) ("Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be.").  But the Copyright Office's decision to register the copyright does not create a rule of general applicability that affects future registration decisions except to the extent that the Copyright Office may not register copyrights that are substantially similar to copyrights that have already been registered.  *See id.* § 102 ("Copyright protection subsists, in accordance with this title, in original works of authorship . . . ."); *id.* § 410(b) ("In any case in which the Register of Copyrights determines that, in accordance with the provisions of this title, . . . the claim is invalid for any other reason, the Register shall refuse registration and shall notify the applicant in writing of the reasons for such refusal.").  Nevertheless, the Court made clear that "precedential value alone does not add up to *Chevron* entitlement; interpretive rules may sometimes function as precedents, and they enjoy no *Chevron* status as a class."  *Mead*, 533 U.S. at 232 (internal citation omitted).  When "any precedential claim of a . . . ruling is counterbalanced by the provision for independent review," then the precedential effect of a ruling does not entitle that ruling to *Chevron* deference. *Id.*

utilitarian aspects of the articles on which they appear, and therefore copyrightable. *Compare id*, *with* Appellant Br. at 6–10. Not only do the letters demonstrate that the Copyright Office has interpreted the Copyright Act consistently, they also demonstrate that the Copyright Office has grounded its decisions to register Varsity's designs in the text of the statute using sound legal reasoning. *See* R. 173-6 at 8, 13 (Carroll Decl. Ex. A) (Page ID #2548–49, 2553). Finally, the Copyright Office's expertise in identifying and thinking about the difference between art and function surpasses ours. *See Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 994 (2d Cir. 1980) ("The Copyright Office continually engages in the drawing of lines between that which may be and that which may not be copyrighted.").

Thus, the district court erred by failing to give greater deference to the Copyright Office's registration determinations. This is not to say that the presumption of validity is irrebuttable. It is not. *Hi-Tech*, 58 F.3d at 1095; *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980). Star must bear the burden to overcome the presumption. We turn now to address whether Star has done so here.

**B.  Useful Articles and Separable Designs**

As an initial matter, we note that courts are divided about whether copyrightability is a question of law or fact. *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1353 n.3 (Fed. Cir. 2014) (noting circuit split); *Gaiman v. McFarlane*, 360 F.3d 644, 648–49 (7th Cir. 2004) (same). We need not resolve this question here. Although there may be cases where "[t]he determination whether a [work] is a pictorial, graphic, or sculptural work, and not an uncopyrightable 'useful article' is a fact-intensive one," *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 710 (9th Cir. 2010), this case is not one of them. The parties agree on the basic facts necessary to make a determination whether the pictorial, graphic, and sculptural features of Varsity's designs "can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article," 17 U.S.C. § 101, and therefore "there is no genuine dispute of material fact" for a jury to resolve because either Star or Varsity "is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

The Copyright Act of 1976 provides protection for "original works of authorship fixed in any tangible medium of expression . . . ." 17 U.S.C. § 102(a) (2012). Among the "works of

authorship" that the Act protects are "pictorial, graphic, and sculptural works." *Id.* § 102(a)(5). "'[P]ictorial, graphic, and sculptural works' include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans." *Id.* § 101. "[T]he design of a useful article . . . shall be considered a pictorial, graphic, or sculptural work," and thus copyrightable, "only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." *Id.* "A 'useful article' is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." *Id.*

These provisions together require a two-part inquiry to determine whether an article is protectable: first, whether the design for which the author seeks copyright protection is a "design of a useful article," and if so, second, whether the design of the useful article "incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the [useful] article." *Id.* This second question is often referred to as testing the "separability" of the pictorial, graphic, or sculptural features of the design of a useful article. *See, e.g.*, Compendium III §§ 924.1–.2 ("When examining a useful article, the [Copyright] Office must determine whether the article contains any pictorial, graphic, or sculptural features that are separable from its utilitarian function."); *Gay Toys, Inc. v. Buddy L. Corp.*, 703 F.2d 970, 972 (6th Cir. 1983) ("'[U]seful articles' are not generally copyrightable, although certain features of 'useful articles' may be copyrighted separately."). This appeal primarily concerns the separability of the graphic features of Varsity's cheerleading-uniform designs.

### 1. Separability

Courts, scholars, and students have endeavored to create a test to determine whether pictorial, graphic or sculptural features "can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. § 101; *see, e.g.*, 2 William F. Patry, Patry on Copyright § 3:135–147 (2015); Note, Barton R. Keyes, *Alive and Well: The (Still) Ongoing Debate Surrounding Conceptual Separablility in American*

*Copyright Law*, 69 OHIO ST. L.J. 109, 115–143 (2008); Shira Perlmutter, *Conceptual Separability and Copyright in the Designs of Useful Articles*, 37 J. COPYRIGHT SOC'Y U.S.A. 339 (1990).  We have not yet adopted an approach to determining whether the pictorial, graphic, or sculptural features of the design of a useful article are separable from the utilitarian aspects of a useful article, and so we do so now.

There are two ways to determine whether a pictorial, graphic, or sculptural work is separable from the utilitarian aspects of an article—physical separability and conceptual separability.[6]  The Copyright Office defines the physical-separability test as follows:  "Physical separability means that the useful article contains pictorial, graphic, or sculptural features that can be physically separated from the article by ordinary means while leaving the utilitarian aspects of the article completely intact."  COMPENDIUM III § 924.2(A).  The Copyright Office considers "[a] sufficiently creative decorative hood ornament on an automobile," which could be ripped from the hood of the automobile without destroying the ornament or the automobile, a physically separable sculptural aspect of the design of an automobile, which "can be identified separately from, and [is] capable of existing independently of, the utilitarian aspects of" the automobile.  COMPENDIUM III § 924.2(A); 17 U.S.C. § 101.

---

[6]We recognize that the words "conceptual" and "physical" separability do not appear in the text of 17 U.S.C. § 101.  The distinction derives from the legislative history of the Copyright Act of 1976, which first introduced the term "pictorial, graphic, and sculptural works" in order to provide "as clear a line as possible between copyrightable works of applied art and uncopyrighted works of industrial design."  H.R. REP. NO. 1476, 94th Cong., 2d Sess. 47, 55 (1976).  The House Judiciary Committee report about the amendment further clarified:

> A two-dimensional painting, drawing, or graphic work is still capable of being identified as such when it is printed on or applied to utilitarian articles such as textile fabrics, wallpaper, containers, and the like.  The same is true when a statute or carving is used to embellish an industrial product or, as in the *Mazer* case, is incorporated into a product without losing its ability to exist independently as a work of art.  On the other hand, although the shape of an industrial product may be aesthetically satisfying and valuable, the Committee's intention is not to offer it copyright protection under the bill.  Unless the shape of an automobile, airplane, ladies' [sic] dress, food processor, television set, or any other industrial product contains some element that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article, the design would not be copyrighted under the bill.  The test of separability and independence from "the utilitarian aspects of the article" does not depend upon the nature of the design—that is, even if the appearance of an article is determined by [a]esthetic (as opposed to functional) considerations, only elements, if any, which can be identified separately from the useful article as such are copyrightable.  And, even if the three-dimensional design contains some such element (for example, a carving on the back of a chair or a floral relief design on silver flatware), copyright protection would extend only to that element, and would not cover the overall configuration of the utilitarian article as such.

*Id.*  In light of this background, the Second Circuit has declared that "'[c]onceptual separability' is . . . alive and well."  *Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1144 (2d Cir. 1987).

Few scholars or courts embrace relying on the physical-separability test without considering whether the pictorial, graphic, or sculptural features of an article are conceptually separable because the physical-separability test has limitations.  The physical-separability test works well to draw the distinction between aesthetic articles and useful articles when the objects at issue are three-dimensional, such as statuettes that serve as lamp bases.  *See Mazer v. Stein*, 347 U.S. 201 (1954).  The test is less effective, however, when the article at issue is two-dimensional because it is nearly impossible physically to detach the article from the object on which it appears.[7]  Robert C. Denicola, *Applied Art and Industrial Design: A Suggested Approach to Copyright in Useful Articles*, 67 MINN. L. REV. 707, 744–45 (1983).  And the statute expressly offers copyright protection to two-dimensional articles.  17 U.S.C. § 101 ("'Pictorial, graphic, and sculptural' works include two-dimensional . . . works . . . .").  Moreover, the physical-separability test can lead to inconsistent results that turn on how the article is made.  Keyes, *supra*, at 120.  For example, if the artist makes the statuette separately before putting a lamp fixture on top of it, then it is copyrightable under the physical-separability test.  In contrast, if the statuette is wired through the body with a lamp socket in the head, then the statuette may not be eligible for copyright protection.  *Id.*

Since Congress passed the Copyright Act of 1976, no court has relied exclusively on the physical-separability test without considering whether the pictorial, graphic, or sculptural features of a design are conceptually separable from the utilitarian aspects of the useful article.[8]  And we decline to be the first to reject conceptual separability altogether.  To start, the House

---

[7]Of course, there are a few examples where a two-dimensional design is physically separable from a useful article.  Recently, the Eleventh Circuit held that décor paper design for laminate wood flooring was "physically severable" because the plaintiff "sells otherwise identical flooring that uses décor paper other than the Glazed Maple design," and thus "[t]he interchangeability of the paper designs" was evidence that the décor paper was physically separable from the useful flooring.  *Home Legend, LLC v. Mannington Mills, Inc.*, 784 F.3d 1404, 1413 (11th Cir. 2015).

[8]In 1978, the D.C. Circuit "rejected the idea of conceptual separability," *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 372 F.3d 913, 922 n.8 (7th Cir. 2004), when considering whether the Register of Copyrights had abused its discretion by denying registration for "the overall shape of certain outdoor lighting fixtures." *Esquire, Inc. v. Ringer*, 591 F.2d 796, 798 (D.C. Cir. 1978).  The Copyright Act of 1976 did not apply in *Esquire* because the Copyright Act had not gone into effect yet.  *Id.* at 799 n.8.  Nevertheless, the D.C. Circuit considered the legislative history of the Copyright Act of 1976 in order to address whether "a protectable element of a utilitarian article must be separable 'physically or conceptually' from the utilitarian aspects of the design."  *Id.* at 803.  The court concluded that "any possible ambiguity raised by [the] isolated reference" to conceptual separability in the legislative history "disappears when the excerpt is considered in its entirety."  *Id.* at 803–04.  Since Congress passed the Copyright Act of 1976, the D.C. Circuit has not reconsidered whether the Act protects the pictorial, graphic, or sculptural features of useful articles that are conceptually—but not physically—separable from the utilitarian aspects of a useful article.

Report, which discusses the amendments to the Copyright Act, expressly refers to design "element[s] that, physically or conceptually, can be identified as separable from the utilitarian aspects of" a useful article. H.R. REP. NO. 1476, 94th Cong., 2d Sess. 47, 55 (1976). We believe that abandoning conceptual separability altogether is therefore contrary to Congress's intent. In addition, our sibling "circuits have been almost unanimous in interpreting the language of § 101 to include both types of separability," *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 372 F.3d 913, 922 n.8 (7th Cir. 2004) (collecting cases), and we see no reason to create a circuit split. Therefore, we hold that the Copyright Act protects the "pictorial, graphic, or sculptural features" of a design of a useful article even if those features cannot be removed physically from the useful article, as long as they are conceptually separable from the utilitarian aspects of the article.

When the Copyright Office "determines that the useful article contains pictorial, graphic, or sculptural features that cannot be physically separated" from the utilitarian aspects of the useful article, then the Copyright Office applies the "conceptual separability test." COMPENDIUM III § 924.2(B). "Conceptual separability means that a feature of the useful article is clearly recognizable as a pictorial, graphic, or sculptural work, notwithstanding the fact that it cannot be physically separated from the article by ordinary means." *Id.* For example, the Copyright Office considers the following works of art conceptually separable from useful articles: "[a]n engraving on a vase," a "carving on the back of a chair," "[a]rtwork printed on a t-shirt," or "[a] drawing on the surface of wallpaper." *Id.*

Courts have struggled mightily to formulate a test to determine whether "the pictorial, graphic, or sculptural features" incorporated into the design of a useful article "can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the [useful] article" when those features cannot be removed physically from the useful article. ROBERT P. MERGES, PETER S. MENELL & MARK A. LEMLEY, INTELLECTUAL PROPERTY IN THE NEW TECHNOLOGICAL AGE 490 (6th ed. 2012). Through the years, courts and scholars have proposed or used the following approaches to conceptual separability:

(1) **The Copyright Office's Approach:** "A pictorial, graphic, or sculptural feature satisfies [the conceptual-separability] requirement only if the artistic feature and the useful article could both exist side by side and be perceived as fully realized, separate works—one an artistic work and the other a useful article." COMPENDIUM III § 924.2(B).

(2)   **The Primary-Subsidiary Approach:**  A pictorial, graphic, or sculptural feature is conceptually separable if the artistic features of the design are "primary" to the "subsidiary utilitarian function."  *Kieselstein-Cord*, 632 F.2d at 993.

(3)   **The Objectively Necessary Approach:**  A pictorial, graphic, or sculptural feature is conceptually separable if the artistic features of the design are not necessary to the performance of the utilitarian function of the article.  *Carol Barnhart, Inc. v. Economy Cover Corp.*, 773 F.2d 411, 419 (2d Cir. 1985).

(4)   **The Ordinary-Observer Approach:**  A pictorial, graphic, or sculptural feature is conceptually separable if "the design creates in the mind of the ordinary[, reasonable] observer two different concepts that are not inevitably entertained simultaneously."  *Id.* at 422 (Newman, J., dissenting).

(5)   **The Design-Process Approach:**  A pictorial, graphic, or sculptural feature is conceptually separable if the "design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences."  *Brandir*, 834 F.2d at 1145; *see also Pivot Point*, 372 F.3d at 930–31; Robert C. Denicola, *supra*, at 741–45.

(6)   **The Stand-Alone Approach:**  A pictorial, graphic, or sculptural feature is conceptually separable if "the useful article's functionality remain[s] intact once the copyrightable material is separated."  *Pivot Point*, 372 F.3d at 934 (Kanne, J., dissenting).

(7)   **The Likelihood-of-Marketability Approach:**  A pictorial, graphic, or sculptural feature is conceptually separable if "'there is substantial likelihood that even if the article had no utilitarian use it would still be marketable to some significant segment of the community simply because of its aesthetic qualities.'"  *Galiano v. Harrah's Operating Co.*, 416 F.3d 411, 419 (5th Cir. 2005) (quoting 1 NIMMER ON COPYRIGHT § 2.08[B][3]).

(8)   **Patry's Approach:**  There no need to engage in a separability analysis if (A) the work is the design of a three-dimensional article, and (B) the design is not of a "useful article."  2 PATRY ON COPYRIGHT § 3:145.  When determining whether pictorial, graphic, or sculptural features are protectable under the Copyright Act, the focus should be on whether those pictorial, graphic, or sculptural aspects are separable from the "utilitarian *aspects*" of the article, not the "article" because "the protected features need not be capable of existing apart from the article, only from its functional aspects." *Id.* § 3:146.[9]  This task requires two additional steps.  *Id.*  First, the court "must be able to discern pictorial, graphic, or sculptural features."  *Id.* Second, the pictorial, graphic, or sculptural features "must be capable of existing as *intangible* features independent of the utilitarian *aspects* of the useful article, not independent of the whole article . . . ."  *Id.*   This

---

[9]Patry recommends abolishing the distinction between "physical" and "conceptual" separability entirely.  2 PATRY ON COPYRIGHT § 3:146.   We decline to abandon those terms because Congress specifically referenced physical and conceptual separability in the House Report discussing the Copyright Act of 1976.  *See* H.R. REP. NO. 1476.

necessitates asking "whether the pictorial, graphic, or sculptural features are dictated by the form or function of the utilitarian aspects of the useful article." *Id.* If form or function—rather than aesthetics—dictates the way that the pictorial, graphic, or sculptural features appear, then those pictorial, graphic, and sculptural features are not capable of existing independently of the utilitarian aspects of the useful article. *Id.*

(9) **The Subjective-Objective Approach:** Conceptual separability is determined by balancing (A) "the degree to which the designer's subjective process is motivated by aesthetic concerns"; and (B) "the degree to which the design of a useful article is objectively dictated by its utilitarian function." *See* Keyes, *supra*, at 141. "The first factor requires courts to consider the degree to which aesthetic concerns, as opposed to functional ones, motivate the designer." *Id.* The second factor considers whether "the design is mostly dictated by function" or "hardly dictated by function at all." *Id.* at 142. If the design of the useful article "is mostly dictated by function," then that fact "weigh[s] against conceptual separability, and therefore, against copyright protection." *Id.* If the design "is hardly dictated by function at all" then that fact "weigh[s] in favor of a finding of conceptual separability." *Id.*

In recent years, our colleagues on the Second and Fourth Circuits have used multiple of the above-listed approaches in the same case when analyzing whether the "pictorial, graphic, or sculptural features" of a design of a useful article "can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the [useful] article." 17 U.S.C. § 101. In *Chosun International, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 325 (2d Cir. 2005), the Second Circuit addressed whether a company that created and manufactured plush Halloween costumes made to look like stuffed toy animals had a valid copyright in its costume designs. The district court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis that the costumes were not copyrightable. *Id.* at 326. On appeal, the Second Circuit reversed, using multiple theories of copyrightability to explain why the designer-plaintiff's copyright-infringement claims could proceed. First, the court said that the costume's design elements could "be 'conceptualized as existing independently of their utilitarian function.'" *Id.* at 329 (quoting *Carol Barnhart*, 773 F.2d at 418). Second, the court concluded that, even if some of the aesthetic design elements merged with the utilitarian elements, and therefore were not conceptually separable, the design was conceptually separable if the "design elements can be identified as reflecting the designer's artistic judgment exercised *independently* of functional influences." *Id.* (quoting *Brandir*, 834 F.2d at 1145). Finally, the court noted that

evidence may show that the plaintiff's designs were conceptually separable from the utilitarian function of the costume because the design "invoke[s] in the viewer a concept separate from that of the costume's 'clothing' function, and that their addition to the costume was not motivated by a desire to enhance the costume's functioning *qua* clothing"—a formulation of conceptual separability that harkens back to Judge Newman's ordinary-observer approach. *Id.* at 330; *see also Carol Barnhart*, 773 F.2d at 422 (Newman, J., dissenting) ("For the design features to be 'conceptually separate' from the utilitarian aspects of the useful article that embodies the design, the article must stimulate in the mind of the beholder a concept that is separate from the concept evoked by its utilitarian function."); 2 PATRY ON COPYRIGHT § 3:141.

In *Jovani Fashion, Inc. v. Cinderella Divine, Inc.*, 808 F. Supp. 2d 542 (S.D.N.Y. 2011), the district court used multiple approaches to address the copyrightability of a designer's prom-dress designs. *See id.* at 549–52. To start, the district court identified the portion of the dress design that Jovani claimed was separable from the dress: "the selection and arrangement of sequins and beads and their respective patterns of the bust portion, as well as the wire-edged tulles added to the lower portion of the depicted dress." *Id.* at 549 (internal quotation marks omitted). First, the district court found that no element of the design could be "ripped off the" dress and "reused or resold" "in its freestanding form," and therefore the elements were not physically separable. *Id.* at 550. Despite the dress's "vague association with the aquatic," the district court concluded that the design did not "'invoke in the viewer a concept separate from that of the dress's 'clothing' function.'" *Id.* at 550 (internal brackets omitted) (quoting *Chosun*, 413 F.3d at 330). Second, the design failed the design-process test because "each of the individual elements [was] plainly fashioned to fit the specific needs of a prom dress." *Id.* Each element of the design was part of the dress: "[t]he cloth swatch containing the sequins and beads is formed to compose the bust portion of the dress; the ruched-satin fabric is shaped into a waistband; and the layers of tulle make up the dress's skirt." *Id.* Third, the "primary role of each element [of the dress's design] is to contribute to an attractive prom dress, or at least to attempt to do so," and therefore the aesthetic components of the design were not primary over the utilitarian elements' function. *Id.* (citing *Kieselstein-Cord*, 632 F.2d at 993). Fourth, and finally, "none of the elements," standing alone, "has any marketable worth." *Id.* (citing *Galiano*, 416 F.3d at 421).

Our colleagues on the Second Circuit affirmed, "largely for the reasons stated by the district court." *Jovani Fashion, Inc. v. Fiesta Fashions*, 500 F. App'x 42, 44 (2d Cir. 2012). The court additionally explained that "the artistic judgment exercised in applying sequins and crystals to the dress's bodice and using ruched satin at the waist and layers of tulle in the skirt does not invoke in the viewer a concept other than that of clothing . . . ." *Id.* at 45. Thus, the court concluded that "these design elements are used precisely to enhance the functionality of the dress as clothing for a special occasion," and therefore "the aesthetic merged with the functional to cover the body in a particularly attractive way for that special occasion." *Id.* Finally, the Second Circuit acknowledged "that clothing, in addition to covering the body, serves a 'decorative function,' so that the decorative elements of clothing are generally 'intrinsic' to the overall function, rather than separable from it." *Id.* (citing *Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 455 (2d Cir. 1989)).

The Fourth Circuit also uses this "hybrid" approach to conceptual separability. In *Universal Furniture*, the court considered whether decorative elements adorning furniture, a useful article, were eligible for copyright protection. 618 F.3d at 433. In reaching the conclusion that the design features were protectable, the Fourth Circuit used two approaches to conceptual separability. *Id.* at 434. Our colleagues used the objectively necessary approach: "[T]he designs are 'wholly unnecessary' to the furniture's utilitarian function." *Id.* (quoting *Carol Barnhart*, 773 F.2d at 419); *see also id.* at 435 ("[The decorative elements'] form is not 'inextricably intertwined' with the function of furniture.") (quoting *Carol Barnhart*, 773 F.2d at 419). They also applied the design-process approach: "[The designer's] process reflects an 'artistic judgment exercised independently of functional influences.'" *Id.* at 434 (quoting *Pivot Point*, 372 F.3d at 931). The Fourth Circuit did not apply or consider any other approaches.

These cases from the Second and Fourth Circuits illustrate that it is difficult to select one approach to the question whether an artistic design is conceptually separable from the utilitarian aspects of the article. We adopt a similar hybrid approach now.

## 2.    The Sixth Circuit Approach to Identifying Pictorial, Graphic, and Sculptural Works

We believe the best approach to determining whether a design is a copyrightable "pictorial, graphic, or sculptural work[]," 17 U.S.C. § 102, is to ask a series of questions that are grounded in the text of the Copyright Act:  (1) Is the design a pictorial, graphic, or sculptural work?  (2) If the design is a pictorial, graphic, or sculptural work, then is it a design of a useful article—"an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information"?  *Id.*  If the design is not the design of a useful article, then there is no need to inquire into whether there are "pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the [useful] article."  17 U.S.C. § 101.

Before addressing separability, a court should ask:  (3) What are the utilitarian aspects of the useful article?  For example, the utilitarian aspect of a chair is to provide a place for a person to sit.  "Portray[ing] the appearance of the [useful] article" and "convey[ing] information" are two utilitarian aspects that courts may not use to determine whether pictorial, graphic, or sculptural features are separable.  17 U.S.C. § 101 (defining "useful article").  We believe that considering these two functions' "utilitarian aspects" in addition to an article's other utilitarian functions for the purpose of determining the separability of a graphic design would be at odds with the Copyright Act's definition of what makes an article a useful article.

Not only is this approach consistent with the text of the Copyright Act, it is consistent with the holdings of our sibling circuits.  In *Hart v. Dan Chase Taxidermy Supply Co.*, 86 F.3d 320, 323 (2d Cir. 1996), the defendant in a copyright-infringement suit argued that fish mannequins "act as a mount for [fish] skin," and therefore the sculptural features of the mannequins were not separable from the mannequin's display function.  The Second Circuit rejected that argument because "fish mannequins, even if considered 'useful articles,' are useful insofar as they 'portray the[ir] appearance.'"[10]  *Id.* (quoting 17 U.S.C. § 101); *see also Superior*

---

[10]*Hart* distinguished the *Barnhart* court's conclusion that "styrene human torsos used to display blouses and sweaters were not copyrightable" because they were "useful articles," *id.*  One key distinction was that, in *Barnhart*, "the parties had stipulated that the torsos were 'useful articles' that were designed 'to display clothes.'" *Id.* (citing *Barnhart*, 773 F.2d at 414, 418).  In addition, the torsos at issue in *Barnhart* "were little more than glorified coat-racks used to display clothing in stores," and thus the *Hart* court concluded that the torsos were distinguishable from fish mannequins, which depict "the shape, volume, and movement of the animal." *Id.*

*Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 494 (4th Cir. 1996) ("To the extent that an argument can be made that [animal] mannequins . . . perform a utilitarian function—other than portraying themselves—by supporting the mounted skins, we believe the function to be conceptually separable from the works' sculptural features."). And the Second Circuit recently "express[ed] skepticism" about the contention that masquerading is a useful function because masquerading involves "portray[ing] the appearance of something (like a lion, ladybug, or orangutan), and in so doing, . . . cause[s] the wearer to be associated with, or appear as, the item portrayed." *Chosun*, 413 F.3d at 329–30 n.3.

Once we have identified permissible utilitarian aspects, we ask the final two questions that have to do with separability. (4) Can the viewer of the design identify "pictorial, graphic, or sculptural features" "separately from . . . the utilitarian aspects of the [useful] article[?]" 17 U.S.C. § 101. If the viewer cannot identify pictorial, graphic, or sculptural features within the design of the useful article, then the design of the useful article is not copyrightable. (5) Can "the pictorial, graphic, or sculptural features" of the design of the useful article "exist[] independently of[] the utilitarian aspects of the [useful] article[?]" *Id.* The objectively necessary approach is useful to answer this final question. If the pictorial, graphic, or sculptural features of the design of the useful article are "not required by [the useful article's] utilitarian functions" or are "wholly unnecessary to performance of the utilitarian function" of the useful article, then the pictorial, graphic, or sculptural features are not dictated by the function of the useful article, and therefore can exist without the useful article. *Carol Barnhart*, 773 F.2d at 419. The design-process approach may also help courts determine whether a design feature is necessary to the utilitarian aspects of the article because the designer's testimony may offer clues as to which components of the design are essential to the functionality of the useful article. *See Pivot Point*, 372 F.3d at 931–32 (employing the design-process approach to determine whether the design of a head mannequin is conceptually separable from the mannequin's utilitarian aspects). But we do not endorse the design-process approach in its entirety. Finally, the Copyright Office has provided a helpful way to think about answering questions four and five: the pictorial, graphic, and sculptural features incorporated into the design of a useful article are conceptually separable if "the artistic feature [of the design] and the useful article could both exist side by side and be perceived as fully realized, separate works—one an artistic work and the other a useful article."

COMPENDIUM III § 924.2(B). If the viewer of a design can imagine the pictorial, graphic, or sculptural features of the design of a useful article as an artistic work, then those features are separately identifiable and can exist independently.

We do not endorse looking at why the designer chose the ultimate design as the final expression of the result she was trying to achieve to the exclusion of other evidence. Nor do we adopt the likelihood-of-marketability test because it privileges a judge's personal taste[11] in popular art, is often based entirely on conjecture, and is often undermined by the simple fact that the defendant in a copyright action has copied the work at issue. *Carol Barnhart*, 773 F.3d at 422 (Newman, J., dissenting); NIMMER, *supra* § 2.08[B] at 2–96.3; *Home Legend, LLC v. Mannington Mills, Inc.*, 784 F.3d 1404, 1412 (11th Cir. 2015) (holding that the district court's conclusion that the plaintiff's design was not marketable "was based not on evidence but on conjecture" and that evidence that the defendant copied the plaintiff's design was evidence that the design had "some value; otherwise [the defendant] would not have copied it."). We also may not consider "the intention of the author as to the use of the work" in determining whether a pictorial work is registrable. 37 C.F.R. § 202.10(a).

With this background in mind, we now turn to address whether Varsity's designs "incorporate[] pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the [useful] article." 17 U.S.C. § 101.

## C. Varsity's Designs

Question One: We begin our analysis by first identifying whether Varsity's designs are "pictorial, graphic, or sculptural works." 17 U.S.C. § 101. Varsity's designs, for which they

---

[11]Justice Holmes cautioned judges against injecting their personal taste into copyright law:

It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits. At the one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke. It may be more than doubted, for instance, whether the etchings of Goya or the paintings of Manet would have been sure of protection when seen for the first time. At the other end, copyright would be denied to pictures which appealed to a public less educated than the judge.

*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251–52 (1903).

received copyright registration, are "two-dimensional works of . . . graphic . . . art." *Id.*; *see also, e.g.*, R. 1-15 at 2 (Compl. Ex. 15) (Page ID #48) (Varsity's certificate of registration for design 078 for "2-Dimensional artwork"); R. 1-16 at 2 (Compl. Ex. 16) (Page ID #51) (design 0815 registered for "2-Dimensional artwork").

Question Two:  Are Varsity's designs "design[s] of . . . useful article[s?]"  17 U.S.C. § 101.   Varsity's designs are sketches that depict cheerleading crop tops and skirts—the components of a cheerleading uniform.  *See* R. 1-15 at 2 (Compl. Ex. 15) (Page ID #48); R. 1-16 at 2–3 (Compl. Ex. 16) (Page ID #51–52); R. 1-17 at 2 (Compl. Ex. 17) (Page ID #54); R. 1-18 at 2 (Compl. Ex. 18) (Page ID #57); R. 51-1 at 2 (1st Am. Compl. Ex. 9) (Page ID #536).  In other words, they are designs of cheerleading uniforms and sportswear, which have an "intrinsic utilitarian function that is not merely to portray the appearance of [clothing] or to convey information."  17 U.S.C. § 101.

Question Three:   What are the "utilitarian aspects" of cheerleading uniforms? Cheerleading uniforms have "an intrinsic utilitarian function," namely to "cover the body, wick away moisture, and withstand the rigors of athletic movements."  Appellant Br. at 57.  Star contends that cheerleading uniforms identify the wearer as a cheerleader and a member of a cheerleading team.  *See* Appellee Br. at 32, 39, 51–52.  But this is no different than saying that a utilitarian aspect of a cheerleading uniform is to convey to others the fact that the wearer of the uniform is a cheerleader for a particular team.  *See* 17 U.S.C. § 101 ("A 'useful article' is an article having an intrinsic utilitarian function that is not merely to . . . convey information.").  And therefore Star's purported utilitarian aspect of a cheerleading uniform is an impermissible factor.  *See supra* Section II.B.2.

It also appears that Star makes one final argument as to why Varsity's graphic designs cannot "be identified separately from, and are [in]capable of existing independently of, the utilitarian aspects of the article":  the designs' "decorative function" is one of the "utilitarian aspects" of a cheerleader uniform.  *See* Appellee Br. at 51–52 (citing *Jovani*, 500 F. App'x at 45).  In *Jovani*, the Second Circuit wrote, "[C]lothing, in addition to covering the body, serves a 'decorative function,' so that the decorative elements of clothing are generally 'intrinsic' to the

overall function, rather than separable from it." *Jovani*, 500 F. App'x at 45 (citing *Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F. 2d 452, 455 (2d Cir. 1989)).

To the extent that Star contends that pictorial, graphic, or sculptural features are inextricably intertwined with the utilitarian aspects of a cheerleading uniform because they serve a decorative function, *see* Appellee Br. at 51–52, we reject that argument. Such a holding would render nearly all artwork unprotectable. Under this theory of functionality, Mondrian's painting would be unprotectable because the painting decorates the room in which it hangs. But paintings are copyrightable. *Gay Toys*, 703 F.2d at 973 ("But the statute clearly intends to extend copyright protection to paintings."). It would also render the designs on laminate flooring unprotectable because the flooring would be otherwise unattractive. But the Copyright Act protects flooring designs that "hid[e] wear or other imperfections in the product." *Home Legend*, 784 F.3d at 1412. And statuettes adorning the base of a lamp would not be copyrightable under this theory because they serve the function of decorating an otherwise boring lamp base. But they are copyrightable under certain circumstances. *Mazer*, 347 U.S. at 214.[12] Finally, holding that the decorative function is a "utilitarian aspect[] of [an] article," 17 U.S.C. § 101, would make all fabric designs, which serve no other function than to make a garment more attractive, ineligible for copyright protection. But it is well-established that fabric designs are eligible for copyright protection. *Accord Folio Impressions*, 837 F.2d at 763. We therefore conclude that a pictorial, graphic, or sculptural work's "decorative function" does not render it unable to "be identified separately from," or "[in]capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. § 101.

Question Four: Can we identify pictorial, graphic, or sculptural features seaparately from the parts of the cheerleading-uniform design, which cover the body, permit free movement, and wick moisture? We can identify graphic features of Varsity's designs—the arrangement of stripes, chevrons, zigzags, and color-blocking. The district court concluded that these graphic features are not separately identifiable from a cheerleading uniform because a cheerleading

---

[12]*Mazer v. Stein* involved an interpretation of the Copyright Act of 1909. When Congress amended the Copyright Act in 1976 "add[ing] language to the definition of 'pictorial, graphic, and sculptural works' in an effort to make clearer the distinction between works of applied art protectable under the bill, and industrial designs not subject to copyright protection," it expressly relied upon *Mazer* to draft the amendment. H.R. REP. NO. 94-1476, at 54–55.

uniform "without team colors stripes, chevrons, and similar designs typically associated with sports in general, and cheerleading in particular, is not recognizable as a cheerleading uniform." R. 199 at 15 (D. Ct. Op. & Order) (Page ID #4309). We disagree. First, Varsity's graphic designs do not "enhance the [cheerleading uniform's] functionality *qua* clothing." *Chosun*, 413 F.3d at 330. A plain white cheerleading top and plain white skirt still cover the body and permit the wearer to cheer, jump, kick, and flip. *See* R. 173-1 at 18 (Spencer Decl. Ex. C) (Page ID #2426–27) (photos of plain white cheerleader uniforms). The top and skirt are still easily identified as cheerleading uniforms without any stripes, chevrons, zigzags, or color-blocking. *See id.* Moreover, the record establishes that not all cheerleading uniforms must look alike to be cheerleading uniforms. The five Varsity designs are examples of how a cheerleading uniform still looks like a cheerleading uniform no matter how different the arrangement of the stripes, chevrons, colorblocks, and zigzags appear on the surface of the uniform. All of Varsity's graphic designs are interchangeable. Varsity's customers choose among the designs in the catalog, including the five designs at issue, select one of the designs, and then customize the color scheme. R. 173-3 at 3–4 (Williams Dep. at 22–23) (Page ID #2449–50). The interchangeability of Varsity's designs is evidence that customers can identify differences between the graphic features of each design, and thus a graphic design and a blank cheerleading uniform can appear "side by side"—one as a graphic design, and one as a cheerleading uniform. Compendium III § 924.2(B). We therefore conclude that each of these graphic design concepts can be identified separately from the utilitarian aspects of the cheerleading uniform.

Question Five: Can the arrangement of stripes, chevrons, color blocks, and zigzags "exist[] independently of" the utilitarian aspects of a cheerleading uniform? We believe they can. Varsity's designers sketch their designs and select, place, and arrange various graphic elements, "such as stripes, lines, chevrons, inverted chevrons, angles, curves, coloring, and shapes." R. 173-2 at 3 (Williams Decl. ¶ 4) (Page ID #2438). Varsity's production department either applies these graphic designs onto cheerleading uniforms or recreates the designs by sewing panels of fabric together. R. 173-1 at 3 (Spencer Decl. ¶ 5) (Page ID #2411). Varsity's designs "may be incorporated onto the surface of a number of different types of garments, including cheerleading uniforms, practice wear, t-shirts, warm-ups, and jackets, among other things." R. 173-2 at 2 (Williams Decl. ¶ 3) (Page ID #2437). This evidence establishes that the

designs are transferrable to articles other than the traditional cheerleading uniform (crop top and skirt).  *See* R. 173-1 at 21–27 (Spencer Decl. Ex. D) (Page ID #2429–35) (photos showing Varsity's designs sublimated onto fabric and showing uniforms with sublimated designs).  In addition, the interchangeability of Varsity's various designs is evidence that the graphic design on the surface of the uniform does not affect whether the uniform still functions as a cheerleading uniform.  Indeed, "nothing (save perhaps good taste) prevents" Varsity from printing or painting its designs, framing them, and hanging the resulting prints on the wall as art. *Home Legend*, 784 F.3d at 1413.  We therefore conclude the arrangement of stripes, chevrons, color blocks, and zigzags are "wholly unnecessary to the performance of" the garment's ability to cover the body, permit free movement, and wick moisture.  *Carol Barnhart*, 773 F.2d at 419.

Because we conclude that the graphic features of Varsity's designs "can be identified separately from, and are capable of existing independently of, the utilitarian aspects of [cheerleading uniforms]," we hold that Varsity's graphic designs are copyrightable subject matter.  17 U.S.C. § 101.  This conclusion is faithful to the statutory text of the Copyright Act and consistent with other courts' treatment of the protectability of clothing and the pictorial and graphic features that appear on clothing under the Copyright Act.  Courts have drawn a line between "fabric design" and "dress design."  "Fabric designs" are "design[s] imprinted on a fabric, such as a rose petal, which in a completed dress may appear repeatedly throughout the dress fabric, or may appear but once on a given dress."  1 NIMMER ON COPYRIGHT § 2.08[H][1]. Take the work of Piet Mondrian, for example.  Mondrian's artwork or design is separable as a work of art because not only is it possible to recreate the design on t-shirts, grocery bags, cellphone cases, or notebooks, but also it actually has been done:  Yves St. Laurent used Mondrian's famous color-blocking and thick, black stripes to create cocktail dresses known as the "Mondrian look."  *See N. Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1032 (9th Cir. 1992) (holding that a jury should determine whether the presumption of a valid copyright for a design of the front of pullover tops based on Mondrian designs was rebutted by claimed lack of originality).  Mondrian's arrangement of color blocks and use of stripes are pictorial and graphic features "that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of" Yves St. Laurent's dress.

In contrast, it is impossible either physically or conceptually to separate a "dress design," which "graphically sets forth the shape, style, cut, and dimensions for converting fabric into a finished dress or other clothing garment," from the utilitarian aspects of clothing, i.e., to cover, protect, and warm the body. 1 NIMMER ON COPYRIGHT § 2.08[H][1]. The shapes of the neckline (v-neck, square-neck, crew-neck), sleeves (short, long, puffy), skirt shape (a-line, pencil, midi, maxi), trouser cut (pleated, plain-front, cuffed), or pockets (patch, welt, jetted)—these are the components of a design that are inextricably connected with the utilitarian aspects of clothing: pockets store pencils or pens; pants and skirts cover the legs; shirts cover the torso modestly or less modestly depending on the neckline. The designs of these components of an article of clothing "can[not] be identified separately from, [or be] capable of existing independently of, the utilitarian aspects of the article [of clothing]." 17 U.S.C. § 101.

The Copyright Act protects fabric designs, but not dress designs. *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995); *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 763 (2d Cir. 1991). A designer may obtain valid copyrights for "a multicolored striped sweater with puffy leaf appliques" and a cardigan, "which has a squirrel and leaves appliqued onto its multipaneled front." *Knitwaves*, 71 F.3d at 999, appx. The sweater has a utilitarian function—to provide warm cover for the torso and arms—and the sweaters still perform that function without the leaf or squirrel designs. Similarly, the design of a rose and "the placement of that rose repeated in horizontal rows against an ornate background" on fabric receive copyright protection. *Folio Impressions*, 937 F.2d at 761, 763, 765. But the creative arrangement of sequins, beads, ribbon, and tulle, which form the bust, waistband of a dress, do not qualify for copyright protection because each of these elements (bust, waistband, and skirt) all serve to clothe the body. *Jovani*, 808 F. Supp. 2d at 550; R. 172-5 at 2 (Photos of Fiesta's and Jovani's designs) (Page ID #2383). And a collection of uniforms, which includes chef hats shaped like vegetables, tuxedo jackets with a "distinctive shawl collar styling with a deep V neckline," and semi-fitted jackets with princess seams and star buttons, does not receive copyright protection. *See Galiano*, 416 F.3d at 415 & n.3, 422.[13] Creative and arguably

---

[13]The Fifth Circuit used the likelihood-of-marketability approach to hold that these uniform designs were not eligible for copyright protection. *See Galiano*, 416 F.3d at 421–22. We do not believe the outcome of that case would be any different under our approach, however, because the aesthetic features of these uniforms could not "be

attractive as these articles may be, they are merely inventive designs used to cover the wearer's body and hair.  Thus, the design of these hats and jackets (useful articles) "can[not] be identified separately from," and are not "capable of existing independently of, the utilitarian aspects of" a hat or a jacket.  17 U.S.C. § 101.

Because we believe that the graphic features of Varsity's cheerleading-uniform designs are more like fabric design than dress design, we hold that they are protectable subject matter under the Copyright Act.  We therefore enter summary judgment for Varsity solely on the issue of the protectability of Varsity's designs as pictorial, graphic, or sculptural works.  Because we conclude that Varsity is entitled to judgment on the issue of whether its designs are "pictorial, graphic, or sculptural works" and not uncopyrightble "useful articles," there is no need to address whether expert testimony would be proper in this case to determine the copyrightability of a design, as Varsity requests.  We express no opinion about whether Varsity's designs are ineligible for copyright protection because they lack originality or any other reason.  The district court did not address Star's contention that Varsity's designs are unoriginal, *see* R. 176-2 at 13–14 (Def.'s Combined Mem. of Law in Opp'n to Pls.' Mot. for Summ. J. and Reply in Supp. of Its Mot. for Summ. J.) (Page ID #3287–88), and therefore we leave that issue for the district court to address in the first instance.

### III.  DISMISSAL OF THE STATE-LAW CLAIMS

The district court dismissed all of Varsity's state-law claims after finding a federal question lacking.  R. 199 at 17 (D. Ct. Op. & Order) (Page ID #4311).  District courts may decline to exercise supplemental jurisdiction over state-law claims if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c) (2012).  Section 1367(c) does not obligate district courts to dismiss state-law claims after dismissal of all federal claims, nor does it require that they retain jurisdiction either except in a few circumstances.  *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996).  We review for an abuse of discretion the district court's decision to dismiss state-law claims after the dismissal of federal claims.  *Id.* at 1254.  Varsity contends that the district court

---

identified separately from," nor were they "capable of existing independently of, the utilitarian aspects of" the uniform pieces.  17 U.S.C. § 101.

erred by exercising this discretion to dismiss because it still had original jurisdiction under 28 U.S.C. § 1332 (2012).

We now vacate the district court's judgment dismissing Varsity's state-law claims for two reasons. First, because we hold that Varsity's designs are copyrightable graphic works, a federal claim remains. Second, Varsity should have the opportunity to amend its complaint to satisfy the requirements of diversity jurisdiction.

Star denies that Varsity sufficiently pleaded diversity jurisdiction because the complaint does not allege an amount in controversy or that the parties are diverse. Appellee Br. at 70. The party invoking federal jurisdiction—in this case, Varsity—bears the burden of proof that the federal courts have jurisdiction. *Cleveland Hous. Renewal Project v. Deutsche Bank Trust Co.*, 621 F.3d 554, 559 (6th Cir. 2010). Section 1332 vests federal courts with original jurisdiction "of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . ." 28 U.S.C. § 1332(a)(1). A corporation is a "citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business." *Id.* § 1332(c)(1). The three plaintiff corporations in this suit are incorporated in Delaware, Tennessee, and Minnesota, but all three identify Tennessee as their principal place of business. R. 1 at 1–2 (Compl. ¶¶ 2–4) (Page ID #1–2).

We assess the citizenship of limited liability corporations ("LLC") differently, however: an LLC "has the citizenship of each of its members." *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009). Varsity has not alleged the citizenship of Star's members in its complaint or first amended complaint. *See* R. 1 at 1–16 (Compl.) (Page ID #1–16); R. 51 at 1–2 (1st Am. Compl.) (Page ID #532–33). Because Varsity's complaint is currently insufficient to establish diversity jurisdiction under 28 U.S.C. § 1332(a), the proper course is to permit Varsity to seek leave to amend the complaint pursuant to Federal Rule of Civil Procedure 15(a)(2) to attempt to establish that all members of Star do not share citizenship with the three plaintiff corporations. *See Kelly v. Ky. Oak Mining Co.*, 491 F.2d 318, 320 (6th Cir. 1974) (holding that plaintiffs should be permitted to amend their complaint in order to cure a defective

allegation of diversity jurisdiction).  We leave it to the district court to decide in the first instance whether the sum or value of this case exceeds $75,000 as required by 28 U.S.C. § 1332(a)(1).

## IV.  CONCLUSION

Because the district court erroneously concluded that Varsity's designs were not copyrightable, we **VACATE** the judgment in favor of Star and enter partial judgment for Varsity on the sole issue of whether Varsity's designs are copyrightable pictorial, graphic, or sculptural works.  We also **VACATE** the order dismissing Varsity's state-law claims.  We **REMAND** the case to the district court for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

McKEAGUE, Circuit Judge, dissenting.  The majority presents a thoughtful approach to this difficult "metaphysical quandary" that courts have wrestled with for years.  *See Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 434 (4th Cir. 2010).  I agree with the majority's general approach.  We first define the work's function and then ask whether the claimed elements can be identified separately from, or exist independently of, that function.  I depart with the majority's analysis, however, in how the function of these designs is defined.  I would hold that there is no conceptual separability and that Varsity's designs are not copyrightable.  I therefore dissent.

*Function.*  The majority explains that the function of a cheerleading uniform is to wick away moisture and "permit the wearer to cheer, jump, kick, and flip."  That broad definition could be used to describe all athletic gear.  But the particular athletic uniforms before us serve to identify the wearer as a cheerleader.  Without stripes, braids, and chevrons, we are left with a blank white pleated skirt and crop top.  As the district court recognized, the reasonable observer would not associate this blank outfit with cheerleading.  This may be appropriate attire for a match at the All England Lawn Tennis Club, but not for a member of a cheerleading squad.

A narrower approach to "function" finds support in other circuits' caselaw.  In *Jovani Fashion, Ltd. v. Fiesta Fashions*, 500 F. App'x 42, 44 (2d Cir. 2012), the Second Circuit concluded that the function of a prom dress was to clothe the body "in an attractive way for a special occasion" because this "clothing, in addition to covering the body, serves a 'decorative function.'"  *Id.* at 45 (citing *Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 455 (2d. Cir. 1989)).  Why?  Because "the decorative elements of clothing are generally 'intrinsic' to the overall function, rather than separable from it."  *Id.*  Similarly, the Fifth Circuit in *Galiano v. Harrah's Operating Co.*, 416 F.3d 411 (5th Cir. 2005), explained that a casino uniform's function is just that: to serve as a "casino uniform[]."  *Id.*  Clothing provides many functions, but a uniform at its core identifies its wearer as a member of a group.  It follows that the stripes, braids, and chevrons on a cheerleading uniform are integral to its identifying function.

The majority rejects this categorization because this holding would purportedly "render nearly all artwork unprotectable." That's not true. It renders unprotectable only artwork that is integral to an item's utilitarian function. In defining that function, we are confined by caselaw and by common sense. Take a dresser, for example. The function of a dresser is to store clothes and other articles. Any ornamental designs displayed on the surface of a dresser are not integral to that function. *Cf. Universal Furniture*, 618 F.3d at 434. Those ornamental designs would therefore be copyrightable. *Id.* In contrast, a painting is not subject to the separability analysis because it does not qualify as a "useful article" under 17 U.S.C. § 101.

*Separability.* Once function is properly defined, it logically follows: the placement of the stripes, braids, and chevrons is not separable from that function. In *Jovani Fashion*, in relation to a prom dress, the court excluded from copyright "the arrangement of decorative sequins and crystals on the dress bodice; horizontal satin ruching on the dress waist; and layers of tulle on the skirt." 500 F. App'x at 44. Here, as in that case, there is no evidence that Varsity's designers "exercise[d] artistic judgment 'independently of functional influences,' rather than as a 'merger of aesthetic and functional considerations.'" *Id.* (quoting *Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1145 (2d Cir. 1987)). In both cases, the designers' aesthetic considerations merged with functional concerns: "to cover the body in an attractive way for a special occasion," *id.*, and to identify the wearer as a member of a particular cheerleading squad. Without the stripes, braids, and chevrons, a blank shell of a cheerleading uniform would lose an important dimension of its functional utility.

These designs are unlike other items that are copyrightable. Take the belt buckles in *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 993 (2d Cir. 1980). The court in that case concluded that while belt buckles are utilitarian objects designed to hold pants in place, the claimed designs were "conceptually separable sculptural elements." *Id.* Here, unlike *Kieselstein-Cord*, Varsity's designs would lose their ability to identify the wearer as a cheerleader without these aesthetic elements. Rather than simply "giv[ing the pieces] a pretty face," *Universal Furniture*, 618 F.3d at 434 (discussing *Pivot Point Int'l, Inc. v. Charlene Products, Inc.*, 372 F.3d 913, 916 (7th Cir. 2004)), Varsity's designs enhance the garment's utility. The claimed artistic choices thus cannot be separated from that function.

The majority notes that the Copyright Office's registration for Varsity's two-dimensional sketches is entitled to *Skidmore* deference.  *See Hi-Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1095 (6th Cir. 1995).  Fair enough, but "under *Skidmore*, we follow an agency's rule only to the extent it is *persuasive*." *Gonzales v. Oregon*, 546 U.S. 243, 269 (2006) (emphasis added).  And this determination is not at all persuasive.  It is not supported by the Copyright Act's "text and design." *Id.*  Nor is it "consistent with the congressional purpose." *Morton v. Ruiz*, 415 U.S. 199, 237 (1974); *see also S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Human Servs.*, 732 F.3d 670, 685 (6th Cir. 2013).  The Copyright Office's determination, therefore, does not change my conclusion.

The fact that Varsity's artistic choices may have been "'aesthetically satisfying and valuable'" likewise does not change this conclusion.  *See Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 418 (2d Cir. 1985) (quoting H.R. REP. NO. 94-1476 at 55 (1976)).  Rather, a more particularized assessment of function accounts for the inherent tension created by protection of clothing design in the Intellectual Property arena.  In dicta, this Court has discussed questions implicated by extending copyright protection to articles with utilitarian value, like clothing.  Recognizing copyright protection for items with utilitarian function "would allow for the protection of patent-like features without having to fulfill the rigorous standards for obtaining a design patent." *See Winfield Collection, Ltd. v. Gemmy Indus., Corp.*, 147 F. App'x 547, 550–52 (6th Cir. 2005) (citations omitted).

Ultimately, this case turns on how function is defined.  How broadly should courts define the function of an article of clothing?  Should they define it at its most basic function, to cover the body?  Should they define it broadly, as the majority does in this case, as wicking away moisture and "permit[ting] the wearer to cheer, jump, kick, and flip"?  Or should they define it more particularly, in relation to its specific purpose—as identifying the wearer as a cheerleader? *See Jovani Fashion*, 500 F. App'x at 44 (concluding that the function of a prom dress is "to cover the body in an attractive way for a special occasion").  For the above reasons I submit the more particularized assessment is more sensible and consonant with the purposes of the law.

* * *

It is apparent that either Congress or the Supreme Court (or both) must clarify copyright law with respect to garment design. The law in this area is a mess—and it has been for a long time. *See Fashion Originators Guild of Am. v. Fed. Trade Comm'n*, 114 F.2d 80, 81 (2d Cir. 1940) (Hand, J.). The majority takes a stab at sorting it out, and so do I. But until we get much-needed clarification, courts will continue to struggle and the business world will continue to be handicapped by the uncertainty of the law.

I respectfully dissent.